HOGAN LOVELLS US LLP
Michael M. Maddigan (Bar No. 163450)
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com

Jennifer Fleury (*pro hac vice forthcoming*)
Justin W. Bernick (*pro hac vice forthcoming*)
Anna Kurian Shaw (*pro hac vice forthcoming*)
Lauren B. Cury (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jennifer.fleury@hoganlovells.com
justin.bernick@hoganlovells.com
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com

*Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Celonis SE and Celonis, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>SAP SE and SAP America, Inc.<br><br>Defendants. | **COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## REDACTED PUBLIC VERSION

HOGAN
LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

Plaintiffs Celonis SE and Celonis, Inc. (collectively, "Celonis") complain and allege as follows against Defendants SAP SE and SAP America, Inc. (collectively, "SAP"):

**Nature of Action**

1.      This case is about SAP's campaign of anticompetitive conduct designed to exclude third-party application and technology providers from its dominant ecosystem, including its acts of tortious interference and false advertising in furtherance of that campaign, in contravention of the promises SAP has made to the market and regulators. For example, SAP has been using its control over its Enterprise Resource Planning ("ERP") ecosystem to exclude process mining competitors and third parties that rely upon access to that ecosystem. SAP has done so not through a superior competitive offering, but through naked exclusion of rivals by making it de facto impossible for customers to work with non-SAP process mining solutions, a reversal of SAP's prior policies. SAP is leveraging its control over its ERP ecosystem and the impending forced migration of customers to SAP's S/4HANA cloud-based ERP solution to prevent SAP customers from sharing their own data with third-party providers, including Celonis, without paying prohibitively expensive fees.

2.      SAP has deliberately sought to exploit its market power over its large, entrenched ERP customer installed base by imposing new policies and restrictions in an attempt to destroy Celonis' business and thereby harm SAP's ERP customers. Given the extremely high costs of switching ERP providers, SAP's ERP customers are effectively locked into the restrictions SAP imposes on how those customers may use their own data on their ERP system. SAP is now attempting to use those restrictions on data access to prevent Celonis from competing with SAP's own process mining company, Signavio.

3.      Celonis began its business relying on SAP's open ecosystem. Celonis joined SAP's Startup Focus program in 2012, during a time when SAP was actively encouraging the development of innovative new applications that were built to work with SAP's ERP technology. Celonis incurred significant costs developing its process mining software to extract data specifically from its customers' SAP ERP system, to integrate that data with other tools, and to

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

provide fact-based, real-time insights to allow businesses to audit, analyze, and improve existing processes. Recognizing the value of Celonis' offering for both SAP and its customers, SAP and Celonis had a mutually beneficial contractual relationship for the next nine years.

4.    When SAP acquired Signavio in 2021, there was concern that SAP would change its policies or begin self-preferencing its own integrated Signavio process mining solution, to the detriment of competitors and consumers. Antitrust regulators relied on SAP's explicit assurances that its ecosystem would remain open and competitive in approving SAP's acquisition of Signavio, specifically SAP's representation that it would not self-preference its own product by charging fees for data access by third parties, such as Celonis.

5.    SAP has broken those promises. SAP is using its control of its ERP ecosystem to try to achieve what it could not through competition on the merits—widespread adoption of its Signavio offering. SAP has engaged in increasingly egregious conduct targeting Celonis' customers to coerce them into using Signavio by, among other things: (1) threatening customers with punitively high fees and costs if they choose to work with a third party for data extraction; (2) simultaneously offering its inferior process mining product, Signavio, at an extremely low cost or even for free, at least for a trial phase; and (3) making false and misleading statements to customers about the risks of using non-SAP solutions like Celonis and about the future capabilities of Signavio. Despite Signavio's demonstrably inferior product offering, there is early evidence that SAP's anticompetitive strategy is working. Without the ability to extract data from a customer's SAP ERP system, ███████████████████████████████████████, depriving SAP customers of the benefit of cutting-edge innovative process mining solutions.

6.    SAP's anticompetitive scheme has caused, and will cause, irreparable and ongoing harm to Celonis in the form ███████████████████████████████ ███████████████████████. If SAP is permitted to continue its conduct unabated, ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████ Celonis seeks (i) an injunction prohibiting SAP's illegal conduct, (ii) monetary

- 3 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

1 damages, and (iii) all other legal and equitable relief available under law and which the court
2 may deem proper.

3 **Parties**

4 7. Plaintiff Celonis SE is based in Germany with its principal place of business
5 located at Theresienstr. 6, Munich, Germany 80333.

6 8. Plaintiff Celonis, Inc., a wholly-owned US entity of Celonis SE, is a Delaware
7 corporation, and maintains offices across the United States, including Northern California, with
8 its principal US office located at One World Trade Center, 70th Floor, New York, NY 10007.

9 9. Celonis SE and Celonis, Inc. (collectively, "Celonis") are premier providers of
10 process mining software that extracts data from customer systems such as SAP's ERP
11 applications, integrates that data with other tools, and provides fact-based, real-time insights to
12 allow businesses to audit, analyze, and improve existing processes.

13 10. Defendant SAP SE is a German company. Its principal place of business is
14 located at Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190.

15 11. Defendant SAP America, Inc. ("SAP America"), a wholly-owned subsidiary of
16 SAP SE, is a Delaware corporation. Its principal place of business is 3999 West Chester Pike,
17 Newtown Square, PA 19073, and it also has a place of business located at 2700 Camino Ramon,
18 Suite 400, San Ramon, CA 94583.

19 12. SAP SE and SAP America (collectively, "SAP") are software companies that
20 provide ERP applications and additional specialized solutions like process mining. SAP America
21 is responsible for sales, marketing, distribution, technical support, and customer service related
22 to SAP ERP applications occurring in the United States, including throughout this District. SAP
23 SE and SAP America have repeatedly committed overt acts in furtherance of the torts of
24 intentional interference with contractual relations and intentional interference with prospective
25 economic relations; false advertising under the Lanham Act and Sections 17500 *et seq.* of the
26 California Business and Professions Code; monopolization, attempted monopolization, unlawful
27 tying arrangements, unlawful bundling, and predatory pricing under Sections 1 and 2 of the

28

Sherman Act and Sections 16700 *et seq*. of the Cartwright Act; and unfair competition under Sections 17200 *et seq*. of the California Business and Professions Code. SAP have used their market power over its ERP ecosystem to self-preference their Signavio process mining software, and to condition their customer's continued use of its S/4HANA ERP product on moving away from Celonis to its Signavio software.

<u>**Jurisdiction and Venue**</u>

13.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This court has jurisdiction over the federal law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

14.     This action arises, in part, under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 to 16770. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and California law.

15.     This action arises in part under the Lanham Act of 1946, as amended, 15 U.S.C §§ 1051 *et seq*. This Court has jurisdiction over Celonis' claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1131 and 1338(a).

16.     This action arises in part under the California False Advertising Law, Cal. Bus. and Prof. Code § 17500 *et seq*.  This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support false advertising claims under both federal and California law.

17.     This action arises, in part, under California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support unfair competition, false advertising, and antitrust claims under both federal and California law.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

18.     This action arises, in part, under California common law.  This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367.

19.     This court has personal jurisdiction over SAP SE and SAP America because, on information and belief, among other acts, they: (1) purposefully have availed themselves of the rights and benefits of the laws of this State and Judicial District, (2) either directly or through intermediaries have conducted, transacted, or solicited business in the State of California and in this Judicial District, (3) maintain an office in the State of California and in this Judicial District such that they are continuously and systematically present in California, or (4) maintain registered agents for service of process in California.

20.     Venue is proper as to SAP SE in this Judicial District under 28 U.S.C. § 1391(c)(3) because SAP SE is not a resident of the United States and therefore may be sued in any judicial district.

21.     Venue is proper as to SAP America in this Judicial District under 28 U.S.C. § 1391 and 1400(b) based on information and belief that SAP America maintains at least one regular and established place of business in the District, located at 2700 Camino Ramon, Suite 400, San Ramon, CA 94583.

**General Allegations**

**a.  Celonis Pioneered Process Mining and is a World Leader in the Technology**

*i.  Introduction to Process Mining*

22.     Celonis, the first commercial process mining company, was founded in 2011 pursuant to a Process Mining Manifesto published by members of the Institute of Electrical and Electronics Engineers earlier in 2011.

23.     Process mining started out as an academic theory, but today it is a well-established business technology, used by thousands of organizations around the world, with hundreds more starting every day.

Hogan Lovells US LLP  Attorneys At Law  Los Angeles

24. Established processes allow tasks to be completed efficiently and consistently. Every step of a business process leaves a digital footprint in that business's transactional systems in the form of event log data.

25. Process mining software works by using this event log data to create a picture of the business's actual processes.

26. Process mining software uses the event log data to create a digital twin of the business's processes, helping the business visualize every move the business makes in real time. The digital twin shows the business its processes as they really are, allowing the business to uncover opportunities for value, and to identify and fix inefficiencies. Process mining software can apply to any process for each system within the business.

27. For example, process mining tools can streamline accounts payable operations and ensure that invoices are entered and paid only once, avoiding duplicate payments. These tools may also be used by accounts payable teams to more readily identify delinquent accounts, rank them by invoice value, and prioritize collections on accounts receivable. Similarly, process mining can increase the transparency of supply chain processes, so that businesses can prioritize material replenishment based on impact.

### ii. Importance of Process Mining

28. Process mining reveals how business processes actually run and can help businesses change those processes for the better. Making business processes run better has a proven positive impact on a business's performance.

29. Many businesses do not realize their processes are variable and the impact that variability has on the business's functioning. Moreover, many businesses do not have clarity into the processes running across programs, systems, and departments.

30. As a result, businesses do not know how their processes flow in reality as compared to how the processes were intended to flow. When processes do not flow as intended, the result can be lost value, low efficiency, unmet customer needs, and greater environmental and resource burdens.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

COMPLAINT

31.     Celonis' process mining technology solves this problem by acting as a connector among systems, programs, processes, and people, illuminating the inner workings of businesses so these elements can work together more effectively.

### iii.   Process Mining Functionality

32.     Process mining works by extracting a customer's data from event logs readily available in today's information systems (including ERPs, Customer Relationship Management ("CRM") tools, databases, applications, etc.) to visualize and analyze business processes—and all of their variations—as they run.

33.     Process mining and ERP applications both serve the needs of large-scale, complex customers, but process mining depends on an underlying ERP system in order to operate. While ERP systems present customers with a unified view of their business activity, process mining shows customers how the processes within that activity actually run, providing them with real-time insights for improving operational processes and orchestrating the daily business.

34.     ERP software is the "hub" or backbone on which many different mission critical day-to-day business processes are run, including HR, payroll, billing, accounting, etc. ERP is an essential software infrastructure on which many companies rely for the operation of their businesses.

