1

HOGAN LOVELLS US LLP
2
Michael M. Maddigan (Bar No. 163450)
1999 Avenue of the Stars
3
Suite 1400
Los Angeles, CA 90067
4
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
5
michael.maddigan@hoganlovells.com

6
Jennifer Fleury (*pro hac vice pending*)
7
Justin W. Bernick (*pro hac vice pending*)
Anna Kurian Shaw (*pro hac vice pending*)
8
Lauren B. Cury (*pro hac vice pending*)
HOGAN LOVELLS US LLP
9
555 13th Street NW
Washington, DC 20004
10
Telephone: (202) 637-5600
jennifer.fleury@hoganlovells.com
11
justin.bernick@hoganlovells.com
anna.shaw@hoganlovells.com
12
lauren.cury@hoganlovells.com
13

14
*Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

15
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
16
**SAN FRANCISCO DIVISION**

17
Case No.: **3:25-CV-02519-TSH**

18
Celonis SE and Celonis, Inc.
**PLAINTIFFS CELONIS SE'S AND**
19
Plaintiffs,
**CELONIS, INC.'S NOTICE OF MOTION**
**AND MOTION FOR PRELIMINARY**
20
**INJUNCTION; MEMORANDUM OF**
v.
**POINTS AND AUTHORITIES**
21
SAP SE and SAP America, Inc.
22
**Date: April 24, 2025**
Defendants.
**Time: 10:00 AM**
23
**Judge: Honorable Thomas S. Hixson**
**Courtroom: E, 15th Floor**
24

25
**REDACTED PUBLIC VERSION**
26

27

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

NOTICE OF MOTION AND MOTION ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

STATEMENT OF ISSUES TO BE DECIDED ................................................................ 2

INTRODUCTION ........................................................................................................... 3

I.    FACTUAL BACKGROUND ............................................................................ 4

II.   LEGAL STANDARD ....................................................................................... 8

III.  CELONIS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM
      ABSENT INJUNCTIVE RELIEF ..................................................................... 8

IV.   CELONIS IS LIKELY TO SUCCEED ON THE MERITS ............................... 10

      A.    Celonis is Likely to Succeed on its Tortious Interference Claims ............. 10

      B.    Celonis Is Likely to Succeed on its Antitrust Claims ................................ 12

            1.    Celonis is Likely to Succeed in Defining Relevant Antitrust
                  Markets .......................................................................................... 12

                  a.    ERP Applications Foremarket ..................................... 13

                  b.    SAP ERP Data Access and SAP Process Mining
                        Aftermarkets............................................................... 14

            2.    Celonis Is Likely to Succeed in Establishing Market Power
                  in the SAP ERP Data Access Aftermarket.................................... 14

            3.    Celonis is Likely to Succeed on its Monopolization Claim
                  Under Section 2 of the Sherman Act for the SAP ERP Data
                  Access Market ............................................................................... 15

            4.    Celonis is Likely to Succeed on Its Attempted
                  Monopolization Claim Under Section 2 of the Sherman Act ........ 16

                  a.    The Evidence Will Establish SAP's Anticompetitive
                        Conduct and Corresponding Intent to Monopolize
                        the Process Mining Market .......................................... 16

                  b.    The Evidence Will Establish SAP's Dangerous
                        Probability of Success ................................................. 17

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

5.    Celonis is Likely to Succeed on Its Illegal Tying Claims Under Section 1 of the Sherman Act and the Cartwright Act ........ 17

6.    Celonis is Likely to Succeed on Its Bundling and Predatory Pricing Claims Under Section 2 of the Sherman Act ..................... 18

7.    Celonis is Likely to Establish that SAP's Anticompetitive Conduct is Causing Antitrust Injury ................................................ 19

C.    Celonis is Likely To Succeed On Its False Advertising Claims ............... 19

D.    Celonis is Likely to Succeed on Its Unfair Competition Claim ................ 20

V.    THE BALANCE OF EQUITIES TIPS STRONGLY IN FAVOR OF CELONIS .............................................................................................. 22

VI.    THE INJUNCTION IS IN THE PUBLIC INTEREST ......................................... 23

VII.    CONCLUSION ............................................................................................... 23

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*,
    No. 23-vc-1903, 2024 WL 1699509 (C.D. Cal. Mar. 28, 2024)...............................................9

*Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*,
    No. 18-CV-06663-TSH, 2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) ..............................10

*All. for Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).............................................................................................8

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
    534 F. Appx. 633 (9th Cir. 2013)........................................................................................9

*Boardman v. Pac. Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016).............................................................................................8

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)..............................................................................................17

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ..........................................................................................................18

*Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.*,
    No. 07-cv-894, 2008 WL 11333638 (C.D. Cal. Nov. 19, 2008)........................................17

*Cascade Health Sol. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)............................................................................................18

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ......................................................................................................21

*Chabner v. United Omaha Life Ins. Co.*,
    225 F.3d 1042 (9th Cir. 2000)...........................................................................................21

*Cisco Sys., Inc. v. Beccela's Etc., LLC*,
    403 F. Supp. 3d 813 (N.D. Cal. 2019) .............................................................................21

*Cisco Systems, Inc. v. Shenzhen Usource Technology Co.*,
    No. 20-CV-04773, 2021 WL 6052007 (N.D. Cal. Dec. 21, 2021) ...................................20

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
    No. 18-cv-1441, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ......................................23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

*Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*,
  411 F.3d 1030 (9th Cir. 2005)............................................................................16

*Credit Bureau Connection, Inc. v. Pardini*,
  726 F. Supp. 2d 1107 (E.D. Cal. 2010)..............................................................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ............................................................12, 14, 17, 18

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023).............................................................................14

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................................21

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016) ..............................................................9

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)........................................................................8, 11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)................................................................13, 14, 16

*Intuit Inc. v. HRB Tax Group, Inc.*,
  No. 24-CV-00253, 2024 WL 5320392 (N.D. Cal. Dec. 3, 2024) ......................23

*Jorgensen v. Cassiday*,
  320 F.3d 906 (9th Cir. 2003).............................................................................23

*Kwan Software Engr., Inc. v. Foray Techs., LLC*,
  No. C 12-03762, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014)...........................20

*Moonbug Entm't Ltd. v. HappyKidsTV*,
  No. 22-cv-3203, 2022 WL 18859471 (N.D. Cal. Dec. 15, 2022)..........................9

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008)......................................................................13, 14

*Payroll Res. Grp. v. HealthEquity Inc.*,
  No. 23-cv-2794, 2024 WL 4194795 (N.D. Cal. Sept. 12, 2024) ........................20

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)......................................................................12, 14

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991)...........................................................................8, 9

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

*Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co., Ltd.*,
    62 F. Supp. 3d 1027 (N.D. Cal. 2014) .......................................................................19

*Sony Comput. Ent. Am., Inc. v. Gamemasters*,
    87 F. Supp. 2d 976 (N.D. Cal. 1999) .........................................................................7

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir.1997)....................................................................................19