35.     To perform process mining, businesses must extract their data from the ERP system to the process mining vendor. Convenient, direct, stable, and performant integration is essential to reap the benefits of process mining.

36.     ERP providers like SAP and Oracle, or CRM providers like Salesforce, historically allowed their customers to extract their own data from the ERP application for third-party vendors like Celonis without any fees or with generous extraction limits before any fees would be incurred.

37.     Celonis builds specialized solutions that add functionality to SAP's ERP ecosystem. ███████████ of Celonis' business is connected to customers that have SAP ERP systems and reflects the fact that SAP is the leading provider of ERP applications that many

companies, especially large-scale, complex companies, use in the running of their day-to-day business processes.

38.    Celonis' specialized solutions are specific to an ERP application—a configuration for one application cannot be redeployed to other ERP applications without reconfiguring or reengineering it at significant burden and cost.  For example, Celonis invested heavily in creating an extractor that was compatible with SAP's ERP applications and could locate and extract the data necessary for Celonis' processing mining software.

39.    Because process mining relies on a business's own data, in combination with other tools, the functionality of Celonis' software (and therefore the utility of that software to its SAP-based customers) is wholly dependent on access to customer data that sits within SAP's ERP application.

40.    SAP's conduct will similarly affect every third party company that relies upon access to customer data that sits within SAP's ERP application.

### iv.   Celonis' Process Mining Offerings

41.    Celonis launched the first process mining tool, Celonis 3.0, in 2013, followed by Celonis 4.0 in 2016, before moving process mining from on-premise to the cloud in 2018.

42.    Celonis now offers its process mining software through its Process Intelligence Platform and remains the leading provider of that type of software. Celonis' software is a type of middleware that acts as a bridge between the customer's data in existing systems and Celonis' platform, helping those customers automate and orchestrate systems, people, and other resources more effectively.

43.    Celonis' process mining technology offers objective, fact-based insights, derived from actual data, to help businesses audit, analyze, and improve their existing processes.

### v.   Process Mining Interchangeability

44.    Process mining is a specialized technology that analyzes event log data to identify trends, patterns, and details of how a process unfolds.

- 9 -

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

45.     As a result, process mining software is not readily interchangeable with earlier solutions, such as process mapping, or with other services, such as data mining software and automation software.

46.     Process mining is faster, cheaper, and more accurate than earlier solutions, such as process mapping. In process mapping, a group of individuals gather to visually map out a specific business process, step-by-step, by identifying all the activities, decision points, and potential bottlenecks involved. The result typically is a detailed process map, often in the form of a flowchart. However, these efforts can be lengthy and often are subjective.

47.     Robotic process automation software ("RPA") sometimes is leveraged with process mining. RPA enables automation within applications and interfaces that businesses already use, such as copying items from one system to another or verifying information between two systems. RPA does not help a business understand its processes, though it can be used to improve a process identified via process mining.

48.     Process mining also is sometimes confused with data mining. Data mining software is broad in scope and analyzes large volumes of data to find patterns, discover trends, and gain insights for future use. While process mining also looks for patterns and trends, it serves a distinct purpose—it analyzes data to optimize business processes.

49.     Thus, both providers and consumers of process mining view the technology as not interchangeable with and as distinct from process mapping, RPA, or data mining.

50.     Celonis offers additional functionality through an offering it calls process intelligence. Process intelligence is a solution that allows businesses to see how their people, applications, and data interact. Process intelligence rapidly provides contextualized insights to the user, allowing them to adapt accordingly. For example, a process intelligence solution may allow a user to ask the system a question, and the system will test hypotheses and change data selection. With process intelligence, users can also automate responses to certain process dynamics, such as sending emails or starting processes in other systems.

**b. General Background on Enterprise Resource Planning**

*i.   Introduction to ERP*

51.    Enterprise Resource Planning ("ERP") is a software application that helps organizations streamline their core business processes—including finance, HR, manufacturing, supply chain, sales, and procurement—with a unified view of business activity.

52.    ERP applications began in the early 1960s, when manufacturing companies adopted computerized business applications for production scheduling.

53.    By the 1990s, ERP had expanded to serve a broader range of business activities across multiple industries, such as HR, project accounting, and CRM needs across retailers, utilities, and service companies.

54.    Today's ERP applications increasingly use intelligent technologies, such as artificial intelligence ("AI"), machine learning ("ML"), natural language processing ("NLP"), and in-memory databases, helping businesses leverage insights from transactional and unstructured data.

*ii.   Importance of ERP*

55.    Most or all of an organization's core business data typically resides in the ERP application. For example:

a.  Finance utilizes ERP to close the books;

b.  Sales utilizes ERP to manage customer orders;

c.  Logistics utilizes ERP for organize deliveries;

d.  Procurement utilizes ERP to source goods and services and manage supplier relationships;

e.  Accounts payable utilizes ERP to pay suppliers;

f.  Management utilizes ERP for visibility into the company's performance; and

g.  Corporate governance utilizes ERP to provide banks and shareholders accurate financial records.

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

### iii.  ERP Functionality

56.    An ERP application consists of integrated module solutions or business applications that share a common database, which connects them and lets them talk to each other. Each ERP module typically focuses on one business area, but they can work together using the same data to meet the company's needs.

57.    Companies pick and choose the module solutions they want—such as financing, logistics, procurement, and HR—and can add and scale as needed. ERP applications can also support industry-specific requirements, either as part of the application's core functionality or through application extensions that integrate with the suite of modules.

58.    While modern ERP applications provide an enormous range of business functionality, they must connect to and synchronize with other applications and data sources to be effective, including CRM and Human Capital Management ("HCM") software, e-commerce platforms, industry-specific solutions, and even other ERP applications.

59.    This integration gives companies a unified view of information from different systems, which improves customer experiences and facilitates collaboration across teams and business partners.

60.    The flexibility of an ERP application allows it to integrate with a wide range of software products using connectors or customized adaptors, such as application programming interfaces ("API"). An API is a type of software interface that connects computers or computer programs and allows them to communicate.

61.    Indeed, on its own website, SAP identifies "integration" with other third-party software solutions and data sources as a "core feature" that all ERP applications should have.

### iv.  Lack of ERP Interchangeability

62.    ERP software is essential for many mission critical day-to-day business processes and is essential infrastructure. As a result, ERP applications are not interchangeable with other tools that companies use to simplify and improve their business processes, such as customer relationship management ("CRM") applications.

COMPLAINT

63.     A CRM system supports and connects front-office business functions, such as marketing sales, advertising, and customer service. ERP applications on the other hand, primarily support and connect back-office functions, such as finance, supply chain operations, and HR.

64.     Thus, both providers and consumers of ERP and CRM applications view each of the applications as serving their own distinct purpose.

**c.    SAP is the World's Largest Provider of ERP Applications**

*i.    SAP's ERP Offerings*

65.     SAP ERP made its first appearance in 1972 with SAP R/2, an early mainframe-based ERP software system.

66.     In the 1990s, SAP introduced SAP R/3, which operates locally in an on-premise environment only.

67.     SAP ECC ("Enterprise Central Component") is SAP's legacy business suite and the final progeny of the R/1, R/2, and R/3 solutions, being offered in an on-premise environment only. In 2014, SAP notified its customers that it was going to discontinue ECC, ceasing technical support by 2025. SAP subsequently extended its support of ECC until 2030.

68.     ECC customers thus will need to migrate to SAP's S/4HANA, which it launched in 2015.

69.     Today, SAP offers two main editions of the S/4HANA ERP application: SAP S/4HANA Cloud Public Edition and SAP S/4HANA Cloud Private Edition.

70.     SAP markets the S/4HANA as a solution for large and upper mid-size customers that have more complex organizational structures and industry requirements. S/4HANA combines the technologies and analytics best suited for large-scale, complex customers, which typically have high annual revenue, high data volume, and large staff (including many employees utilizing the ERP).

71.     For small and mid-size enterprises, SAP markets other ERP applications, such as SAP Business ByDesign, an "out-of-the-box" solution suited for less complex businesses.

72.     With respect to ERP applications sold to large-scale, complex customers, and on

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

information and belief, ███████████████████████████████████

73.    Oracle is the only other significant competitor for ERP applications sold to large-scale, complex customers, but industry research indicates that Oracle's share has historically been less than SAP's with respect to the number of installed ERP applications for that customer base.

74.    In addition to size, geography is another important factor in selecting an ERP application. While many ERP applications are accessible from any location with an internet connection, providers find that a strong, local footprint can assist in marketing and client retention. To that end, it is common for ERP providers to have strong ties to the businesses in their native countries or regions.

*ii. SAP's ERP Data Access*

75.    Historically, ERP applications had been "agnostic" to the customer's database platform.  However, that position has changed over time as providers have required that their ERP applications also run on their proprietary transactional databases.

76.    For example, in 2015 SAP changed its approach to require that S/4HANA run on a HANA database. SAP has admitted that HANA is the only existing database that supports the features of S/4HANA. Similarly, Oracle (SAP's main competitor for ERP applications) requires that Oracle ERP run on its transactional database.

77.    SAP's about-face and reversal of years of prior practice is notable even as compared to Oracle, because, upon information and belief, Oracle allows its ERP application customers to extract their data to non-Oracle analytical platforms with no performance degradation or other extraction limitations, whereas SAP has imposed such limitations.

78.    Specifically, SAP offers two types of licenses to its customers to access their data on SAP databases: "runtime" and "full use." A "runtime" license imposes restrictions on how data can be accessed from the HANA database. It prohibits customers from accessing their data directly from the HANA database and instead requires customers to access their data through an application layer. A "runtime" license also limits the ways in which a customer can combine

- 14 -

SAP and non-SAP data. A "full use" license removes restrictions on how SAP and non-SAP data can be combined.

79.    Upon information and belief, "runtime" and "full use" licenses are priced differently.  Upon information and belief, a "runtime" license is generally priced as a percentage of the price of the SAP application(s) that the HANA database supports, while the "full use" license is priced based on the size of the customer's database.

80.    Upon information and belief, a "full use" HANA license cannot be priced lower than a HANA "runtime" license for any customer, and SAP's policy is not to discount a "full use" license.

*iii.   SAP's Position in the ERP Applications Market*

81.    Since SAP's creation over 50 years ago, it has become the world's largest ERP application provider.

82.    As of February 2025, SAP reported the following statistics for its ERP business:

a.   Nearly $36 billion in total revenue from cloud and software;

b.   SAP customers generate 84% of total global commerce;

c.   98 of the 100 largest companies in the world are SAP customers;

d.   85 of the 100 largest companies in the world are SAP S/4HANA customers; and

e.   Approximately 80% of SAP's customers are small or medium sized enterprises.

83.    Celonis' own experience reflects SAP's strong position in the ERP Applications Market. ███████████ of Celonis' business is connected to customers with SAP ERP systems.