*SuccessFactors, Inc. v. Softscape, Inc.*,
    544 F. Supp. 2d 975 (N.D. Cal. 2008) ......................................................................19

*Synopsys, Inc. v. InnoGrit, Corp.*,
    No. 19-cv-2082, 2019 WL 2617091 (N.D. Cal. June 26, 2019)..................................9

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ..............................................................................................21

*United States v. E.I. duPont de Nemours & Co.*,
    351 U.S. 377 (1956)...................................................................................................12

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).......................................................................................12, 14, 15

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.*,
    210 Cal. App. 4th 579 (Ct. App. 2012).....................................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................................................22

**Statutes**

15 U.S.C. § 1 (Sherman Act) ...........................................................................12, 17, 21

15 U.S.C. § 2 (Sherman Act) .......................................................................12, 15, 16, 18, 21

15 U.S.C. § 1125 (Lanham Act) ...........................................................................2, 19, 20, 21

Cal. Bus. & Prof. Code § 16700, *et seq.* (California Cartwright Act) ......................17, 21

Cal. Bus. & Prof. Code § 17200, *et seq.* (California Unfair Competition Law)................20, 21, 22

Cal. Bus. & Prof. Code § 17500, *et seq.* (California False Advertising Law)...............2, 19, 20, 21

**Other Authorities**

Fed. R. Civ. P. 65 .........................................................................................................1

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

**NOTICE OF MOTION AND MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on April 24, 2025, or as soon as the matter may be heard, in the United States District Court for the Northern District of California, San Francisco Division, Celonis SE and Celonis, Inc. (collectively, "Celonis") will and hereby do move this Court, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction order enjoining SAP SE and SAP America, Inc. (collectively, "SAP"), and all those acting at their direction or in concert with them, from the acts set forth in the accompanying proposed order, namely: (a) implementing and/or enforcing any policy, technical measure or modification to licensing terms, or change to the same that would inhibit or prevent customers from utilizing Celonis' ABAP extractor to extract their data from the SAP ERP application; (b) implementing any policy change, technical measure or modification to licensing terms that would require customers to pay more to extract data for use with non-SAP competitor process mining solutions; and (c) making, issuing, or causing to be made any communications with or directed at customers suggesting that using Celonis will: (i) negatively impact customers' migration to S/4HANA, pose a risk to customers' system stability or is otherwise incompatible with SAP or (ii) require customers to obtain a full-use license or pay other fees not imposed on Signavio customers. SAP should be directed to allow Celonis' ABAP extractor to continue operating with SAP's ECC and S/4HANA platforms without additional cost until (1) the completion of all legal proceedings in this Action, including all appeals, or (2) further order of the Court. Such protections should extend to Celonis' affiliates, partners, employees, users, and customers.

This motion is made on the grounds that: (1) absent a preliminary injunction, Celonis is likely to suffer irreparable harm; (2) Celonis is likely to succeed on the merits of its claims; (3) the balance of equities tips sharply in Celonis' favor; and (4) the public interest supports an injunction. This motion is based upon the Complaint in this action; this Notice of Motion; the Memorandum of Points and Authorities; the Proposed Order; the Declarations of Hayk Zargaryan, William Mark Jacobs, and Kostis Hatzitaskos, Ph.D.; all matters with respect to which this Court may take judicial notice; and such oral and documentary evidence as may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

**1.    Does SAP's conduct threaten immediate irreparable harm to Celonis?** Yes. SAP continues its false and misleading statements to customers and its campaign of exclusionary conduct, particularly during a time when significant numbers of Celonis' contracts are up for renewal, Celonis stands to lose █████████ of its business and █████████████ of dollars in revenue.

**2.    Does Celonis present a likelihood of success on the merits?** Yes. SAP's actions constitute tortious interference with Celonis' contracts and prospective economic relations and constitute fraudulent, unlawful, and unfair business practices. Applicable law establishes that SAP cannot use its dominant power and anticompetitive conduct in one market to exclude Celonis, its competitor in another market. And SAP's false and misleading statements to customers constitute false advertising under the Lanham Act and California law.

**3.    Does the balance of equities tip in Celonis' favor?** Yes. Without an injunction, Celonis is at risk of losing █████████ of its business. By contrast, SAP cannot identify any legitimate harm in permitting the status quo to continue while the merits are decided.

**4.    Would the requested injunction serve the public interest?** Yes. The injunction serves not only the public's interest in proper enforcement of the antitrust laws and avoidance of false advertising, but also the customers' interest in having access to software products under the same technical and policy restrictions that existed at the time of the contracting. Moreover, customers have an interest in not being misled by false and deceptive communications, including into purchasing expensive licenses or migrating to inferior products.

Hogan Lovells US LLP
Attorneys At Law
Los Angeles

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

1

## INTRODUCTION

2      Celonis moves for a preliminary injunction to protect a business it built through superior

3 innovation from being gutted by an anticompetitive change in policy and corresponding false and

4 misleading statements by SAP. SAP is the world's largest provider of Enterprise Resource

5 Planning ("ERP"), the software application within a company that runs a company's core business

6 processes. Compl. ¶ 51. SAP has long touted its open ecosystem, inviting innovators to develop

7 applications that integrate with SAP's system through programs like SAP Startup Focus. *Id.* ¶ 3.

8 Celonis was one such innovator, pioneering a new industry called process mining, which works

9 with the troves of data managed by ERP systems to help businesses visualize and improve their

10 end-to-end processes. *Id.* Celonis, like competing process mining vendors, is dependent on access

11 to the source data housed in SAP's ERP. *Id.* ¶ 39.

12      SAP, having acquired a competitor to Celonis called Signavio, now seeks to use its control

13 over its ERP customers to monopolize the process mining market.  *Id.* ¶¶ 4-5. In particular, SAP

14 seeks to exclude application providers like Celonis from competing for SAP's customer base,

15 which will deprive SAP's customers of the option to use innovative vendors like Celonis. *Id.* ¶¶

16 1, 5.

17      SAP seeks to gain market share in process mining not through superior innovation or

18 quality, but through exclusionary conduct, such as making false and misleading claims about the

19 supposed risks of using third party options for data access, and changing its licensing terms to

20 make it de facto impossible for customers to work with non-SAP process mining solutions. This

21 conduct contradicts SAP's prior statements to regulators that third parties like Celonis could

22 continue to access data in its ERP without incurring extra fees, thus keeping its downstream

23 ecosystem open and competitive. *Id.* ¶ 172.

24      Using its control over its ERP ecosystem, SAP is forcing all of its customers to incur a

25 costly migration to its S/4HANA cloud-based ERP solution on SAP's timetable.  Simultaneously,

26 SAP is weaponizing its licensing terms to prevent SAP customers from sharing their own data

27 with vendors, including Celonis, without paying prohibitively expensive fees. SAP is falsely

28

Hogan Lovells US
LLP
Attorneys At Law
Los Angeles

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

claiming that customers' continued use of Celonis' services is noncompliant with SAP licensing terms, requires additional costly licenses, creates a risk to their systems' stability, and will interfere with the migration SAP is forcing customers to undergo, all at a time when a large percentage of Celonis' contracts are coming due for renewal. *Id*. ¶¶ 131, 135, 177-80. In April 2025, SAP plans to launch its Datasphere pricing scheme which will impose exorbitant costs on third-party providers while allowing SAP Signavio users to access Datasphere's capabilities for free. *Id*. ¶¶ 149, 171.