84.    SAP's conduct affects all third parties that require access or advertise compatibility with SAP's ERP application.  Given SAP's position in the ERP Applications Market, if SAP is successful in locking out every third party that relies on SAP ERP customers, that will have anticompetitive effects reaching far beyond the ████████████.

*iv.   SAP Customers are "Locked In" to SAP's ERP Ecosystem*

85.    SAP's strong position in the ERP Applications market is further entrenched by the fact that its customers are "locked in" and cannot switch ERP systems without incurring massive

- 15 -

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

burden and expense. "Lock-in" refers to a situation where an organization becomes dependent on a software vendor for its software and related services. Even if an organization later decides to switch its software, there might be restrictions that prevent, prohibit, or otherwise make that switch more difficult.

86.    Organizations struggle with vendor lock-in because of factors like project duration, database complexity, proprietary knowledge, and cost. Indeed, ERP implementations are very complex and may cost hundreds of millions of dollars.

87.    As a result of these complexities and challenges, changing ERP applications is viewed within the industry as complex, costly, disruptive, and risky. Companies rarely if ever change their ERP systems, with some customers referring to it as an "interspecies organ transplant." A significant portion of SAP's installed customer base has used SAP's ERP application for over two decades or more.

88.    Customers who choose SAP's ERP application are subject to this lock-in effect. A business which has opted to use and has invested in the SAP ERP software cannot realistically move away from the SAP ecosystem. Switching to another platform is extremely costly, time consuming, and highly disruptive.

89.    An enterprise's ERP application can constitute billions of dollars in spend and require years of planning and implementation for large-scale, complex companies. This investment stands in contrast to the hundreds of thousands to several million dollars (at the high end) that an enterprise might also pay for an additional application or service, like process mining software.

90.    An enterprise also has a long and continuing investment in its ERP application in the form of training, system integrity, breadth of use, and enterprise-wide integration.

a.    Businesses can spend days to weeks training their employees on ERP applications, and these trainings can reoccur at regular intervals to both introduce new skills and reinforce existing ones.

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

b.  Businesses also put significant resources into effective data governance to ensure the datasets and reports the ERP application utilizes are reliable.

c.  Businesses also use their ERP application across the breadth of their organizations, meaning the individual preferences of different departments must yield to the common needs of the overall entity.

d.  Businesses also value reputation and longevity when it comes to ERP applications. Since the switching costs are particularly high for ERP systems, ensuring that a new deployment will service the needs of the customer well into the future remains a vital consideration.

e.  Finally, SAP offers incentives for its customers to upgrade, keeping them within the SAP ecosystem.

91.  These barriers make migration to other ERP providers virtually impossible and this lock-in therefore reinforces SAP's position in the market for ERP applications.

92.  ██████████████████████████████████████████████████████ ████████████████████████████████████████ Indeed, Celonis is not aware of any major customer of SAP who has abandoned the SAP platform in order to switch to another platform.

93.  SAP itself recognizes its customers as an "established (locked in) installed base to sell new products and services to." The leverage that SAP enjoys as a result of this lock-in is further illustrated in the context of SAP ERP upgrades, which are expensive and complex, and threaten disruption.

94.  Yet most, if not all, customers ultimately have no other choice but to implement the upgrades—switching to another ERP application is simply not a realistic option. SAP has been able to pressure its customers by phasing out support for older versions of the SAP ERP, thereby increasing maintenance costs for customers unless they update.

    v.  *SAP's Forced Migration Illustrates this Lock-In*

95.  SAP's position in the market for ERP applications, and the extent to which its

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

users are locked into its ecosystem, is illustrated by SAP's impending forced migration from ECC to S/4HANA.

96.    In light of the SAP S/4HANA offerings, SAP is sunsetting ECC. Customers can expect maintenance and occasional updates of core applications through 2027, by which time they will need to have migrated to SAP S/4HANA. Because customers will require ongoing maintenance and support for business-critical SAP ERP applications, customers will effectively be required to transition to S/4HANA when SAP ends support for ECC.

97.    But the majority of SAP customers, including those that use Celonis, still use ECC. █████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████

98.    The migration process generally takes two years.

99.    The industry is concerned about this migration, as even moving simple technology—which an ERP application is not—from on-premise to cloud is complicated. Various industry sources are providing advice on the migration, highlighting customers' anxiety.

100.    In addition to the complexity, the migration also is expensive. Costs can range from $50 million or $100 million to up to $1 billion. █████████████████ ███████████████████████████████████████████ ███████████

101.    SAP's ECC to S/4HANA migration thus is causing its own customers to undertake great risks to their businesses, and to pay hundreds of millions of dollars to SAP over the next couple of years for the privilege. That SAP can force this on its customers without fear of losing market share to its competitors illustrates its position in—and the lock-in effect of—the ERP application market.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

1

    **d. SAP's Process Mining Software Struggles Despite Self-Preferencing**

2   102. Following its founding, Celonis joined SAP's Startup Focus Program in 2012.

3 The Startup Focus Program was an accelerator for analytics startups building new applications

4 on the SAP HANA platform, which, at the time, was open to third-party applications.

5   103. By 2016, Celonis was an SAP Solution Extension Partner in SAP's independent

6 software vendor ("ISV") program, and SAP resold Celonis on SAP contracts.

7   104. In fact, Celonis was a Level 1 preferred vendor and marketed as "SAP Process

8 Mining by Celonis."

9   105. After SAP purchased Signavio, a competitor of Celonis, in 2021, Celonis and

10 SAP's contractual relationship ended and the partnership between Celonis and SAP ceased.

11   106. SAP's hope was that customers would select its own process mining solution,

12 Signavio, instead of Celonis.

13   107. At the time of the acquisition, SAP represented to regulators that it would not

14 self-preference its own offerings, such as Signavio, and not charge fees for data access by third

15 parties. Specifically, SAP explicitly represented that "[p]rocess management software accesses

16 data in the ERP using only simple scanner access, which is an indirect use for which no fees are

17 applicable."

18   108. But Signavio struggled to gain significant acceptance amongst users, particularly

19 versus Celonis.

20   109. Celonis is a superior product to Signavio that is more frequently recommended by

21 customers.

22   110. Signavio has significant limitations versus Celonis, including stability, scalability,

23 limited data models, limited real-time data ETL capabilities, analysis errors, limited

24 filtering/selection components, limited workflow/automation capabilities, and poor integration

25 between the AI/ML capabilities and the process mining module.

26   111. Thus, SAP began to exploit its control over its installed base of customers,

27 particularly on its cloud-based platform. SAP began to use this control to restrict access to its

28

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

ERP application, particularly for highly innovative applications that enable SAP users to run business processes outside the SAP platform—business processes for which SAP had its own competitive, internal, native solutions.

112. Meanwhile, SAP linked Signavio directly with SAP's ERP, giving Signavio an access advantage over alternative products from third-party providers.

113. Finally, SAP offered numerous promotions for SAP ERP users, such as six months of free access or a one-time free of charge analysis. At one point, SAP even included two years of Signavio for free in certain of its bundled offerings, highlighting SAP's willingness to exclude rival process mining solutions like Celonis even if it meant selling Signavio to customers at prices below the cost of providing the service.

114. Moreover, SAP bundles Signavio with other specialized solutions as part of its RISE offering. Signavio is an "entitlement" within the bundle, rather than an "add-on," meaning customers who select RISE automatically gain access to Signavio. In other words, all customers with RISE gain access to Signavio regardless of pricing tier because Signavio is supplied as part of the "starter pack" for those customers.

115. SAP's below-cost pricing was further exacerbated by SAP's self-preferencing and discriminatory licensing requirements, which, as described above, dictate how data can be accessed from the HANA database. While SAP was offering Signavio below cost, its licensing requirements significantly *raised* the cost of using a third-party option like Celonis, particularly if SAP insisted that the third-party option necessitated a "full use" license as opposed to simply a "runtime" license. This was in direct contravention of SAP's prior statement to regulators that it would not charge fees for data access by third parties. Critically, SAP does not impose any additional license fees for Signavio to access SAP customer data.

**e.  SAP Had a Beneficial Prior Course of Dealing with Third-Party Providers, Including Celonis, Starting in 2012**

116. SAP had long operated on an open access policy to permit the development of third-party specialized solutions for its ERP applications, which have enriched and added functionalities to the SAP ecosystem.

- 20 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

117.   Indeed, SAP tested and qualified Celonis' integration, finding it met all of SAP's quality standards. Celonis on multiple occasions won the SAP HANA Innovation Award, which honors HANA-based solutions that make a decisive contribution to business value.

118.   In more recent times, however, innovative applications also have been developed that allow SAP users to perform certain functions for using their own data better and more efficiently outside the SAP ecosystem, including process mining and other business process management functions.

119.   As a result, SAP views some providers, particularly those that provide applications or services that compete with SAP's native offerings, as hindering SAP's profitability because the third-party products and applications increase the choices available to SAP users.

120.   This increased choice, while possibly diminishing the ancillary revenue of the SAP ecosystem, does not undermine it. Rather, the increased competition for additional services like process mining helps ensure the ecosystem will continue to remain a desirable software infrastructure for many businesses in the foreseeable future.

121.   But SAP's own internal documents show that it is not content controlling the software infrastructure and allowing its customers to decide which additional offerings are best situated for their purposes. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

122.   SAP could have reacted to such competitive pressure by innovating and improving its own products. Instead, to protect itself from the threat of competition, SAP has embarked upon an aggressive campaign to exclude third-party application and technology providers from its ecosystem through new charges and fees, arbitrary technical limitations, restrictive policy updates, and self-preferencing of its own solutions at the expense of rivals.

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

**f.   Following the Signavio Acquisition in 2021, SAP Customers Continued to Derive Value From Celonis' Offering Using SAP Compliant Technology**

123.    Since 2021, Celonis' customers have relied on what is known as the "indirect static read" exception in SAP's ERP Software Usage Rights to utilize their own data for Celonis' process mining software.

124.    In particular, the exception allows customers to utilize their own data and extract it to third-party non-SAP systems without a license, as long as all of the criteria listed below are met.

a.   The data was created by an individual licensed to use the SAP ERP system from which the information is being extracted;

b.   The action runs automatically on a scheduled basis; and

c.   The use of such extracted information by the non-SAP systems and/or their users does not result in any updates to and/or trigger any processing capabilities of the SAP ERP system.

125.    Specifically, Celonis customers have used Celonis' RFC ABAP extractor to extract their data from the ERP application, which meets the indirect static read exception requirements. The ABAP extractor extracts data reliably not only from SAP's ECC product, but also from SAP's S/4HANA offering.

126.    Celonis has been using the RFC ABAP extractor for years, including for any sales through its former partnership with SAP, without any issues. In fact, before SAP acquired Signavio, Celonis was marketed as SAP's favored process mining solution, with SAP deeming Celonis a "Level 1 Gold Integrator." As SAP's preferred process mining solution, Celonis served clients using SAP's ECC platforms and S/4HANA platforms without issue. But with the end of Celonis' contractual relationship with SAP, this preferred vendor status was revoked as well.