Celonis filed the underlying action against SAP, asserting eleven causes of action arising from SAP's campaign of tortious interference, anticompetitive conduct, and false and misleading advertising designed to exclude vendors like Celonis from competing for SAP ERP customers. Facing immediate irreparable harm—including the threat of losing ███████████ of dollars in revenue, ██████████ its customer base, market share, and goodwill—Celonis now seeks emergency injunctive relief from this Court. All of the relevant factors weigh strongly in favor of injunctive relief, and a preliminary injunction should issue.

## I.    FACTUAL BACKGROUND

Celonis' computer scientists invented process mining, which relies on data extracted from a company's ERP application to model, analyze, and optimize business processes. Compl. ¶¶ 22, 35. Process mining companies act as a bridge between a company's ERP and its business processes by extracting a company's data from the ERP and converting the data into visual analytics that allow companies to readily analyze the effectiveness of their processes. *Id*. ¶ 42. Businesses of all sizes use insights from process mining to uncover opportunities for value and to fix inefficiencies. *Id*. ¶¶ 24-25.

Celonis and other process mining providers function by connecting their data extraction and analysis capabilities to a company's ERP, such as SAP's Enterprise Central Component ("ECC"), or SAP S/4HANA. *Id*. ¶¶ 32, 54, 67, 69. Because process mining relies on a business's own data stored in an ERP, Celonis depends on access to SAP's ERP to provide process mining to SAP's customers. *Id*. ¶ 39. Celonis launched its ABAP extractor in reliance on open access to SAP's ERP

Hogan Lovells US
LLP
Attorneys At Law
Los Angeles

platform. *Id.* ¶ 3. The functions involved in process mining are dynamic and complex, meaning connectors must be customized to the ERP system from which they extract data. Celonis' dedicated SAP extraction tool cannot, without modification, be used to extract data from another company's ERP system. *Id.* ¶ 38.

Recognizing the value of Celonis' offering for both SAP and its customers, SAP and Celonis maintained a mutually beneficial contractual relationship for many years following Celonis' launch. *Id.* ¶ 3. Through this relationship, Celonis provided its process mining services to SAP and SAP's customers, *id.*, and SAP even marketed Celonis' services as "SAP Process Mining by Celonis." *See* Ex. A, Zargaryan Decl. ¶ 13. Through contracts and development, SAP became—and remains—the cornerstone ERP of Celonis' business. Celonis has since expanded its offerings and provides process mining to businesses that use other ERP providers, such as Oracle. However, because SAP is the market-leading provider of ERP applications, approximately ███ of Celonis' business is connected to customers that have SAP ERP systems. Compl. ¶ 37.

Despite the long-term partnership and successful collaboration between SAP and Celonis, SAP acquired a direct competitor of Celonis, Signavio, in March 2021. *Id.* ¶ 105. Celonis and SAP then terminated their formal relationship on November 15, 2022. *Id.* ¶ 105. As part of the regulatory review of SAP's acquisition of Signavio, SAP made specific assurances to competition authorities that it would not apply fees for the data extraction method relied on by Celonis—assurances which were relied on by regulators in approving the acquisition and determining that SAP would be unlikely to engage in foreclosure for downstream competitors. *Id.* ¶ 107, 115. Although the formal relationship between the two companies ended, many Celonis customers continued to contract with SAP for ERP services, and with Celonis for process mining services, necessarily requiring Celonis to work with SAP. Until recently, this ongoing (albeit informal) symbiotic relationship continued without issue.

SAP announced in 2022 that it would discontinue its ECC services by the end of 2027 (extending an earlier deadline), forcing all customers to transition to S/4HANA by that cut-off.

*See id*. ¶¶ 95-100. Almost 70% of SAP's customers have yet to transition to S/4HANA. *See id*. ¶ 97. SAP is urging those customers to migrate as soon as possible, however, as the process could take approximately two years. *See id*. ¶¶ 95-100, 165-66. Because of this timeline, the 2027 ECC services cutoff, and the extensive investment and data lock-in of ERP customers, many SAP customers have little choice but to migrate now and incur extensive migration costs, sometimes upwards of $100 million. *Id*. ¶¶ 96-101. In addition to their breathtaking expense, ERP migrations present significant risk to companies, and SAP's forced S/4HANA migration is no different. *See id*. ¶ 99. SAP is exploiting the uncertainty caused by its migration policies to advance its native offerings and to unlawfully exclude third-party vendors from offering competing products. Specifically, SAP is proactively making misrepresentations in the marketplace that vendors like Celonis could be responsible for any migration failures and that any such failure is at the customer's own risk. *See id.* ¶¶ 152-56.

Through this process, SAP has gradually implemented four increasingly restrictive and anticompetitive tactics to exclude competition and flex its market power. The fourth tactic alone— the launch of the SAP Datasphere pricing structure in April 2025—will wholly thwart SAP's competition.

***First***, SAP now is telling its customers that they may only extract S/4HANA data through either SAP's Datasphere extractor or through an extraction method called OData. *Id*. ¶ 151. Both methods present issues. Datasphere requires customers to pay an exorbitant cost to SAP if the customer wants to use a third-party vendor, rendering Celonis' service prohibitively expensive for customers. *Id*. ¶¶ 163, 175. Comparatively, OData is drastically inferior and technically infeasible when compared to either Datasphere or Celonis' ABAP extractor. *Id*. ¶¶ 149, 174. This effectively blocks all non-SAP extraction methods. SAP is telling customers that Celonis—once contractually required to remain compliant with SAP and marketed as an SAP service—is no longer compliant with SAP despite no change to the character of Celonis' products. *Id*. ¶ 155–58.

***Second***, in February 2024, SAP modified its guidance to SAP users, informing them that SAP no longer permits certain third-party extractions. *Id*. ¶ 138. SAP then updated its guidance

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

again in July 2024 to self-preference its own data extraction solution. *Id*. ¶ 144. The July update recommends that customers "use SAP Datasphere for realizing data replication scenarios," *id*. ¶ 145, in a further effort to exclude third-party options like Celonis.

**Third**, SAP is using Celonis' contract renewal negotiations to mislead the market and pressure Celonis' customers to switch to Signavio. Given the natural lifecycle of contracts in this industry, ████ of Celonis' existing business is at risk of being lost if contracts are not renewed because of SAP's tactics. *See* Ex. B, Jacobs Decl. ¶ 10. Celonis is actively negotiating renewals of these contracts, while SAP is actively making false and misleading statements to the same customers to make the switch to Signavio now, claiming Celonis is noncompliant, destined to incur substantial fees, and likely to impede their migrations. Compl. ¶¶ 165-84. As Celonis competes for new business and old contracts come up for renewal, customers have expressed fears of SAP ERP service disruptions as they migrate based on SAP's false statements. Jacobs Decl. ¶ 7. SAP continues to mislead the marketplace and exercise its market power to strongarm companies into preventing their use of third parties for process mining, urging them to opt for Signavio instead.