127.    Despite this history, SAP personnel have questioned, and are misinforming, SAP's own customers about the compliance of Celonis' ABAP extractor. Specifically, SAP personnel have falsely accused its customers and Celonis of using extractors based on "disallowed technology" or technology that purportedly triggers additional licensure

- 22 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

requirements and thus would necessitate customers to pay a prohibitive amount of money to access their own data.

128.    On numerous occasions from 2021 to the present, SAP has contacted its customers that are using Celonis and has accused those customers of violating the indirect static read exception, without any basis, before pressuring them to upgrade their "runtime" license to "full use," thus incurring substantial additional costs.

129.



130.    These licensing discussions are taking place well after the original purchase of the ERP application and do not constitute any change to the application; rather, the licenses simply constitute permission from SAP allowing the customer to perform certain actions that previously were prohibited.

131.    An example of the commercial material created by SAP and provided to Celonis' customers in some of these outreaches is pictured below at **Figure 1**, in which SAP falsely claims that "Celonis ABAP extractor is *not* compliant with runtime databases" while Signavio is:

[REDACTED]

132. [REDACTED]
[REDACTED]
[REDACTED]

133. SAP knew or should have known these statements were false, including at the time it made them. Indeed, SAP conceded in a letter dated February 5, 2024, following these statements, that it [REDACTED] and SAP represented that it would cease making such statements to customers.

134. Despite these representations, SAP continued to make false and misleading statements regarding Celonis' compatibility with SAP, including statements to Celonis customers concerning Celonis' alleged use of the ODP API and associated issues of compliance with SAP Note 3255746.

135. SAP is also now falsely claiming that use of Celonis will interfere with customers' migration to S/4HANA and that customers will be required to pay prohibitively high fees if they seek to continue to use Celonis' products.

136.    Instead of seeking to improve its offerings through innovation, SAP has thus responded to the competition from third-party providers by aggressively leveraging its market power. Specifically, SAP is using scare tactics and threatening customers with additional fees to access the customers' own data within their specific SAP environment, and falsely alleging that the migration of their ERP system from on-premises to cloud will be imperiled by allowing access to Celonis and other third party software tools. SAP is engaging in this conduct in an effort to build a defensive wall that will insulate its native, ancillary offerings from competition, and ultimately increase its revenue.

**g.  Starting in 2024, SAP Has Taken Steps to Exclude Third-Party Providers Like Celonis from its Ecosystem**

*i.    SAP Notes Make Third-Party Data Extraction Unviable*

137.    In addition to threatening customers to acquire or upgrade unnecessary licenses at the cost of tens or even hundreds of thousands of dollars and otherwise impeding the ability of customers to access their own data, SAP has recently signaled that it plans to cut off access to third-party software providers like Celonis completely.

138.    On February 2, 2024, SAP updated SAP Note 3255746, which had previously stated that SAP does not *support* the use of ODP API for third-party applications, to state it does not *permit* the use of ODP API for third-party applications. The revised Note further states that, "Any and all problems experienced or caused by customer or third-party applications using RFC modules of the Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and SAP is not responsible for resolving such problems."

139.    The February 2024 Note is reproduced at **Figure 2** below. The green highlights indicate the updated language. The red highlights indicate the prior language, which had been operative since 2022.

**Figure 2**



### 3255746 - ~~Supported~~ Unpermitted usage of ODP Data Replication APIs

| | | | |
|---|---|---|---|
| Version | 14 | Type | SAP Note |
| Language | English | Master Language | English |
| Component | BC-BW-ODP (Operational Data Provisioning (ODP) and Delta Queue (ODQ)) | Released On | ~~1702.1002.2022~~2024 |

**Symptom**

The usage of RFC modules of the Operational Data Provisioning (ODP) Data Replication API by customer~~-~~, or third-party ~~applications~~ applications to access SAP ABAP sources (On-Premise or Cloud Private Edition) is NOT ~~supported~~ permitted by SAP. ~~These functional~~ Such modules are only intended for SAP-internal applications . Since they are un-released and un-documented they can be changed by SAP and ~~may be modified~~ at any time by SAP without ~~further notice~~. Customer or partner applications using these functional modules do not follow SAPs recommendation for a sustainable and enterprise-critical architecture. Any ~~notice~~.

SAP reserves the right to implement technical measures to restrict and audit the unpermitted use of RFC modules of the Operational Data Provisioning (ODP) Data Replication API .

Any and all problems experienced or caused by ~~such applications~~ customer or third-party applications using RFC modules of the Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and ~~resolutions are not supported by SAP~~SAP is not responsible for resolving such problems.

**Other Terms**

ODQ, ABAP CDS, @Analytics.dataExtraction.enabled, extractor, DataSource, S-API

**Solution**

The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API. All customer and ~~partner~~ third-party applications should be ~~build~~ built using this API since it provides a stable interface (link ~~to~~ to documentation).

More information on Operational Data Provisioning (ODP) is available in the FAQ.

140.    While the Note suggests that customers should use an OData API, the suggestion is not a viable alternative for data access because neither the performance nor the reliability of this alternative is satisfactory. This alternative is particularly ill-suited for high-volume data transfers such as required by process mining software like Celonis.

141.    For example, an OData setup will take on average five times the amount of time as an RFC level integration for a typical use case, such as to extract data from SAP S/4HANA private cloud for an Accounts Payable process. In practice that means that, where 100 tables would need to be extracted, the RFC-based setup would take 0.5 days as compared to the OData setup taking at least three days.

142.    Performance also is not comparable. For operational use cases where Celonis needs real-time data (e.g., time-sensitive matters such as logistics, supply chains, airport baggage handling), Celonis could not use OData because transferring significant amounts of live data is not reliable with OData and would make operational use cases (e.g., real-time data refresh and high amounts of data for use cases in ground operations for airlines or transportation/logistics)

practically impossible. SAP itself recognized this limitation in a later update to the Note discussed below, cautioning: "When using the OData interface, which is based on OData version V2, you may need to check the performance impact of your data replication process in case you replicate large volumes of data."

143.    SAP's customers and the industry generally recognize these limitations, and, as a result, ███████████████████████████████████████. They are not viewed as a viable option.

144.    After inducing uncertainty in its customer base by restricting ODP-based extractors that use the RFC module like Celonis, SAP then updated the Note again—to self-preference its own solution.

145.    On July 7, 2024, SAP revised the Note to recommend that customers "use SAP Datasphere for realizing data replication scenarios to move data from various SAP sources (such as SAP S/4HANA, SAP BW, SAP ECC sources etc.) into third-party applications & tools." A comparison of this Note to its February predecessor, as well as a clean version, are available at **Figures 3** and **4**, respectively.

**Figure 3**

Hogan Lovells
US LLP
ATTORNEYS AT LAW
LOS ANGELES

**Figure 4**

SAP · SAP Note

## 3255746 - Unpermitted usage of ODP Data Replication APIs

Component: BC-BW-ODP (Basis Components > BW Service API > Operational Data Provisioning (ODP) and Delta Queue (ODQ)), Version: 5, Released On: 11.07.2024

### | Symptom

The usage of RFC modules of the Operational Data Provisioning (ODP) Data Replication API by customer, or third-party applications to access SAP ABAP sources (On-Premise or Cloud Private Edition) is NOT permitted by SAP. Such modules are only intended for SAP-internal applications and may be modified at any time by SAP without notice.

SAP reserves the right to implement technical measures to restrict and audit the unpermitted use of RFC modules of the Operational Data Provisioning (ODP) Data Replication API .

Any and all problems experienced or caused by customer or third-party applications using RFC modules of the Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and SAP is not responsible for resolving such problems.

### | Other Terms

ODQ, ABAP CDS, @Analytics.dataExtraction.enabled, extractor, DataSource, S-API

### | Solution

We clearly advice you to use SAP Datasphere for realizing data replication scenarios to move data from various SAP sources (such as SAP S/4HANA, SAP BW, SAP ECC sources etc.) into third-party applications & tools. SAP Datasphere offers different services for these scenarios such as the replication flow as integrated data replication tool within SAP Datasphere for various data replication scenarios as well as the access using the OpenSQL interface.

Replication Flows are the recommended and strategic replication tool for realizing data replication scenarios for replicating SAP-data to SAP as well as third party applications & tools. Please use the following link to find more information about replication flows (documentation), where you can find more information about the current supported connections. In future, additional connectivity will be added step by step to replication flows and added to our documentation once it is available as public feature. Furthermore, you can check our SAP Datasphere Road Map Explorer for additional planned innovations in this area.

The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API and can still be used (link to documentation) but there are no plans to enhance this interface based on the strategic direction towards using replication flows in SAP Datasphere. When using the OData interface, which is based on OData version V2, you may need to check the performance impact of your data replication process in case you replicate large volumes of data.

More information on Operational Data Provisioning (ODP) is available in the FAQ.

146.    On its Technology Blog, SAP further states, "*For generic data access from SAP applications, we recommend leveraging SAP Datasphere. SAP Datasphere is the new semantic layer, which enables a business data fabric architecture that uniquely harmonizes mission-critical data across the organization from various SAP and non-SAP sources*."

147.    But SAP Datasphere, discussed in more detail below, requires customers to pay an exorbitantly expensive fee if they want to use a third-party vendor for extracting their own data, particularly for a use like process mining, rendering the use of any options besides SAP's

Signavio economically unviable.

148.    The July 2024 update further stated that SAP will no longer invest in OData-based extractors (the solution recommended in the February 2024 update), rendering that option unreliable as well. The Note stated specifically: "The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API and can still be used [...] but *there are no plans to enhance this interface based on the strategic direction towards using replication flows in SAP Datasphere*." (Emphasis added).

149.    In other words, SAP offers as the only alternatives to Datasphere technical options that are nonviable, ensuring that customers—regardless of preference—must use SAP's Datasphere.

150.    Note 3255746 seemingly allows for additional extraction options outside of SAP's recommendations, so long as those options are not ODP-based, such as Celonis' RFC-based ABAP extractor. Despite this appearance, however, SAP has another policy—its "Clean Core Policy"—that effectively prohibits using any data extraction method outside of SAP's options.

*ii.   SAP's Clean Core Policy Enforces SAP's Data Extraction Prohibition*

151.    In 2023, SAP introduced the "Clean Core Policy" as part of its migration of all legacy accounts to S/4HANA. SAP claims the Policy is intended to address new challenges posed by the cloud. SAP claims that, as a result of the migration, each individual customer cannot implement enhancements in the same way that it could in earlier on-premise environments.

152.    Under the Clean Core Policy, customers will be limited to data extraction utilizing the insufficient OData-based ODP API or SAP Datasphere options discussed previously. Despite the unique considerations that various customers' environments pose, SAP is explicitly telling all customers that they need to follow the Clean Core Policy and that SAP will enforce the Clean Core Policy even if a different data extraction method is technically possible within that environment.