**Fourth**, at the end of April 2025, SAP will launch the Signavio and SAP Datasphere integration, which is currently in Beta testing. Compl. ¶¶ 159-63. This roll out is the capstone of SAP's escalating harm to the market. SAP's Datasphere will impose extremely high premium outbound service costs on Celonis' customers and potential customers, creating a prohibitive barrier to continued use of Celonis for data extraction. *Id*. ¶ 163. Meanwhile, SAP's Signavio—which even SAP implicitly acknowledges is inferior, given that it has promised (without factual support) that Signavio will have all the features and functionality of Celonis by 2027—will not be subject to the same integration fee under this latest SAP policy change. *Id*. ¶ 164. Current Celonis customers up for renewal are likely to abandon Celonis due to these restrictions, and customers are likely to choose Signavio as anything else is effectively prohibited or prohibitively expensive. Jacobs Decl. ¶ 10. Celonis now imminently faces loss of a significant portion of its current and future business as soon as this new SAP Signavio and Datasphere integration is unveiled for all SAP ERP customers.

## II.    LEGAL STANDARD

A "preliminary injunction is an equitable remedy." *Sony Comput. Ent. Am., Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 983 (N.D. Cal. 1999). "District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (citation omitted). "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Boardman*, 822 F.3d at 1024 (citation omitted). A moving party must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted).

The Ninth Circuit employs a "sliding scale test," in which "a stronger showing of one element may offset a weaker showing of another." *Cottrell*, 632 F.3d at 1131. "So, when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citation omitted). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *See Cottrell*, 632 F.3d at 1135.

Because Celonis can establish each required element—that it is likely to suffer irreparable harm in the absence of preliminary relief, that it is likely to prevail on the merits or at the very least to raise serious questions going to the merits, that the balance of hardships tips sharply in its favor, and that an injunction is in the public interest—a preliminary injunction should be issued.

## III.    CELONIS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Courts recognize that intangible and unquantifiable injuries often lack an adequate legal

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

1  remedy and, therefore, constitute irreparable harm. *See id.* at 603 ("[I]ntangible injuries . . . qualify

2  as irreparable harm"). SAP's misconduct—and SAP's clear intent to continue this misconduct—

3  have caused and will continue to cause irreparable harm to Celonis. Jacobs Decl. ¶¶ 11-13; Zargaryan

4  Decl. ¶ 16.

5        ***Loss of customers and damage to customer relationships***. The threat of losing customers

6  supports a finding of irreparable harm. *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. Appx. 633,

7  636 (9th Cir. 2013) (affirming finding of irreparable harm where plaintiff provided "evidence of

8  threatened loss of [] customers or goodwill"). Even where a specific customer has not yet left, the

9  Ninth Circuit recognizes that interfering with a company's relationship with its customers can

10  constitute irreparable harm. *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016)

11  (finding irreparable harm based on likelihood of losing established customer relationships).

12        Celonis will lose a significant amount of customers if SAP continues to coerce those

13  customers with false statements concerning Celonis' compatibility with the SAP ERP application,

14  threats concerning the loss of SAP support for customers' ERP migrations, and deceptions

15  concerning the risk to customers' systems and migrations associated with continued use of Celonis.

16  Jacobs Decl. ¶ 13. The loss of these customers is and will be the direct result of SAP's efforts to

17  disrupt unlawfully Celonis' relationships with the same. These facts amply demonstrate irreparable

18  harm. *See Accretive Specialty Ins. Sols., LLC v. XPT Partners, LLC*, No. 23-vc-1903, 2024 WL

19  1699509, at *12-13 (C.D. Cal. Mar. 28, 2024) (granting TRO on CFAA claim; "continued loss of . .

20  . clients" demonstrates irreparable harm).

21        ***Loss of market share.*** Relatedly, "[a]mple case law supports [the] arguments that loss of

22  market share and lost profits constitute irreparable harm." *Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-

23  cv-2082, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019).

24        Here, the same facts that show Celonis is at risk of losing customers also show it is at risk of

25  losing market share. *See* Jacobs Decl. ¶ 13. SAP's unlawful behavior not only is driving away current

26  customers but also is preventing Celonis from acquiring new customers. *Id.*

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

***Damage to reputation and goodwill***. Harming a company's reputation or goodwill constitutes irreparable harm. *See Rent-A-Center*, 944 F.2d at 603 (stating damage to goodwill qualifies as irreparable harm); *see also Moonbug Entm't Ltd. v. HappyKidsTV*, No. 22-cv-3203, 2022 WL 18859471, at *10 (N.D. Cal. Dec. 15, 2022) (damage to "business, reputation, and goodwill . . . are intangible quantities sufficient to establish an irreparable harm").

Celonis has suffered and will continue to suffer such irreparable harm. Celonis has spent over a decade developing a reputation of competence, reliability, and trust with customers that span many industries, including some of the largest companies in the world. Jacobs Decl. ¶¶ 5-6. These customers have invested hundreds of millions into their ERP applications on which mission critical business processes are run. Compl. ¶¶ 34, 86. As a result, Celonis' customer base is particularly sensitive to even the perceived possibility of service interruptions. By falsely claiming that Celonis' processes are not compliant with SAP's policy requirements, disingenuously warning customers that Celonis' technology could cause migration failures, and misleading customers by assuring them that Signavio will have parity with Celonis in the future, SAP is causing Celonis' customers to doubt the veracity of Celonis' prior representations as well as the future reliability of Celonis' offerings. *See id*. ¶¶ 173–177. Customers therefore are threatening to leave Celonis or hesitating to enter into contracts with Celonis because they cannot justify paying for a product that they cannot use fully or freely. *See, e.g.*, *id*. ¶¶ 179. This misconduct has and will continue to erode Celonis' goodwill and reputation as a reliable process mining provider, built up over a decade of service. *See* Jacobs Decl. ¶¶ 12-13; Zargaryan Decl. ¶ 16; *Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *15 (N.D. Cal. Apr. 12, 2019) (finding irreparable harm when the Defendant's false advertising was "an untrue swipe at [Plaintiff's] reputation and goodwill among its customers.").

## IV.    CELONIS IS LIKELY TO SUCCEED ON THE MERITS

### A.    Celonis is Likely to Succeed on its Tortious Interference Claims

A tortious interference claim with existing or prospective relations requires Celonis to show: (1) a valid contract or an economic relationship with the probability of future economic benefit; (2)

SAP's knowledge of the contract or relationship; (3) SAP's intentional acts designed to induce a breach or disruption of the contractual or economic relationship; (4) actual breach or disruption of the contractual or economic relationship; and (5) resulting damage. *See Winchester Mystery House, LLC v. Glob. Asylum, Inc.*, 210 Cal. App. 4th 579, 596 (Ct. App. 2012). The facts here present a clear case of tortious interference.