153.    If the customer is using another data extraction method and a problem arises, SAP will attribute the problem to non-compliance with the Clean Core Policy, which will be the fault of the customer.

154.    To ensure compliance with customers still using on-premises ERP editions, an SAP migration architect or architecture review board is involved in most migrations, enforcing SAP recommendations and marking any use of a third-party vendor that involves data extraction as a "high risk" for failure.

155.    SAP is then telling customers this "high risk" designation indicates they are likely to run into reliability problems that will harm the migration.  If these problems occur, SAP will not provide support on tickets or other issues (even though customers are paying for such support as part of their ERP license).

156.    This change presents a real risk to customers, as the likelihood of a migration failure is high given the complexity of the effort involved. In fact, industry sources estimate that as many as 75% to 80% of projects like these have failures. Customers are naturally nervous to continue migration deemed to have a "high risk" for failure.

157.    SAP's representations regarding the justification for the Clean Core Policy in this instance are incorrect, and the Clean Core Policy is instead being used merely as a pretextual scare tactic to prevent customers from using competing solutions like those offered by Celonis. As noted earlier, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

158.    In fact, system migration is a core use case that Celonis supports and has supported since its time as an SAP partner, helping customers in the pre-migration phase understand what are the most important process deviations they have that could impact their migration.

    *iii.    SAP Datasphere Beta Program Self-Preferences Signavio*

159.    As noted above, SAP customers who migrate to S/4HANA are expected per Note 3255746 to use SAP Datasphere, a data management tool that is supposed to help businesses

1    integrate, catalog, and store data, whether from SAP applications or third party tools.

2    160.    But SAP Datasphere instead effectively prohibits third-party solutions like

3    Celonis because of the high cost of granting third-party access.

4    161.    SAP is launching a program to integrate Signavio, its process mining software,

5    into Datasphere, thus positioning it as the default tool for customers using S/4HANA.

6    162.    This positioning will allow customers to extract data to Signavio via Datasphere

7    at no extra cost, in stark contrast to the high cost of extraction to third party solutions like

8    Celonis, priced by gigabytes of uncompressed data transferred.

9    163.    Given the volumes of data that process mining software requires, the costs to

10    customers of using Datasphere to extract data for a third-party provider like Celonis will be

11    prohibitively expensive. On information and belief, Celonis estimates that transfer costs likely

12    will be up to ten times the price customers pay to use Celonis in the first place. For example,

13    extracting a single table of approximately 100GB—an insubstantial amount of data in this

14    context—could cost a customer $30,000 at the prices Celonis understands SAP Datasphere is

15    charging.  This amount does not include additional extractions of the same table as the data it

16    contains changes in real time.  Ultimately, the charges could total millions of dollars in just a few

17    years, or potentially even in just a few months.

18    164.    When customers have questioned their options for process mining software in

19    light of these new charges, arbitrary technical limitations, and restrictive policy updates, SAP has

20    informed ██████████████████████████████████████████████████

21    ████████████████████████████████████████ This recommendation comes despite

22    demonstrable evidence that Signavio is an inferior product.  ██████████████████████

23    ████████████████████████████████████████████████████████████

24    ██████████████████████████████████

25
26        **h.  To Enrich Itself, SAP is Forcing Customers to Choose Now Between Higher
        Prices and Lower Quality for Process Mining Software**

27    165.    The unfair competition from SAP's actions, false statements, and policy changes

28    cannot be overstated. SAP is unilaterally deciding to sunset a legacy ERP application that a

- 32 -

majority of its customers utilize. These customers are locked into the SAP ERP ecosystem, spending millions for the platform, and are unable to migrate it to a competing provider.

166.    SAP is using this leverage to force these customers to migrate to SAP's cloud-based ERP application on SAP's timetable.

167.    The migration process is complex, potentially taking up to two years, and mission critical, given the importance of ERP to a business's functioning.

168.    SAP is pressuring customers to start the migration process now to avoid the possibility of missing the future cutoff date in 2027.

169.    This migration coincides with several other SAP policies that effectively disallow any viable data extraction from its cloud-based ERP application, imposing both arbitrary technical limitations and exorbitant, unwarranted costs on many third-party providers such as Celonis.

170.    And if customers attempt to use an unpermitted method to get their data to their preferred vendors, any issues that they encounter in their ERP application—including issues with their complex and mission critical migration—will be at their own risk, and SAP will disclaim any responsibility for resolving such issues, regardless of the customer's agreement with SAP.

171.    Meanwhile, SAP is offering its own process mining solution, Signavio, as a native integration in the cloud-based ERP application, with no charge for data transfers, and at low cost or even for free as part of a bundle.

172.    SAP has undertaken all of these actions and changes in contravention of its assurances made in 2021 to regulators when it initially acquired Signavio—that process management software, accessing data in the ERP application via simple scanner access, was an indirect use that would not incur fees.

173.    As a result of SAP's conduct, customers are starting 2025 faced with unfair and detrimental choices for their businesses. Unable to switch from the SAP ERP application given its lock-in, and with millions of dollars in migration costs hanging over their heads (especially if migration were to fail), the customers are asked to choose between using their preferred

vendors—such as Celonis for process mining—or capitulating to SAP in the false hope it will help improve their chances for a successful migration.

174.    This is a Hobson's choice.  If an SAP customer retains their preferred non-SAP vendor, it will mean submitting to impossible technical restrictions, uneconomic data transfer charges, or unjustifiable risks to their migrations. On the other hand, if an SAP customer submits to the migration that SAP is attempting to impose, then it will mean leaving behind more innovative products for inferior native SAP offerings.

175.    Celonis already has been approached by various customers who are uncertain of what to do and are eager to avoid this predicament. With the migration deadline fast approaching, customers are very concerned about defying SAP's requirements and risking costly mistakes in their migration programs. The risks of such migration mistakes are so substantial that it creates a situation in which customers feel obligated to forego Celonis and to take Signavio in order to safeguard the investment they have already made and must continue to make in their locked-in SAP ERP application.

176.    █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████ As discussed, the outbound fee can be substantial, sometimes even exceeding the cost of the third-party vendor, and in any case rendering the use of the third-party vendor economically unviable.

177.    █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

178. ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

Although there are no architectural and licensing implications for extracting data from S/4HANA using Celonis' extractor, SAP is telling customers otherwise and ███████████████████

███████████████████████

179. ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████ SAP even has acknowledged Celonis' superiority as a product, promising that Signavio will catch up in functionality in the years to come.

180. ████████████████████████████████████████████████ and Celonis expects this story to play out repeatedly over the coming months, as additional contracts go up for renewal between the date of this filing and the time SAP transitions to S/4HANA at the end of 2027.

181. Even more threatening, Celonis' potential customers are currently being coerced by SAP's conduct. █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

182. SAP is engaging in this conduct now, despite the fact that there is no technical problem with Celonis' extractor, because SAP wants not only to sell the license for its ERP application but also to eliminate competition for additional services like Signavio's process mining.

183. SAP has no procompetitive justifications for its conduct. Any alleged concerns about migration success or other issues are pretextual, given the evidence of successful

COMPLAINT

migrations amongst Celonis customers and the long history of successful data extraction using tools SAP is now effectively prohibiting.

184.    If SAP succeeds in driving out external competition for SAP's own internal solutions, and given the lock-in that customers face with SAP's ERP applications, SAP will have the ability to raise the price of its additional services like process mining without restraint.

### i.    SAP Dominates the SAP ERP Data Access Aftermarket and is Attempting to Dominate the SAP Process Mining Aftermarket

#### i.    Relevant Product Markets

185.    There are at least three relevant antitrust product markets applicable to this dispute: (1) ERP Applications, (2) ERP Data Access, and (3) SAP Process Mining.

186.    Antitrust law and economics each recognize the concepts of "foremarkets" and "aftermarkets." The foremarket consists of the relevant market for a given primary good or service, of which there may be multiple brands. For example, there may be a relevant market for photocopier machines, which would be the foremarket. By contrast, an aftermarket is a derivative relevant market that may be limited to products or services related to a single brand of the primary product or service sold in the foremarket. For example, while the photocopier foremarket may have multiple brands, there may be a derivative relevant market for the servicing of only Kodak-brand photocopiers—this is known as an aftermarket. In this context, ERP Applications is a foremarket: it is comprised of ERP applications that customers utilize. The SAP ERP Data Access Market and SAP Process Mining Market are separate aftermarkets, comprised of data access to the SAP ERP application and process mining software compatible with the SAP ERP application.

#### 1.   ERP Applications Market

187.    As described above, an ERP application is the "hub" or backbone on which many different mission critical day-to-day business processes are run, including HR, payroll, billing, accounting, etc. It is an essential software infrastructure on which many companies rely for the operation of their business.

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

188.    ERP applications are a distinct type of business software. While ERP applications may share some functionality with other tools that companies use to simplify and improve their business processes, like CRM systems, providers and consumers of ERP applications recognize them as separate products serving distinct purposes.

189.    As noted, ERP applications handle back-office functions, such as finance, supply chain operations, and HR. This focus stands in contrast with, e.g., CRM systems that handle front-office business functions, such as marketing sales, advertising, and customer service.

190.    There are no reasonable substitutes for ERP applications. Though businesses may use services like QuickBooks or Excel at the beginning of their existence, these tools do not present reasonable alternatives because they prove inefficient and unsustainable as the business matures and expands.

191.    Customers are locked into their SAP ERP application as a result of the information disparity at the time of purchase and the enormously high costs of switching.

192.    These customers also are unable to perform detailed cost analyses for the lifecycle of their ERP applications at time of purchase. It is difficult for customers to obtain the necessary information among competing ERP applications with respect to maintenance costs, upgrade timelines (or the costs of such upgrades), as well as any disruption in service that may occur over the life of the product. Such pre-purchase analyses also cannot account for any post-sale changes in policy or practice such as SAP's changes discussed above. There thus exists an information disparity between ERP application customers and providers.

193.    Severe switching costs associated with changing a customers' ERP application provider effectively preclude the vast majority of customers from changing their ERP applications. These switching costs include both direct financial costs and indirect costs at every stage of the switching process. Initially, ERP application customers devote substantial resources to evaluating ERP applications. For large customers, this process can take several years to complete, given the need to thoroughly examine the functionality of ERP applications and measure that functionality against the unique needs of a particular customer.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

194.    After the evaluation process, customers spend significant sums on the actual licensing, development, and implementation of ERP applications within their specific business environments. A large customer may spend tens of millions of dollars on its ERP applications in a given year, depending upon the complexity and customization of its ERP applications, the number of users, and other factors.

195.    Implementing ERP applications involves extensive costs and substantial devotion of resources, including but not limited to training employees on how to properly use those ERP applications, troubleshooting problems, and realigning business practices with the selected provider. In addition to employee-focused change management, implementation involves major costs associated with migrating data, testing and deployment of specific software developed for each customer, and technical implementation that occurs during this time period.