*First*, Celonis has valid contracts with customers as well as ongoing solicitation of prospective customers. Compl. ¶¶ 128-29, 175-79.

*Second*, SAP is aware of Celonis' contracts. SAP has made false and misleading statements to those customers about compliance and has approached customers about switching to Signavio based on these misleading statements, even offering to buy out their Celonis contracts. Jacobs Decl. ¶¶ 8-9. In addition, Celonis' prospective customers have stated they must contact SAP to confirm compliance issues prior to engaging with Celonis. Compl. ¶¶ 129, 131-35, 175-80.

*Third*, SAP's false statements to Celonis' customers, whether actual or prospective, regarding Celonis' compliance and risks associated with continued use of Celonis constitute "intentional acts designed to induce a breach or disruption" of Celonis' contractual and economic relationships with third parties. *See hiQ Labs, Inc.*, 31 F.4th at 1192 (noting that "cease-and-desist letters referring to a contractual or other economic relationship between plaintiff and any third party could establish the intent element of the interference claim") (cleaned up). Indeed, SAP is combining these false statements with exhortations and enticements that Celonis' customers instead select Signavio. Compl. ¶¶ 176-79; Jacobs Decl. ¶¶ 8-9.

*Fourth*, SAP's exclusionary tactics have disrupted Celonis' ability to offer process mining services to its actual and prospective customers. Putting aside the technical and economic limitations imposed by SAP's enacted and proposed restrictions, Celonis' customers themselves have told Celonis that they are considering leaving Celonis to avoid the negative repercussions on their ERP application that SAP has threatened, such as the business risk stemming from SAP refusing to support their ERP migration and the possibility of significant fees for data extraction. Compl. ¶ 175; Jacobs Decl. ¶ 8. Such exclusionary behavior is ripe for a preliminary injunction. *See Credit Bureau*

*Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1120-22 (E.D. Cal. 2010) (granting preliminary injunction because SAP "impermissib[ly] revo[ked]" an implied license for a software program and "restricted [plaintiff's] access to the software and ability to service existing and new clients," where plaintiff had "marketed the software under its name and has enjoyed unlimited use of, and access to, the software" for years prior to revocation).

**Fifth**, disrupting these contractual and economic relationships harms Celonis. Given that customer contracts in this industry typically last ███ years, the combined lost revenue and foreclosed opportunities that SAP's conduct threatens pose an existential threat to Celonis' business.

### B.    Celonis Is Likely to Succeed on its Antitrust Claims

Section 2 of the Sherman Act forbids SAP from acquiring or maintaining market power in a relevant market via anticompetitive conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Section 1 of the Sherman Act makes it illegal for a party to agree to sell one product in which it has market power on the condition that the buyer also purchase another product, or forbid the purchase of that product from any other supplier. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62, (1992).

SAP has violated both of these provisions by abusing its market power over the access to customers' data on SAP ERP applications. SAP has used this market power to force SAP ERP customers to (1) pay unnecessary fees and costs; (2) cease using preferred options in favor of lesser quality, native options; (3) choose between successfully migrating and supporting their ERP application and utilizing Celonis; and (4) sell its Signavio offering for below cost with the intent of excluding other competitors. This conduct has allowed SAP to reduce choice, stifle innovation, raise prices and costs, reduce quality, and prevent the free flow of competition on the merits.

####    1.   *Celonis is Likely to Succeed in Defining Relevant Antitrust Markets*

A market comprises "any grouping of sales whose sellers, if unified by a monopolist," could profitably raise prices above a competitive level. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Product markets consist of products that are "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. duPont de Nemours &*

- 12 -

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

*Co.*, 351 U.S. 377, 395 (1956). The law also recognizes the concepts of "foremarkets" and "aftermarkets." An aftermarket is "wholly derivative from and dependent on" the foremarket and may constitute a relevant market where "market imperfections, including information and switching costs . . . prevent consumers from realizing that their choice in the [foremarket] will impact their freedom to shop in the aftermarket." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

There are three relevant antitrust product markets applicable to this dispute: (1) an ERP Applications Foremarket, (2) an SAP ERP Data Access Aftermarket, and (3) an SAP Process Mining Aftermarket. These markets are global because product availability is not materially limited by geography, and there are no geographic barriers to competing in these markets. Compl. ¶ 223.

a.   ERP Applications Foremarket

ERP applications is a proper foremarket because, from a product perspective, businesses of all sizes utilize ERP applications. Compl. ¶¶ 70-71. Businesses view ERP applications as essential for mission critical day-to-day business processes that are not interchangeable with other tools. *Id*. ¶ 62. SAP's S/4HANA in particular is suited for large-scale, complex enterprises, which typically have high annual revenue, high data volume, and large staff (including many employees utilizing the ERP). *Id*. ¶ 70. These ERP applications can cost business hundreds of millions, or even billions, of dollars; generally serve as the repository for most or all of the business's core data; and require continuing investment in the form of training, system integrity, breadth of use, and enterprise-wide integration. *Id*. ¶¶ 55, 89-90. These characteristics represent high barriers to entry that prevent reasonable substitutes from entering the market. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) ("Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale.").

All of these factors indicate that ERP Applications is its own independent market in the eyes of both customers and suppliers and that there are high barriers to entry that prevent the reasonable entrance of new substitutes.

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

b.  <u>SAP ERP Data Access and SAP Process Mining Aftermarkets</u>

The SAP ERP Data Access and SAP Process Mining Aftermarkets are cognizable aftermarkets. As the owner of the ERP application, SAP is the gatekeeper that controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed. Compl. ¶¶ 201. That is, the SAP ERP Data Access Aftermarket is "wholly derivative from" the ERP Applications Foremarket. *See Newcal Indus.*, 513 F.3d at 1049. The same is true for the SAP Process Mining Aftermarket. Process mining software is only useful to customers if it can conduct dynamic analysis on their business processes in real time. Compl. ¶ 214. An SAP ERP customer, thus, can only select from process mining software that is compatible with SAP's ERP application—*i.e.*, the SAP Process Mining Market is "wholly dependent on" the ERP Applications Market. *See Newcal Indus.*, 513 F.3d at 1049.

Customers in these aftermarkets are locked into their foremarket as a result of the information disparity at the time of purchase and the high costs of switching. Compl. ¶ 197; *see* Ex. C, Hatzitaskos Decl. ¶ 14. With respect to the information disparity, customers are unable to analyze the lifecycle cost of their ERP applications at the time of purchase. Compl. ¶ 191-92; Hatzitaskos Decl. ¶¶ 26, 27. Indeed, "customers engage with SAP about data access licensing well after committing to the SAP ERP" as it is a "separate product." Hatzitaskos Decl. ¶ 20.