196.    Accordingly, changing ERP application providers is not a task completed in days or weeks but over a period of months or years, from the date a license agreement is signed, through development, testing, and training, to the actual deployment.

197.    These switching costs, coupled with the information disparity between provider and customer as to future changes in policy or practice, mean that ERP application customers are "locked-in" to their current providers and thus may be exploited by a change in policy or practice from their provider that was not known at the time customers made their initial choice of ERP application provider. Indeed, as discussed above, SAP has twice updated Note 3255746 in the past year.

198.    It also is possible to identify a narrower market for ERP applications sold to large companies. As explained above, SAP markets its S/4HANA ERP application as a solution for large and upper-midsize customers that have more complex organizational structures and industry requirements. These customers are unique in their ERP application needs because of their high annual revenue, high data volume, and large staff, including many employees utilizing the ERP application.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

COMPLAINT

199.    This narrower market would have the same characteristics as the ERP Applications Market, although SAP's share of the market would range from ████████ depending on the industry in which the customer operates.

2.    <u>SAP ERP Data Access Market</u>

200.    The SAP ERP Data Access Market is the product market for accessing customers' own data that is stored in the SAP ERP application. While the SAP ERP Data Access Market is derivative of the ERP Applications Market, it constitutes its own distinct aftermarket that is properly limited to the SAP ERP applications that customers utilize.

201.    The SAP ERP Data Access Market is limited to SAP itself.  As the owner of the ERP application, SAP is the gatekeeper that controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed.

202.    SAP offers ERP data access via multiple products that represent reasonable substitutes in the eyes of its ERP customers.  Firstly, and as recounted above, SAP offers customers various licensing options, with the licenses controlling how data can be accessed from the HANA database. Secondly, and again as recounted above, SAP offers customers various technical solutions, with those technical solutions representing the only data extraction "compliant" with announced SAP policy.

203.    Also, as recounted above, these licensing options and technical solutions are not necessarily considered by the ERP customers at the time they purchase their ERP application. Rather, an ERP customer may not engage with SAP concerning data access until well after the original ERP purchase and at the point when the customer is considering functionality from third parties that would add to its experience with the SAP ERP ecosystem.

204.    SAP markets and sells these products to its ERP customers. The price of the licenses depends upon the access requirements of the customer (although as noted SAP has attempted to "oversell" its customers on their licensing needs). The price of the technical solutions can be monetary or nonmonetary. SAP Datasphere charges customers a premium outbound cost, while OData, although not charging a fee, taxes its customers in the form of substandard performance.

205.    Data access to other company systems (or even the company's raw data) is not a reasonable substitute for ERP data access when the customer uses an ERP system. As explained above, an ERP system becomes the central repository for most or all of a company's data, providing it in a uniform fashion. While companies previously could choose the database underlying their ERP applications, including databases that would allow extracts to third-party providers, SAP changed that practice when it introduced S/4HANA in 2015 and required all S/4HANA users to also utilize the HANA database.

206.    As a result, if an SAP ERP customer wants to access its own data in the ERP application, that customer must utilize a data access option that SAP allows.

207.    This requirement means that a customer's initial selection of an ERP application effectively determines the universe of data access alternatives available to it throughout the life of the ERP application.

208.    As discussed above, this restriction on the customer's aftermarket options is difficult for a customer to comprehend a priori. A customer would need to overcome several complexities and challenges—such as ensuring stakeholder engagement in the ERP selection process; creating portable applications that can be deployed on a variety of ERP applications; understanding project commonalities across technology, technical requirements, and vendors; developing a future exit strategy; and analyzing current alternatives like upgrades—when considering the future limitations its ERP selection will impose.

209.    In addition, customers are at an information disadvantage and unable to accurately price the life-cycle of their ERP application usage as explained above.

210.    Customers cannot migrate away from this uncertainty because of the significant switching costs and lock-in discussed. Changing ERPs is viewed within the industry as complex, costly, disruptive, and risky. And the same barriers to entry that protect SAP's position with its customers in ERP Applications Market also protect SAP's position in the SAP ERP Data Access Market.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

COMPLAINT

211.    In the SAP ERP Data Access Market, SAP itself controls the barriers to entry by setting the legal and technical requirements on how customers or their contracted third-party vendors can access customers' data in the ERP application.

212.    There is substantial evidence that SAP monopolizes the SAP ERP Data Access Market. As the gatekeeper for its own ERP application, SAP solely controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed.

3.    SAP Process Mining Market

213.    The SAP Process Mining Market is the product market for process mining software compatible with SAP ERP applications. While the SAP Process Mining Market is derivative of the ERP Applications Market, it constitutes its own distinct aftermarket that is properly limited to the SAP ERP applications that customers utilize. The SAP Process Mining Market is comprised primarily of Celonis, Signavio, Software AG, and UiPath.

214.    Process mining software needs to be compatible with SAP ERP applications. Absent this compatibility, the process mining software is unusable to the customer because the customer's data on which the software relies is contained within the customer's SAP ERP application. As noted above, process mining acts as a bridge between the customer's data in an existing system and Celonis' platform. Specifically, the software uses event log data to create a digital twin of the business's processes, helping the business visualize every move the business makes in real time. Thus, any option that does not achieve this real time access to allow dynamic analysis—as a result of technical incompatibility as opposed to arbitrary administrative exclusion—is not interchangeable.

215.    This compatibility requirement means that a customer's initial selection of an ERP application effectively determines the universe of alternatives available to it with respect to aftermarket services like process mining. Once a customer has selected the SAP ERP application, it must select a process mining software compatible with that platform.

216.    As discussed above, this restriction on the customer's aftermarket options is difficult for a customer to comprehend at the time it is selecting an ERP application. A customer would need to overcome several complexities and challenges—such as ensuring stakeholder

- 41 -

engagement in the ERP selection process; creating portable applications that can be deployed on a variety of ERP applications; understanding project commonalities across technology, technical requirements, and vendors; developing a future exit strategy; and analyzing current alternatives like upgrades—when considering the future limitations its ERP selection will impose.

217.    In addition, customers are at an information disadvantage and unable to accurately price the life-cycle of their ERP application usage as explained above.

218.    Customers cannot migrate away from this uncertainty either because of the significant switching costs and lock-in discussed. Changing ERPs is viewed within the industry as complex, costly, disruptive, and risky.

219.    Just as SAP's position in the ERP Applications Market, and dominance in the SAP ERP Data Access Market, is protected by high barriers to entry, so is SAP erecting high barriers to entry around the SAP Process Mining Market as well given its complete control over the ecosystem.

220.    In the SAP Process Mining Market, SAP itself controls the barriers to entry by setting administrative and technical requirements on the market participants that are allowed to integrate with its ERP application. This case is not one of a true technical problem or actual incompatibility that prevents a third party from offering a viable alternative product. Nor is it a case of a smaller company upset that a bigger competitor has a better product in the eyes of customers. In this instance, customers already were using the smaller company's viable alternative product despite the existing barriers—compliance with licensing requirements.  SAP is now setting those barriers even higher, to the point where it is aiming for all options but SAP's own Signavio offering to be excluded.

221.    There is substantial evidence that SAP seeks to monopolize the SAP Process Mining Market. Having purchased Signavio in 2021, it already has a competing product in the market that it self-preferences against third-party options like Celonis via promotions, offerings, and technical advantages. Nonetheless, customers still have chosen to use Celonis, even when SAP has bundled Signavio into its offerings for free, indicating Celonis' superior quality.

- 42 -

222.    Now SAP seeks to self-preference its Signavio offering further, and to disadvantage and harm Celonis further, by prohibiting customers from using any other option using its unwarranted policy changes, arbitrary technical limitations, and unilateral imposition of data transfer charges.

*ii.    Relevant Geographic Market*

223.    The geographic scope of the ERP Applications Market, the SAP ERP Data Access Market, and the SAP Process Mining Market is global. The availability of ERP applications, of data access, and of process mining software is not materially limited by geography.

224.    It may be possible to identify a narrower market for ERP applications based on country or region, however. While geography does not impact availability, as explained above there are national and regional preferences from a customer's perspective for ERP providers with a strong, local footprint, which could create geographical barriers.

**j.    SAP's Anticompetitive Conduct Has Harmed Competition and Caused Celonis to Suffer Antitrust Injury**

225.    SAP's anticompetitive conduct has harmed competition. SAP's anticompetitive conduct has also inflicted antitrust injury upon Celonis.

226.    As recounted above, SAP is using its market power in the SAP ERP Data Access Market to subject customers to increasingly stringent restrictions on data extraction of those customers' own data from SAP ERP applications. The purpose of these restrictions is to force customers who desire to continue using third-party options like Celonis' process mining software either (i) to pay additional fees to SAP in the form of licenses and transfer costs or (ii) to cease using those third-party options in favor of SAP's own, lesser quality offerings, such as Signavio.

227.    Moreover, SAP is using its market power in the SAP ERP Data Access Market to achieve what it could not through competition on the merits—adoption of its Signavio offering. Although SAP already is self-preferencing its Signavio offering, it has faced challenges with consumer acceptance of its offering. Rather than improving the product, SAP is moving to restrict its own customers from using any other competing product, including Celonis' process

1  mining software. These restrictions thus ensure that customers will have to utilize the lower

2  quality Signavio for their process mining needs.

3      228.    SAP also is using its market power in the SAP ERP Data Access Market to

4  prohibit customers from using Celonis' process mining software if those customers want to

5  receive the value of their SAP ERP application. SAP's restrictions on data extraction and

6  prohibitively expensive fees on data transfers, coupled with the threat that migrating customers

7  use unpermitted processes at their own risk, have forced customers to choose between

8  undertaking SAP's obligatory and impending ERP application migration and Celonis' process

9  mining software. Given SAP's market power in the SAP ERP Data Access Market, and the lock-

10  in that customers face in the ERP Applications Market, it is hardly a choice at all.

11      229.    In addition, SAP is providing its Signavio process mining software below cost.

12  Although SAP entices customers in the present by bundling Signavio with other specialized

13  solutions and presenting them as a free "entitlement" with a customer's ERP application, SAP's

14  below-cost pricing aims to drive third-party alternatives from the SAP Process Mining Market.

15  Once those third-party alternatives, which constrain SAP competitively, are excluded, SAP will

16  be able to raise the price of its Signavio offering without restraint given the lock-in effects of the

17  ERP Applications Market.

18      230.    Finally, SAP's conduct directly contradicts representations SAP made, just over

19  three years ago, to regulators and to the public about the type of access it would allow to its ERP

20  application. SAP's about-face on such a fundamental issue has pulled the rug out from under

21  customers and third-party providers alike, allowing SAP to enrich itself unjustly while

22  simultaneously destroying the value created by the beneficial relationships between SAP's

23  customers and third-party providers in the SAP ERP ecosystem.