With respect to the switching costs, customers face both direct and indirect costs at every stage from evaluation, licensing, development, and implementation, with yearly costs in the tens of millions of dollars. Compl. ¶ 193; Hatzitaskos Decl. ¶ 23.

2.  *Celonis Is Likely to Succeed in Establishing Market Power in the SAP ERP Data Access Aftermarket*

The next step is to consider a defendant's power in the market underlying its claims; in this instance, the SAP ERP Data Access Aftermarket. *Grinnell Corp.*, 384 U.S. at 570-71; *Eastman Kodak*, 504 U.S. at 464 ("we consider the other necessary feature of an illegal tying arrangement: appreciable economic power in the tying market").

Market power can be shown with direct or indirect evidence. *See Rebel Oil Co.*, 51 F.3d at 1434. For direct evidence, the Ninth Circuit requires "proof of actual detrimental effects on

1    competition, such as reduced output, increased prices, or decreased quality in the relevant market."

2    *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 983 (9th Cir. 2023) (cleaned up). For indirect

3    evidence, "[c]ourts generally require a 65% market share to establish a prima facie case of market

4    power." *Image Tech. Servs.*, 125 F.3d at 1206.

5         There is substantial evidence that SAP has market power in the SAP ERP Data Access

6    Aftermarket. SAP is the gatekeeper that controls both the technical and legal conditions on which

7    customers' data stored in the ERP application can be accessed. Compl. ¶ 201. In fact, SAP is

8    threatening to enact those restraints by cutting off access to third parties like Celonis and charging

9    for outbound integration via Datasphere. *Id.* ¶ 226. Given SAP's control over the SAP ERP data

10   access, and its ability to exclude third parties from its ERP application at will, it is likely SAP's

11   share of the market is above 65%, if not approaching 100%.  Hatzitaskos Decl. ¶ 35.

12         3.    *Celonis is Likely to Succeed on its Monopolization Claim Under Section 2 of the
               Sherman Act for the SAP ERP Data Access Market*

13   After establishing market power in a relevant product market, a plaintiff alleging

14   monopolization in violation of Section 2 of the Sherman Act must show that a defendant gained

15   or maintained that power through anticompetitive conduct. *Grinnell Corp.*, 384 U.S. at 570-71.

16   In this instance, SAP is using its market power in the SAP ERP Data Access Aftermarket to

17   subject customers to increasingly stringent restrictions on data extraction of those customers' own

18   data from SAP ERP applications. The purpose of these restrictions is to force customers who

19   desire to continue using options like Celonis' process mining software either (i) to pay additional

20   fees to SAP in the form of licenses and transfer costs or (ii) to cease using those third-party options

21   in favor of SAP's own, lesser quality offerings, such as Signavio. Compl. ¶ 226.

22         SAP also is using its market power in the SAP ERP Data Access Aftermarket to prohibit

23   customers from using Celonis' process mining software if those customers want to receive the value

24   of their SAP ERP application. *See* Zargaryan Decl. ¶ 8. SAP's restrictions on data extraction and

25   prohibitively expensive fees on data transfers, coupled with the threat that migrating customers use

26   unpermitted processes at their own risk, have forced customers to choose between undertaking

27   SAP's obligatory and impending ERP application migration and utilizing Celonis' process mining

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

software. *See* Jacobs Decl. ¶ 10. Given SAP's market power in the SAP ERP Data Access Aftermarket, and the lock-in that customers face in the ERP Applications Foremarket, it is hardly a choice at all. Compl. ¶ 228.

In addition, SAP is providing its Signavio process mining software below cost. Although SAP entices customers in the present by bundling Signavio with other specialized solutions and presenting them as a free "entitlement" with a customer's ERP application, Zargaryan Decl. ¶ 9, SAP's below-cost pricing aims to drive competitors from the SAP Process Mining Aftermarket. Once those competitors, which constrain SAP, are excluded, SAP can raise the price of its Signavio offering without restraint given the lock-in effects of the ERP Applications Foremarket. Compl. ¶ 229.

Finally, SAP's conduct contradicts representations SAP made, just over three years ago, to regulators and to the public about the type of access it would allow to its ERP application. SAP's about-face on such a fundamental issue has pulled the rug out from under customers and vendors alike, allowing SAP to enrich itself unjustly while simultaneously destroying the value created by the beneficial relationships between those two groups. *Id*. ¶ 230.

4. *Celonis is Likely to Succeed on Its Attempted Monopolization Claim Under Section 2 of the Sherman Act*

To establish attempted monopolization, Celonis must show with respect to a relevant market that SAP has "a specific intent to control or destroy competition," engaged in "predatory or anticompetitive conduct directed at accomplishing that purpose," and has "a dangerous probability of achieving monopoly power." *Image Tech. Servs.*, 125 F.3d at 1202.

a. The Evidence Will Establish SAP's Anticompetitive Conduct and Corresponding Intent to Monopolize the Process Mining Market

Anticompetitive conduct alone can satisfy the specific intent requirement if the conduct "form[s] the basis for a substantial claim of restraint of trade" or is "clearly threatening to competition or clearly exclusionary." *Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*, 411 F.3d 1030, 1042 (9th Cir. 2005) (citation omitted). In this instance, SAP has noted its intent to divert customers from Celonis to Signavio. Compl. ¶ 106. It is now acting upon that intent by

- 16 -

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

using its market power in the SAP ERP Data Access Aftermarket and the anticompetitive conduct discussed above to achieve what it could not through competition on the merits—exclusion of Celonis from the SAP Process Mining Aftermarket and adoption of its Signavio offering. Rather than improving the product, SAP is moving to restrict its own customers from using any other competing product, including Celonis' process mining software. These restrictions thus ensure that customers will have to utilize the lower quality Signavio for their process mining needs. *Id.* ¶ 227.

### b. The Evidence Will Establish SAP's Dangerous Probability of Success

There is a dangerous probability that SAP will succeed in monopolizing the SAP Process Mining Aftermarket. In determining dangerous probability of success, courts do not rely exclusively on market share and have foregone it when other factors like high barriers to entry indicate that competitive forces will not constrain a defendant's pricing. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 319 (3d Cir. 2007) (foregoing market share analysis in light of extensive allegations concerning licensing practices); *Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.*, No. 07-cv-894, 2008 WL 11333638, at *2 (C.D. Cal. Nov. 19, 2008) ("[M]arket share is not dispositive. Rather, it is just one factor for courts to consider.") (citation omitted). Because process mining relies on a business's own data, it is dependent on access to that data sitting within the SAP ERP application. Compl. ¶ 40. But SAP is the gatekeeper that controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed. *Id.* ¶ 201. And this control is not restrained or otherwise regulated by competition in the foremarket, due to the lock-in effect created by the difficulty of switching away from an ERP provider. *Id.* ¶¶ 218–220.