24      231.    In these ways, SAP's anticompetitive conduct has allowed it to reduce choice,

25  stifle innovation, raise prices and costs, reduce quality, and prevent the free flow of competition

26  on the merits. All of these constitute antitrust injury.

27

28

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

**Interstate Trade and Commerce**

232.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

233.    SAP's anticompetitive conduct has taken place in—and negatively affected the continuous flow of interstate trade and commerce in—the United States in that, among other things:

    a.    SAP has provided its SAP ERP applications and process mining software throughout the United States;

    b.    The anticompetitive scheme alleged herein has affected billions of dollars of commerce. SAP has inflicted antitrust injury by artificially excluding Celonis, raising the costs of Celonis and other competitors, increasing prices, reducing quality, stifling choice and competition, and causing other antitrust injuries described herein.

234.    SAP's actions must be stopped, and the harm to Celonis must be remedied.

**Claims for Relief**

**FIRST CLAIM FOR RELIEF**

**(Intentional Interference with Contractual Relations)**

235.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

236.    As herein alleged, SAP has intentionally interfered with the contracts between Celonis and its customers for the provision of process mining software.

237.    SAP has known of these contracts.

238.    SAP's conduct has prevented and will prevent performance, has made and will make performance more expensive or difficult, and has caused customers to terminate their contracts.

239.    SAP has intended to disrupt the performance of those contracts or knew that disruption of performance was certain or substantially certain to occur.

240.    Celonis has been and will be harmed.

241.    SAP's conduct has been and will be a substantial factor in causing Celonis' harm.

- 45 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

**SECOND CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Relations)**

242.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

243.    As herein alleged, SAP has intentionally interfered with prospective and existing economic relationships between Celonis and its past and current process mining customers, as well as future customers. Celonis has received outreach and feedback from customers tying decisions to leave, not renew, or not engage with Celonis to the problems created by the events described herein.

244.    Celonis and the customers mentioned in the previous paragraph have had economic relationships that probably would have resulted in an economic benefit to Celonis.

245.    Under those relationships, Celonis would have earned revenue for providing its products and services to each potential client.

246.    SAP has known of these relationships and prospective relationships.

247.    SAP has engaged in wrongful conduct, including, but not limited to, its violations of Section 17200 of the California of the California Business and Professions code.

248.    SAP has intended to disrupt those relationships and prospective relationships or knew that the disruption of those relationships was certain or substantially certain to occur.

249.    SAP's conduct has disrupted and will disrupt those relationships.

250.    Celonis has been and will be harmed.

251.    SAP's wrongful conduct has been and will be a substantial factor in causing Celonis' harm.

**THIRD CLAIM FOR RELIEF**

**(Federal False Advertising, 15 USC § 1125(a)(1)(B))**

252.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

253.    SAP has, on or in connection with its goods and/or services, used in commerce false or misleading descriptions of fact, and /or false or misleading representations of fact,

- 46 -

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of SAP and/or Celonis' goods, services and/or commercial activities, in violation of the Lanham Act, 15 USC § 1125(a)(1)(B).

254.    SAP's false or misleading descriptions of fact and /or false or misleading representations of fact have deceived, and are likely to continue to deceive, a substantial portion of SAP's audience, which includes Celonis' customers, including as to the compliance of Celonis' offerings with SAP policies, the need for additional licenses, the risks associated with use of Celonis' offerings, and the relative equivalence of SAP's competing Signavio product.

255.    SAP's false or misleading descriptions of fact and /or false or misleading representations of fact are by their nature and in light of their significant financial implications material, and have and will continue to influence consumer purchasing decisions, including to dissuade consumers from purchasing or renewing Celonis' offerings.

256.    Celonis has been, and will continue to be, damaged by SAP's acts of false advertising in an amount to be determined at trial.

257.    Upon information and belief, SAP's conduct is willful, deliberate, intentional and in bad faith.

258.    As a result of SAP's acts, SAP has caused, and will continue to cause, irreparable harm to Celonis and to the goodwill associated with the Celonis products, services, and trademarks, for which Celonis has no adequate remedy at law. Thus, Celonis is entitled to injunctive and other relief.

## FOURTH CLAIM FOR RELIEF

### (California False Advertising Law, Cal. Bus. and Prof. Code § 17500 *et seq.*)

259.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

260.    SAP has, on or in connection with its goods and/or services, used in commerce false or misleading descriptions of fact and /or false or misleading representations of fact, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of SAP and/or Celonis' goods, services, and/or commercial activities, in violation of the Cal. Bus.

- 47 -

and Prof. Code § 17500 *et seq*.

261.    Members of the public, including actual and prospective customers of Celonis, have been, are likely to and will continue to be deceived by SAP's false and misleading statements.

262.    Because of SAP's false and misleading statements of fact, members of the public, including Celonis' customers, have expressed concern regarding the continued use of Celonis' services, resulting in the actual and likely further loss of customers and market share by Celonis.

263.    Celonis has been, and will continue to be, damaged by SAP's acts of false advertising in an amount to be determined at trial.

264.    Upon information and belief, SAP's conduct is willful, deliberate, intentional, and in bad faith.

265.    As a result of SAP's acts, SAP has caused, and will continue to cause, irreparable harm to Celonis, for which Celonis has no adequate remedy at law.  Thus, Celonis is entitled to injunctive and other relief.

### FIFTH CLAIM FOR RELIEF

### (Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2)

266.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

267.    SAP possesses monopoly power in the SAP ERP Data Access Market. SAP has the power to control prices and/or exclude competition in these relevant markets and have done so with respect to its own customers and Celonis, constituting direct evidence of SAP's monopoly power. Indeed, SAP has unilaterally set a price increase with the ERP application and excluded Celonis by (1) prohibiting all viable methods of data extraction without significant additional cost, (2) misinforming customers about costs associated with using Celonis, (3) creating and arbitrarily updating policies to prevent customers from using viable methods of data extraction, and (4) coercing customers to choose between using Celonis and getting the benefit of their SAP ERP application (as using unapproved data extraction methods could subject customers to risk-shifting with respect to their migrations).

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

268.   SAP's position in the market confirms its monopoly power, serving as the gatekeeper that solely controls the legal and technical conditions upon which customers and their contracted third-party vendors can access customers' own data. SAP's dominance is protected by high entry barriers and high switching costs that make it unlikely, at any time in the foreseeable future, for a competitor to enter and take away substantial market share from SAP. All of this indirect evidence further confirms SAP's monopoly power.

269.   SAP has willfully acquired and maintained monopoly power in the SAP ERP Data Access Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes, but is not limited to:

a.   arbitrarily changing existing policies to exclude previously utilized data extraction methods like Celonis' RFC ABAP;

b.   recommending data extraction methods that customers specifically and the industry generally recognize as nonviable for process mining like OData;

c.   introducing new policies to constructively prohibit customers from using third-party providers like Celonis;

d.   conditioning migration and support of customers' ERP applications business on customers not using Celonis' process mining software, or, alternatively, on customers using Signavio's process mining software;

e.   offering Signavio at a price below the cost of providing that software to its customers;

f.   coercing customers to abandon Celonis in favor of Signavio to avoid data extraction issues; and

g.   threatening ERP application migration and support for customers who continue to utilize the current Celonis extractor contrary to the Clean Core Policy.

270.   There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

271.   SAP's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

272.   SAP's conduct has had a substantial effect on interstate commerce.

273.   Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct. For example, SAP's change in policy and false and misleading statements stand to impact ██████████████████████████████████ given SAP's instruction that customers start their migrations as soon as possible.

274.   Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

275.   Because of SAP's monopolization in violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's monopolization has caused.

**SIXTH CLAIM FOR RELIEF**

**(Attempted Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2)**

276.   Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

277.   SAP has attempted to willfully acquire and maintain monopoly power in the SAP Process Mining Market by means of predatory, exclusionary, and anticompetitive conduct. As discussed above, such conduct includes, but is not limited to:

a.   arbitrarily changing existing policies to exclude previously utilized data extraction methods like Celonis' RFC ABAP;

b.   recommending data extraction methods that customers specifically and the industry generally recognize as nonviable for process mining like OData;

c.  introducing new policies to constructively prohibit customers from using third-party providers like Celonis;

d.  conditioning migration and support of customers' ERP applications business on customers not using Celonis' process mining software, or, alternatively, on customers using Signavio's process mining software;

e.  offering Signavio at a price below the cost of providing that software to its customers;

f.  coercing customers to abandon Celonis in favor of Signavio to avoid data extraction issues; and

g.  threatening ERP application migration and support for customers who continue to utilize the current Celonis extractor contrary to the Clean Core Policy.

278.    SAP has engaged in this conduct with a dangerous probability of monopolizing the SAP Process Mining Market. SAP already has the power to control prices and/or exclude competition in this market and have done so with respect to its own customers and Celonis, constituting direct evidence of SAP's dangerous probability of obtaining monopoly power. Indeed, SAP has unilaterally set a price increase for process mining—demanding more money from its customers for less service. SAP also has excluded Celonis by (1) prohibiting all viable methods of data extraction, (2) misinforming customers about costs associated with using Celonis, (3) creating policies to prevent customers from using viable methods of data extraction, and (4) coercing customers into a false choice between using Celonis and the SAP ERP application. SAP's market position confirms SAP's dangerous probability of obtaining monopoly power. SAP's market position is protected by high entry barriers given that SAP dictates the terms and conditions on which a third party can access its ecosystem. This reality makes it unlikely, at any time in the foreseeable future, for a competitor to enter or take away substantial market share from SAP. All of this indirect evidence further confirms SAP's dangerous probability of obtaining monopoly power.

279.    SAP has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the SAP Process Mining Market. Specific intent to monopolize means a desire to dominate a market by improper means. There is clear evidence of SAP's

- 51 -

specific intent to obtain power through unfair and anticompetitive means, including SAP's sudden reversal of policy, attempts to coerce all Celonis customers to terminate their Celonis contracts in favor of an inferior SAP native competitor, and unsupported representations that Signavio will soon have all the features and functionality of Celonis.

280.     There are no legitimate pro-competitive or business justifications for SAP's conduct and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

281.     SAP's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

282.     SAP's conduct has had a substantial effect on interstate commerce.

283.     Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct. For example, SAP's change in policy and false and misleading statements stand to impact ███████████████████████████ given SAP's instruction that customers start their migrations as soon as possible.

284.     Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

285.     Because of SAP's attempted monopolization in violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's attempted monopolization has caused.

### SEVENTH CLAIM FOR RELIEF

### (Illegal Tying Under Section 1 of the Sherman Act, 15 U.S.C. § 1)

286.     Celonis repeats and realleges each and every allegation of this Complaint as if

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

1    fully set forth herein.

2        287.    Data access and process mining software are each separate products with distinct

3    purposes as explained in this Complaint.