### 5. *Celonis is Likely to Succeed on Its Illegal Tying Claims Under Section 1 of the Sherman Act and the Cartwright Act*

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak*, 504 U.S. at 461-62 (citation omitted). "[I]f the seller has 'appreciable economic power' in the tying product market and if the

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

arrangement affects a substantial volume of commerce in the tied market," there is an antitrust violation. *Id.* at 462. That is the case here.

SAP possesses market power in the SAP ERP Data Access Aftermarket, *i.e.*, the "tying" product market. *See* Section IV(B)(2). That power has allowed SAP to likewise restrain competition and coerce others in the SAP Process Mining Aftermarket, *i.e.*, the "tied" product market. *See id.* Specifically, SAP has conditioned migration and support of customers' ERP applications—business investments worth millions, even billions—on customers agreeing not to use Celonis' process mining software. If customers continue to use Celonis' data extraction—a necessary component to get the value of Celonis' process mining software—then the use is at the customers' own risk. SAP will deem any migration failure—a migration SAP has instructed customers to undertake as soon as possible—to be a result of the tool and will not provide the customer support (even if customers are paying for it as part of their ERP license). Compl. ¶ 151-58; Zargaryan Decl. ¶ 7. Thus, Celonis is likely to succeed on its illegal tying claim.

   6. *Celonis is Likely to Succeed on Its Bundling and Predatory Pricing Claims Under Section 2 of the Sherman Act*

A seller engages in illegal bundling under Section 2 of the Sherman Act if "the full amount of the discounts given by the [seller] on the bundle," when allocated to the competitive product, results in the "price of the competitive product… [being] below the [seller]'s incremental cost." *Cascade Health Sol. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008). Similarly, a seller engages in predatory pricing under Section 2 of the Sherman Act if it prices below an appropriate measure of cost and has a dangerous probability of recoupment via supracompetitive prices after the competitor is excluded from the market. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

The evidence establishes that SAP is offering Signavio at low cost or no cost to its customers, at least on a trial basis, sometimes bundled as part of its RISE offering. Compl. ¶ 5, 114. The discount across the bundle, if applied to the price of Signavio outside the bundled offering, would place the Signavio offering below its incremental cost. *Id.* ¶ 115. While SAP is offering Signavio below cost, its licensing requirements significantly *raise* the cost of using an

- 18 -

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

option like Celonis, particularly if SAP insists the option necessitates a "full use" license as opposed to simply a "runtime" license. *Id.* ¶ 115.

SAP has a dangerous probability of recouping its predatory pricing on Signavio given its control of the SAP Process Mining Market. As detailed in Section I above, SAP controls the technical and policy restrictions for the market that dictate how and whether vendors can offer process mining software to SAP ERP customers. *See* Zargaryan Decl. ¶ 7-11. SAP's current conduct illustrates its ability to drive those vendors from the market, ultimately leaving SAP ERP customers with only one viable choice for process mining: Signavio. Thus, Celonis is likely to succeed on its illegal bundling and predatory pricing claims.

> 7. *Celonis is Likely to Establish that SAP's Anticompetitive Conduct is Causing Antitrust Injury*

As stated above in Section I, SAP's assault on Celonis has caused Celonis to lose customers and the trust of the marketplace, both of which it has cultivated for over a decade since its founding, as a result of SAP's anticompetitive conduct. Given that customer contracts in this industry typically last ███ years, the combined lost revenue and foreclosed opportunities that SAP's conduct threatens pose an existential threat to Celonis' business. *See* Jacobs Decl. ¶ 13. Indeed, allegations that SAP's predatory pricing tactics have resulted in losses to Celonis and "deprived consumers of technological choices and innovative technology options" constitute antitrust injury. *See Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co., Ltd.*, 62 F. Supp. 3d 1027, 1044 (N.D. Cal. 2014) (citations omitted). Celonis is therefore likely to succeed on its antitrust claims.

**C.    Celonis is Likely To Succeed On Its False Advertising Claims**

A Lanham Act false advertising claim requires Celonis to show: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *SuccessFactors, Inc.*

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

*v. Softscape, Inc.*, 544 F. Supp. 2d 975, 982 (N.D. Cal. 2008) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997)). California's False Advertising Law ("FAL") is "substantially congruent" to Lanham Act claims for false advertising, *Cisco Systems, Inc. v. Shenzhen Usource Technology Co.*, No. 20-CV-04773, 2021 WL 6052007, at *4 (N.D. Cal. Dec. 21, 2021), and the analysis for these claims is the same. *Kwan Software Engr., Inc. v. Foray Techs., LLC*, No. C 12-03762, 2014 WL 572290, at *3 (N.D. Cal. Feb. 11, 2014).

Here, SAP has made false statements of fact that continued use of Celonis' services (1) will negatively impact customers' migration to S/4HANA; (2) poses a risk to customers' system stability; and (3) does not, absent additional costly licensing, comply with SAP policies. Zargaryan Decl. ¶ 7-9, Compl. ¶¶ 129, 131-32, 134-35. These statements have been made both in correspondence with customers and in commercial advertisements, Compl. ¶¶ 129, 131-32, including to customers located in the United States. *See* Zargaryan Decl. ¶ 12; Compl. ¶ 129. Celonis already has been approached by multiple existing and prospective customers who have been deceived by and are concerned with these statements, Compl. ¶¶ 175, 178, including due to the financial and operational consequences they implicate. *Supra* at 6.

Indeed, at least one customer whose departure alone will cost Celonis several million dollars in revenue has indicated that it is considering leaving Celonis for Signavio as a result of SAP's false representations. Compl. ¶ 179. Others are hesitating to enter into contracts with Celonis at all. *Supra* at 10. And SAP's false statements are further eroding Celonis' goodwill and reputation as a reliable process mining provider, built up over a decade of service, including by causing Celonis' customers to doubt the veracity of Celonis' prior representations as well as the future reliability of Celonis' offerings. *Supra* at 10.

**D.      Celonis is Likely to Succeed on Its Unfair Competition Claim**

California's Unfair Competition Law ("UCL") is designed "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Payroll Res. Grp. v. HealthEquity Inc.*, No. 23-cv-2794, 2024 WL 4194795, at *4 (N.D. Cal. Sept. 12, 2024) (citation omitted). It prohibits any business practice that is "unlawful," "unfair," or

1    "fraudulent," and provides for injunctive relief. *See* Cal. Bus. & Prof. Code § 17200; *see also id.*

2    § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition

3    may be enjoined in any court of competent jurisdiction"). A business practice is "unlawful" under

4    the UCL if it violates any other law. *See Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042,

5    1048 (9th Cir. 2000). Thus, SAP's violations of Sections 1 and 2 of the Sherman Act, as well as

6    Section 16700 of the Cartwright Act, for monopolization, attempted monopolization, illegal tying,

7    illegal bundling, and predatory pricing can serve as the basis for a UCL claim.

8    　　　　A business practice is "fraudulent" when the conduct is likely to deceive members of the

9    public and market participants. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). Thus,

10   SAP's false advertising and resultant violations of the Lanham Act and FAL also serve as

11   independent bases for Celonis' UCL claim. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d

12   1074, 1089 (N.D. Cal. 2017) (noting that a violation of the FAL "is also a violation of the

13   fraudulent prong of the UCL"); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D.

14   Cal. 2019) (finding that "a valid claim under the Lanham Act…satisfies both the UCL's unlawful

15   and fraudulent prongs").

16   　　　　Under the UCL, a business practice is "unfair" when the conduct violates even the "policy

17   or spirit" or is "comparable" to a violation of the antitrust laws, or "otherwise significantly

18   threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th

19   163, 187 (1999). SAP's scheme is "unfair" for similar reasons as it is anticompetitive—SAP is

20   leveraging its monopoly power to extract ill-gotten gains from both its customers' and vendors'

21   investment into the SAP ERP ecosystem. With respect to customers, SAP's conduct exploits their

22   lock-in by presenting them with the option either to switch their process mining to Signavio or to

23   accept onerous and prohibitive conditions on Celonis' use. With respect to vendors, SAP's conduct

24   exploits the innovative applications those vendors developed—for the SAP ERP ecosystem at SAP's

25   encouragement no less—by coercing customers to choose or switch to an inferior native offering.

26   　　　　Finally, despite assuring regulators that "[p]rocess management software accesses data in

27   the ERP system but only requires simple scanner access for which no fees for indirect use are

28

Hogan Lovells US LLP
Attorneys At Law
Los Angeles

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

1  applicable," SAP now has disavowed those assurances, Compl. ¶ 107, raising an additional basis

2  for Celonis' UCL claim under the fraudulent prong. SAP's broken promises impact vendors like

3  Celonis, as well as customers, since both groups had relied on those assurances to understand how

4  data could be extracted from the SAP ERP application. *Id.* ¶ 123, 134. Thus, Celonis is likely to

5  succeed on its UCL claim.

6  **V.    THE BALANCE OF EQUITIES TIPS STRONGLY IN FAVOR OF CELONIS**

7       Courts "balance the competing claims of injury and . . . consider the effect on each party of

8  the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

9  7, 24 (2008). Absent judicial relief, SAP will continue to coerce Celonis' customers into switching

10 to Signavio. As a result of SAP's current conduct, Celonis expects to lose significant customers, as

11 well as the trust of the marketplace, both of which it has cultivated for over a decade. Jacobs Decl. ¶

12 13-14. Given that customer contracts in this industry typically last ███ years, the combined lost

13 revenue and foreclosed opportunities from SAP's conduct pose an existential threat to Celonis'

14 business. *Id.* ¶ 14.

15      By sharp contrast, SAP faces no burden here. The requested relief amounts to merely

16 returning to the status quo prior to SAP's current anticompetitive conduct. Celonis has extracted data

17 from SAP's ERP application for years without incident. Compl. ¶ 126. And there is no evidence that

18 Celonis' long-standing tools have caused or are causing any issues with customers' migrations from

19 ECC to S/4HANA, as many of Celonis' own clients have completed their migration without issue.

20 Zargaryan Decl. ¶ 8; Compl. ¶ 158. To the extent there is any adverse economic effect that Celonis'

21 existence could have on SAP, that effect does not warrant putting Celonis' business under threat

22 before the merits of this case can be decided.

23      In addition to these risks to Celonis, its process mining software adds value to SAP by giving

24 SAP users another option for that service, an option that many SAP users freely select over SAP's

25 native offering. Compl. ¶¶ 123-26. This choice enhances users' experience of the SAP ERP

26 application overall, which in turn helps SAP maintain its touted position as the leading provider of

27 ERP applications. Indeed, ERP applications generate hundreds of millions or even billions of dollars

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH

1  in revenue for SAP, versus the hundreds of thousands or low millions of dollars that users will expend

2  on a specialized solution like process mining. *Id*. ¶ 89.

3  **VI.    THE INJUNCTION IS IN THE PUBLIC INTEREST**

4      The public interest in this dispute also strongly favors quickly restoring and preserving

5  the status quo as it existed before SAP announced its change in policy. Celonis' customers are

6  themselves at risk of irreparable harm because there is demonstrable evidence that Signavio is

7  an inferior product, a quality gap that SAP does not contest and does not expect to bridge until

8  2027. Compl. ¶ 164. An order here will ensure that numerous SAP ERP application customers

9  will continue to have access to the software products for which they contracted under the

10  technical and policy restrictions that existed at the time of the contracting, helping their

11  businesses run at peak performance without disruption.

12      An order here will also help foster competition in innovation, rather than allowing SAP

13  to shut out all competitors who rely on access to its data for the duration of this litigation. The

14  public also has an important interest in ensuring proper enforcement of both the federal and

15  California antitrust laws so they can enjoy the economic and moral benefits of a fair playing field

16  that these laws were designed to preserve. "[I]t is [also] in the public interest to avoid false

17  advertising," *Intuit Inc. v. HRB Tax Group, Inc.*, No. 24-CV-00253, 2024 WL 5320392, at *18

18  (N.D. Cal. Dec. 3, 2024), so that customers and the public do not continue to be deceived and

19  misled by SAP's false statements.

20  **VII.    CONCLUSION**

21      Celonis requests that this Court issue a preliminary injunction restoring and preserving the

22  status quo. The preliminary injunction requires no security because it will have no negative effect

23  on SAP. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may

24  dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

25  defendant from enjoining his or her conduct."); *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No.

26  18-cv-1441, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018) (bond not required for injunctive

27  relief that "simply enjoin[s] Defendant from doing something Defendant never had a right to do

28

Hogan Lovells US
LLP
Attorneys At Law
Los Angeles

1 | in the first place").

2

3 | Dated: March 17, 2025                    Respectfully submitted,

4 |                                          By: */s/ Michael M. Maddigan*
   |                                          Michael M. Maddigan (Bar No. 163450)
5 |                                          HOGAN LOVELLS US LLP
   |                                          1999 Avenue of the Stars
6 |                                          Suite 1400
   |                                          Los Angeles, CA 90067
7 |                                          Telephone: (310) 785-4600
   |                                          Facsimile: (310) 785-4601
8 |                                          michael.maddigan@hoganlovells.com

9

10 |                                         Jennifer Fleury *(pro hac vice pending)*
    |                                         Justin W. Bernick *(pro hac vice pending)*
    |                                         Anna Kurian Shaw *(pro hac vice pending)*
11 |                                         Lauren B. Cury *(pro hac vice pending)*
    |                                         HOGAN LOVELLS US LLP
12 |                                         555 13th Street NW
13 |                                         Washington, DC 20004
    |                                         Telephone: (202) 637-5600
14 |                                         jennifer.fleury@hoganlovells.com
    |                                         justin.bernick@hoganlovells.com
15 |                                         anna.shaw@hoganlovells.com
16 |                                         lauren.cury@hoganlovells.com

17 |                                         *Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

18

19

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS CELONIS SE'S AND CELONIS, INC.'S NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO.: 3:25-CV-02519-TSH