4        288.    As alleged in this Complaint, SAP has induced and/or coerced numerous of its

5    own customers into one or more contracts, combinations, or conspiracies to unreasonably

6    restrain trade, to control prices, degrade quality, exclude competitors, and to otherwise harm

7    competition.

8        289.    Specifically, SAP has, through its legal and technical requirements on data

9    extraction, conditioned migration and support of customers' ERP applications—business

10   investments worth millions, even billions—on customers not using Celonis' process mining

11   software, or, alternatively, on customers using Signavio's process mining software. If customers

12   continue to use Celonis' data extraction—a necessary component to get the value of process

13   mining software—then the use is at the customers' own risk, and SAP will deem any migration

14   failure—a migration SAP has instructed customers to undertake as soon as possible—to be a

15   result of the tool and will not provide the customer support (even if customers are paying for it as

16   part of their ERP license).

17       290.    SAP possesses substantial economic power in the SAP ERP Data Access Market,

18   i.e., the "tying" product market. That economic power has allowed SAP to likewise restrain

19   competition and coerce others in the SAP Process Mining Market, i.e., the "tied" product market.

20   That some of Celonis' customers and prospective customers already have sacrificed their

21   relationship or potential future business with Celonis to abide by SAP's data extraction policies

22   and secure migration and support of their ERP application as a result of SAP's conduct confirms

23   SAP's coercive power.

24       291.    SAP's anticompetitive coercion has had anticompetitive effects.

25       292.    There are no legitimate pro-competitive or business justifications for SAP's

26   conduct (including because such conduct is not intended to and does not enhance overall

27   efficiency or market efficiency), and even if there were such justifications, the anticompetitive

28

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

1    effects of that conduct would far outweigh any possible pro-competitive effects.

2    293.    SAP's conduct has had a substantial effect on interstate commerce, including in

3    the tied product markets.

4    294.    Celonis has been, and will continue to be, injured in its property as a result of

5    SAP's conduct.

6    295.    Celonis has suffered, and will continue to suffer, injury of the type that the

7    antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled

8    innovation, increased prices and costs, reduced quality, and inhibition of the free flow of

9    competition on the merits.

10    296.    Because of SAP's violation of Section 1 of the Sherman Act, Celonis seeks an

11    award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis

12    also seeks appropriate equitable relief to enjoin SAP from continuing to engage in

13    anticompetitive behavior and to remedy the harms that SAP's illegal tying has caused.

14                          **EIGHTH CLAIM FOR RELIEF**

15                  **(Illegal Tying Under The California Cartwright Act,**

16                  **Cal. Bus. & Prof. Code § 16700  *et seq*.)**

17    297.    Celonis repeats and realleges each and every allegation of this Complaint as if

18    fully set forth herein.

19    298.    Data access and process mining software are each separate products with distinct

20    purposes as explained in this Complaint.

21    299.    As alleged in this Complaint, SAP has induced and/or coerced numerous of its

22    own customers into one or more contracts, combinations, or conspiracies to unreasonably

23    restrain trade, to control prices, degrade quality, exclude competitors, and to otherwise harm

24    competition.

25    300.    Specifically, SAP has, through its legal and technical requirements on data

26    extraction, conditioned migration and support of customers' ERP applications—business

27    investments worth millions, even billions—on customers not using Celonis' process mining

28

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

software, or, alternatively, on customers using Signavio's process mining software. If customers continue to use Celonis' data extraction—a necessary component to get the value of process mining software—then the use is at the customers' own risk, and SAP will deem any migration failure—a migration SAP has instructed customers to undertake as soon as possible—to be a result of the tool and will not provide the customer support (even if customers are paying for it as part of their ERP license).

301.    SAP possesses substantial economic power in the SAP ERP Data Access Market, i.e., the "tying" product market. That economic power has allowed SAP to likewise restrain competition and coerce others in the SAP Process Mining Market, i.e., the "tied" product market. That some of Celonis' customers already have sacrificed their relationship with Celonis to abide by SAP's data extraction policies and secure migration and support of their ERP application as a result of SAP's conduct confirms SAP's coercive power.

302.    SAP's anticompetitive coercion has had anticompetitive effects.

303.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

304.    SAP's conduct has had a substantial effect on interstate commerce, including in the tied product markets.

305.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

306.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

307.    It is appropriate to bring this action under the Cartwright Act because many affected individuals and entities reside in California, SAP America maintains an office in California, and overt acts in furtherance of SAP's anticompetitive scheme occurred in California.

308.    Because of SAP's violation of the Cartwright Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's illegal tying has caused.

**NINTH CLAIM FOR RELIEF**

**(Illegal Bundling Under Section 2 of the Sherman Act, 15 U.S.C. § 2)**

309.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

310.    ERP applications, data access, and process mining are separate products with distinct purposes as explained in this complaint.

311.    SAP possesses substantial economic power in the SAP ERP Data Access Market. SAP is attempting to restrain competition and coerce others in the SAP Process Mining Market.

312.    As part of that effort, SAP has bundled together its ERP application, data access products, and its SAP process mining software to offer to customers.

313.    Within this bundle, SAP sells the SAP process mining software at a low discounted price or even for free.

314.    On information and belief, the total discount SAP offers across the bundle including the SAP process mining software exceeds the cost of providing that software to the customer, resulting in SAP selling process mining services at a price below the cost of providing those services.

315.    SAP's anticompetitive coercion has had anticompetitive effects.

316.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

317.    SAP's conduct has had a substantial effect on interstate commerce, including in the bundled product markets.

Hogan Lovells
US LLP
Attorneys At Law
Los Angeles

318.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

319.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

320.    Because of SAP's violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's illegal bundling has caused.

## TENTH CLAIM FOR RELIEF

### (Predatory Pricing Under Section 2 of the Sherman Act, 15 U.S.C. § 2)

321.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

322.    ERP applications, data access, and process mining are separate products with distinct purposes as explained in this complaint.

323.    SAP possesses substantial economic power in the SAP ERP Data Access Market. SAP is attempting to restrain competition and coerce others in the SAP Process Mining Market.

324.    As part of that effort, SAP sells SAP process mining software to customers at a low discounted price or even for free.

325.    On information and belief, the low price at which SAP is offering the SAP process mining software is below the cost of providing that software to the customer.

326.    SAP's anticompetitive coercion has had anticompetitive effects.

327.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

328.    SAP's conduct has had a substantial effect on interstate commerce, including in

- 57 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

the SAP process mining product market.

329.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

330.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

331.    Because of SAP's violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's predatory pricing has caused.

**ELEVENTH CLAIM FOR RELIEF**

**(Unfair Competition, Cal. Bus. & Prof. Code § 17200 *et seq.*)**

332.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

333.    California's Unfair Competition Law ("UCL") prohibits any business act or practice that is "unlawful," or "unfair," or "fraudulent," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

334.    Celonis has standing under the UCL as it has been deprived of money and/or property sufficient to qualify as injury in fact, such economic injury being the direct result of SAP's fraudulent and unfair business practices described herein.

335.    UCL § 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

336.    Celonis seeks injunctive relief under § 17203 enjoining SAP from ongoing anticompetitive and otherwise unlawful, unfair, and fraudulent business practices, including false advertising. Such conduct is an actual and imminent threat to Celonis, including, but not limited to, lost business, lost goodwill, and reputational harm. Unless SAP is restrained by a preliminary and permanent injunction, Celonis will suffer severe, irreparable harm in that it will be forced

- 58 -

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

1    either to cease providing services to its customers or to jeopardize its customers' relationship

2    with SAP, particularly for ERP application migration and support. Celonis is informed and

3    believes, and on that basis alleges, that unless the Court grants injunctive relief, SAP will

4    continue to restrict customers' ability to extract their own data from the SAP ERP application for

5    use with Celonis' process mining software.

6        337.    SAP's common law torts, false advertising, monopolization, attempted

7    monopolization, tying, bundling, and predatory pricing are blatantly illegal and/or

8    anticompetitive, violating the Sherman Act, the Cartwright Act, federal law and California

9    common law, rendering them both unlawful and unfair under the UCL. Furthermore, SAP's false

10   and misleading representations and blatant disregard for the assurances it previously made to

11   regulators and thus the public constitute fraud under the UCL. Celonis has no adequate remedy at

12   law because monetary damages will not afford adequate relief for the loss of its business

13   relationships, client goodwill, and ability to continue operating.

14       338.    SAP's unlawful, unfair, and fraudulent business practices not only harm Celonis

15   but also threaten its customers as well. Celonis thus brings this claim to remedy an important

16   right affecting the public interest and seeks to confer on the public a significant benefit. Pursuant

17   to Code of Civil Procedure Section 1021.5, Celonis seeks and should be awarded, in addition to

18   all other remedies, prevailing party attorneys' fees.

19                                **Prayer for Relief**

20       Wherefore, Celonis prays for judgment as follows:

21       1.     A preliminary injunction prohibiting SAP, its officers, agents, servants,

22   employees, attorneys, and affiliated companies, its assigns and successors in interest, and those

23   persons in active concert or participation with them, from continued violations of the antitrust

24   laws, Lanham Act or false advertising laws;

25       2.     A permanent injunction prohibiting SAP, its officers, agents, servants, employees,

26   attorneys, and affiliated companies, its assigns and successors in interest, and those persons in

27   active concert or participation with them, from continued violations of the antitrust laws,

28

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

1  Lanham Act or false advertising laws;

2      3.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C.

3  § 1;

4      4.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C.

5  § 2;

6      5.      A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code §

7  16700, *et seq.;*

8      6.      A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code §

9  17200, *et seq.;*

10      7.      A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code §

11  17500, *et seq.;*

12      8.      A judgment in favor of Celonis that SAP has violated 15 USC § 1125(a)(1)(B);

13      9.      An order awarding all monetary gains, profits and advantages derived by SAP for

14  the acts complained of herein;

15      10.      An order awarding the cost of corrective advertising, to be determined by the

16  Court after a full hearing on the merits;

17      11.      An order awarding treble damages, along with reasonable attorney's fees, pre-

18  judgment interest, and post-judgment interest, for SAP's violation of the antitrust laws, Lanham

19  Act and false advertising laws;

20      12.      An order awarding Celonis its costs and attorney's fees; and

21      13.      Any and all other legal and equitable relief as may be available under law and

22  which the court may deem proper.

23                          **<u>Jury Demand</u>**

24      Celonis hereby demands a jury trial on all claims and issues presented in this Complaint

25  so triable.

26

27

28

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

Dated: March 13, 2025

By: ___/s/ Michael M. Maddigan___
Michael M. Maddigan (Bar No. 163450)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com

Jennifer Fleury (*pro hac vice forthcoming*)
Justin W. Bernick (*pro hac vice forthcoming*)
Anna Kurian Shaw (*pro hac vice forthcoming*)
Lauren B. Cury (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jennifer.fleury@hoganlovells.com
justin.bernick@hoganlovells.com
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com

*Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

HOGAN LOVELLS
US LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT