HOGAN LOVELLS US LLP
Michael M. Maddigan (Bar No. 163450)
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com

Jennifer Fleury (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
Anna Kurian Shaw (*pro hac vice*)
Lauren B. Cury (*pro hac vice*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jennifer.fleury@hoganlovells.com
justin.bernick@hoganlovells.com
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com

Christopher C. Wheeler (Bar No. 224872)
Alexis J. Loeb (Bar No. 269895)
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com
aloeb@fbm.com

*Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **CELONIS SE AND CELONIS, INC.**<br><br>**Plaintiffs,**<br><br>v.<br><br>**SAP SE AND SAP AMERICA, INC.**<br><br>**Defendants.** | **3:25-CV-02519-VC-SK**<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**REDACTED PUBLIC VERSION**

1

# TABLE OF CONTENTS

2

Page

3

Nature of Action ................................................................................................................. 1

4

Parties .............................................................................................................................. 16

5

Jurisdiction and Venue .................................................................................................... 17

General Allegations .......................................................................................................... 19

6

    a.   Celonis Pioneered Process Mining and is a World Leader in the Technology ..................... 19

7

    b.   General Background on Enterprise Resource Planning ........................................ 25

8

    c.   SAP is the World's Largest Provider of ERP Applications ................................. 27

9

    d.   SAP's Process Mining Software Struggles Despite Self-Preferencing ................................ 35

10

    e.   SAP Had a Longstanding Open Access Policy for Customers to Extract Their Own Data . 40

11

    f.   SAP Begins to Falsely Claim that Celonis' Technology is Non-Compliant with SAP Users'
         Licenses ................................................................................................................ 41

12

    g.   SAP Has Taken Steps to Exclude Third-Party Providers Like Celonis for Anticompetitive
         Reasons ................................................................................................................ 50

13

14

    h.   To Enrich Itself, SAP is Forcing Customers to Choose Now Between Higher Prices and
         Lower Quality for Process Mining Software .......................................................... 58

15

    i.   SAP Dominates the SAP ERP Data Access Aftermarket and is Attempting to Dominate the
         SAP Process Mining Aftermarket ........................................................................ 62

16

17

    j.   SAP's Anticompetitive Conduct Has Harmed Competition and Caused Celonis to Suffer
         Antitrust Injury .................................................................................................... 70

18

    k.   Monopolization and Attempted Monopolization: SAP's Separate Course of Anticompetitive
         Conduct ................................................................................................................ 72

19

Interstate Trade and Commerce ....................................................................................... 84

20

Claims for Relief ............................................................................................................. 84

Prayer for Relief ............................................................................................................. 103

21

Jury Demand .................................................................................................................. 105

22

23

24

25

26

27

28

AMENDED COMPLAINT

Plaintiffs Celonis SE and Celonis, Inc. (collectively, "Celonis") complain and allege as follows against Defendants SAP SE and SAP America, Inc. (collectively, "SAP"):

### Nature of Action

1.      SAP has departed from its longstanding policies to impose a series of new, onerous restrictions that prevent customers from accessing and using their own enterprise data—even though that data belongs to the customers themselves and resides in customer databases, often in customer-owned environments. These restrictions are not commercially or technologically necessary; rather, they are part of a targeted effort to block Celonis and other competitors from serving joint customers and from participating in markets downstream from SAP's Enterprise Resource Planning ("ERP") software.

2.      Customers buy SAP's ERP software to collect and run data for various business processes, such as payroll, supply-chain management, and billing. Third parties such as Celonis offer SAP customers downstream products that use the customers' enterprise data collected by the ERP software for various purposes, including process mining. Process mining, described in detail below, is one such market in which SAP has sought to exclude competitors such as Celonis and to self-preference its own offering, Signavio. Celonis is a pioneer in process mining, which analyzes customers' enterprise data to model, analyze, and optimize their business processes.

3.      In process mining and across the enterprise tech stack generally, SAP has a clear goal: to ensure that the competitive value of its customers' enterprise data accrues solely to SAP by denying customers the freedom to work with the providers of their choice in these downstream markets.

4.      SAP's customers own that enterprise data, which resides in their instances of SAP ERP systems. SAP's General Terms and Conditions for Cloud Services explicitly recognize this, providing that "Customer owns all right and interest in and to Customer Data," defined to include "any content, materials, data and information that Authorized Users enter into the production system of a Cloud Service or that Customer derives from its use of and stores in the Cloud Service."

5.      Nevertheless, SAP also recognizes that the competitive value of that customer enterprise data is immense. Customers grant vendors—like Celonis, SAP, and myriad others—access to their data for the provision of mission-critical business services. Entire industries, such as process mining that Celonis provides, rely on access to this enterprise data. SAP accordingly has recognized that restricting its competitors' access to customer data gives it a unique anticompetitive advantage.

6.      Not surprisingly, such data access is critical for business innovation. Artificial Intelligence (AI), for example, is fundamentally based on its ability to access large amounts of enterprise data. Notably, SAP Board Member Muhammad Alam stated at SAP's 2025 SAPPHIRE conference, "In AI, the fact that we have the data and the context . . . puts [SAP in a] *category of one*."

7.      Striking a similar note to that "category of one" framing, SAP's CEO Christian Klein stated at the same conference, "[N]o other tech company has more access to semantically rich business data." The conduct described herein reflects SAP's anticompetitive scheme to misuse that unique position vis-à-vis customer data to self-preference its own products and exploit the lock-in of its customers, all at the expense of fair competition.

8.      This case is about SAP's campaign of anticompetitive and otherwise unlawful conduct designed to choke off downstream third-party technology providers, including its acts of tortious interference and false advertising in furtherance of that campaign. And this campaign is in contravention of the promises SAP has made to Celonis and other competitors, and to the market more broadly. For example, SAP has been using its control over customers' ERP data to exclude process mining competitors and other third parties that rely upon that customer data.

9.      SAP has done so not through a superior competitive offering, but through naked exclusion of rivals by making it prohibitively burdensome and costly for customers to work with non-SAP process mining solutions, a reversal of SAP's prior policies. SAP is leveraging its control over customers' data and the impending forced migration of customers to SAP's S/4HANA cloud-based ERP solution to prevent SAP customers from sharing their own data with third-party providers, including Celonis, without paying prohibitively expensive fees.

AMENDED COMPLAINT

10.     SAP has deliberately sought to exploit its market power over its large, entrenched ERP customer installed base by imposing new policies and restrictions in an attempt to destroy Celonis' business and thereby harm SAP's ERP customers and the overall market for process mining. Given the extremely high costs of switching ERP providers, SAP's ERP customers are effectively locked into the restrictions SAP now imposes on how those customers may use their own data stored on their own ERP system. SAP is now attempting to use those restrictions on data access to prevent Celonis and other competitors from competing with SAP's captive process mining company, Signavio.

**SAP Promises an "Open Ecosystem" and Free Customer Choice**

**Inducing Third Parties, Including Celonis, To Develop Around SAP**

11.     Relying on SAP's promises of an "open data ecosystem," Celonis invested in developing its business based on the extraction of customer data from its customers' own instances of SAP ERP software. Celonis joined SAP's Startup Focus program in 2012, during a time when SAP was actively encouraging the development of innovative new third-party applications that were built to work with SAP's ERP technology. SAP made clear and repeated promises of an "open enterprise platform" and "[a]n open and vibrant partner ecosystem," touting that the program was "All About Access" to help startups overcome "big data and real-time challenges" through access to SAP technology, as well as the "SAP Install Base of close to 200,000 customers across 25 industries." SAP made clear that open data access was a "fundamental pillar of [SAP's] success and growth strategy," and that its "intent [wa]s to help accelerate adoption of SAP HANA through an open ecosystem strategy."

12.     SAP's repeated, clear, and unambiguous promises of an open ecosystem and customer access to their own data have not been limited to the context of its Startup Focus Program, and indeed extended to the market more broadly, including the following examples:

a.  In a 2012 thought leadership paper titled "SAP Technology Vision: Leveraging Technology Innovation to Reshape Your Business," SAP explained, "To meet our customers' current and future business needs, SAP is developing an adaptable,

extensible, and open enterprise platform and infrastructure that delivers current and complete information at any time for any device." [1]

b. In a 2012 written interview with Computerworld, [2] SAP co-CEO Bill McDermott explained "We're here to have an open ecosystem, where we give *the customer a free choice*. They don't have to go on any forced marches" (emphasis added). In response to the question of whether HANA is "open in the sense that you'll be publishing interfaces and providing whatever information developers need," McDermott responded, "[o]f course. And we'll make a lot of noise on this topic at SAPPHIRE. We want to expand on it."

c. In its 2013 annual report, [3] SAP stated "An open and vibrant partner ecosystem is a fundamental pillar of our success and growth strategy."

d. In a 2018 blog post titled "SAP Cloud Platform: An open enterprise platform with a cloud-native core," [4] SAP wrote: "For SAP Cloud Platform, open-source and open standards have always been guiding principles to ensure that our customers and partners benefit from the latest development [sic] in cloud technology . . . . This is why SAP joined . . . the Cloud Native Computing Foundation (CNCF) as a platinum member in 2017." CNCF describes itself as "the open source, vendor-neutral hub of cloud native computing."

13.    In reliance on these promises and the continued ability of SAP customers to extract their own data and freely select third-party vendors, Celonis incurred significant costs developing its process mining software to enable customers to extract their data from their implementations of SAP's ERP systems, to integrate that data with other tools, and to provide fact-based, real-time insights to allow customers to audit, analyze, and improve business processes.

14.    By January 2014, Celonis Process Mining was officially certified by SAP for

---

[1] https://www.cs.purdue.edu/homes/bb/CS348-F15/other_handouts/SAP-technology-vision.pdf
[2] https://www.computerworld.com/article/1533842/sap-co-ceo-bill-mcdermott-explains-its-five-market-focus.html?
[3] https://www.sap.com/content/dam/site/investors/assets/2013/sap-2013-annual-report.pdf
[4] https://community.sap.com/t5/technology-blog-posts-by-sap/sap-cloud-platform-an-open-enterprise-platform-with-a-cloud-native-core/ba-p/13362772

operation with SAP systems. Recognizing the value of Celonis' offering for both SAP and its customers, SAP and Celonis had a mutually beneficial contractual relationship for the next nine years. The Startup Focus Program, on information and belief, was formally terminated in 2018 and replaced by the SAP Partner Edge program—a "program designed to foster collaboration and support between SAP and its partners." Celonis joined the SAP Partner Edge program.

15.     During the course of their partnership, Celonis and SAP collaborated on more than 220 implementations for some of the world's largest companies, including ███████████ ███.

16.     When SAP acquired Signavio in 2021, there was concern that SAP would change its policies or begin self-preferencing its own integrated Signavio process mining solution, to the detriment of competitors and consumers. Antitrust regulators relied on SAP's explicit assurances that its ecosystem would remain open and competitive in approving SAP's acquisition of Signavio, noting that SAP "explicitly confirmed" that "[p]rocess management software accesses data in the ERP system but only requires simple scanner access for which no fees for indirect use are applicable."

**SAP Reverses Course, Breaking Its Promises and Embarking on**

**A Campaign of Anticompetitive Activity**

17.     In 2023, Celonis learned that SAP had reversed course, breaking its promises of an open data ecosystem. SAP is now using its control of its ERP ecosystem to try to achieve what it could not through competition on the merits: widespread adoption of Signavio. Signavio was and remains a demonstrably inferior product to Celonis—less stable, more error-prone, and missing multiple key capabilities that customers value.

18.     SAP has engaged in increasingly egregious conduct targeting Celonis' current and potential customers to coerce them into using Signavio by, among other things: (1) tying its ERP applications (and/or its data access tools) to customers' use of Signavio and/or rejection of Celonis; (2) unlawfully bundling Signavio with other products and engaging in predatory pricing by offering Signavio for $0; (3) announcing and enforcing increasingly restrictive policies that effectively

eliminate customers' ability to extract data to downstream vendors of their choice; (4) engaging in a campaign of false and misleading statements to deter customers from working with Celonis, including telling customers that they would experience technical problems with their core ERP software, and that their use of Celonis would violate an SAP license restriction, among other false statements; (5) tortiously interfering with Celonis' contractual relationships; (6) tortiously interfering with Celonis' prospective economic advantages, including with potential customers like ███████████████████████████████████████ who would most likely have been Celonis customers were it not for SAP's wrongful and illegal conduct; and (7) intentionally inducing third-party technology companies to build their businesses around the SAP ERP platform with promises that it has since broken.

19.    As demonstrated in Figure 1 in paragraph 20 below, SAP has systematically implemented a series of increasingly exclusionary policies designed to preclude customers from extracting their own data to work with third-party downstream competitors like Celonis, and in contravention of its former promises. Beginning in 2023, SAP implemented a "Clean Core" policy, which in effect restricted customers' use of Celonis' RFC-ABAP extractor. In response, Celonis developed an ODP-RFC extractor that relies on the ODP framework, a technology that is natively available in S4/HANA and allows third parties to access customer data stored on S4/HANA systems. However, SAP then restricted customers' use of ODP-RFC extractors through public Note 3255746.

20.    Without the ability to extract data through either RFC-ABAP (restricted by Clean Core) or ODP-RFC (restricted by Note 3255746), customers are left with **no** commercially viable means of extracting their own data for use with Celonis or other third-party vendors. The two remaining so-called "options"—OData and Datasphere—are effectively unusable. OData has prohibitively slow runtimes, technical limitations, and risks to extraction. With respect to Datasphere, if it were to be used by Celonis customers, SAP would impose prohibitively high fees—exceeding the cost of Celonis itself. To be clear, this case is not about Celonis insisting on any particular method of extraction. It is about SAP's deliberate campaign to seize control over

1  customer data, eliminate all workable extraction paths for non-SAP vendors, and force competitors

2  like Celonis out of the market by making it impossible for them to serve shared customers. Figure

3  1 shows these policy changes and the increasingly draconian limitations that SAP has imposed on

4  its customers' use of their own data:

5  **Fig. 1 – <u>SAP's Increasingly Exclusionary Extraction Policies</u>**

| Policy | Date | SAP Restriction of Customer Extraction | Post-Implementation Options for Extraction to Third Parties |
|---|---|---|---|
| N/A | Before SAP's Initiation of Anticompetitive Scheme | No restriction. | • ABAP<br>• OData<br>• ODP |
| Note 3255746 v.1 | 10/17/2022 | SAP continues to allow but withdraws support from third-party ODP extraction. | • ABAP<br>• OData<br>• ODP (unsupported for third-party services) |
| Clean Core Initiative | 2023 | SAP launches a campaign against customer use of any non-SAP extensions, purportedly to support S/4HANA migration. It formally advises against ABAP extraction and then informs customers that ABAP extraction is prohibited. | • OData<br>• ODP (unsupported for third-party services) |
| Note 3255746 v.4 | 2/2/2024 | SAP prohibits third-party ODP extraction. SAP promotes Datasphere, an SAP product with commercially infeasible fees for data access. | • OData<br>• Datasphere (prohibitively expensive fees when used with outside vendors like Celonis for data extraction) |
| Note 3255746 v.5 | 7/11/2024 | SAP withdraws support from OData extraction and asserts that there are no plans to enhance this interface in the future. | • OData (unsupported)<br>• Datasphere (prohibitively expensive fees when used with outside vendors like Celonis for data extraction) |
| **RESULT**: <u>**No commercially viable extraction methods**</u> to third-party products. | | | |

21.     SAP coined a term for its organized campaign of anticompetitive conduct, tortious interference, broken promises, and false advertising against Celonis: project "Honeymoon Is Over." This refers to the fact that, after encouraging Celonis to build tools that would help customers extract their own data from their implementation of SAP's ERP systems, SAP has now targeted Celonis in the hopes of monopolizing the market for process mining to the benefit of its self-preferenced Celonis competitor, Signavio. The "honeymoon" of free and fair competition is over.

### False Advertising

22.     SAP has engaged in a campaign of false and misleading statements designed to deter customers from working with Celonis. These misrepresentations were not isolated or accidental— they were systematic and consistent across large swaths of Celonis' current and potential customer base, and conveyed by SAP employees in sales, support, and executive roles who SAP had trained and instructed to execute this campaign. SAP falsely told customers that using Celonis was not compliant with SAP policies, would require prohibitively expensive ERP licenses, posed a risk to their system stability, or would jeopardize their migration to S4/HANA. These statements, demonstrably false and misleading at the time SAP made them, were disseminated to customers at critical points in the sales cycle, and were intended to (and did) sow fear, uncertainty, and doubt about Celonis and its products. SAP has also made false statements comparing SAP and Celonis, including with respect to Celonis' capabilities, and including in public-facing materials on its website. Additionally, SAP lures customers to its own solution under false pretenses, including through continued promises of an "open ecosystem," notwithstanding its practices, policies and threats to the contrary. This Amended Complaint not only identifies specific misleading statements that were made, it identifies the specific individuals at SAP who made them, when they were made, to which customers, with which specific nexus to California, satisfying Rule 9(b) and clearly stating claims under the Lanham Act and California Law.

### Tortious Interference

23.     SAP intentionally disrupted Celonis' contractual relationships with its customers. SAP's "Honeymoon Is Over" campaign was expressly aimed at causing Celonis customers not to

renew or expand their contracts with Celonis, or otherwise to terminate their contracts, as well as disrupting Celonis' potential new customer relationships. SAP targeted multiple known Celonis accounts, often shortly before renewal deadlines, and threatened those customers with penalties, increased fees, or risks to their ERP migrations if they continued working with Celonis. In other cases, SAP offered to buy Celonis customers out of their contracts. As the Court has recognized, this conduct supports a claim for tortious interference with contractual relations. The more detailed wrongful conduct alleged herein—namely SAP's systematic pattern of independently wrongful conduct in connection with this interference, including false and misleading statements, predatory pricing, illegal tying, and additional exclusionary conduct—supports a claim for tortious interference with prospective economic relations. As non-exhaustive examples, due to SAP's tactics, Celonis has lost prospective contracts with █████████████████████████████ ████████████████. Celonis has lost expansion contracts with multiple customers, including █ █████████████████████████████████████████. Celonis has also lost renewal contracts due to this same conduct, including with ████████████████████████.

*Promissory Estoppel*

24.     SAP intentionally induced third-party technology companies, including Celonis, to build their businesses around customers being allowed to extract their own data from their own SAP ERP implementations, including through promises of an open ecosystem, and including as part of SAP's efforts to accelerate adoption of S4/HANA. Celonis' reasonable reliance on those promises, SAP's failure to now abide by them (including through the conduct complained of herein), and the harm that will befall Celonis as a result, all support a claim for promissory estoppel.

*Tying*

25.     After trying and failing to win in head-to-head competition over process mining customers, SAP is rigging the game. SAP is now unlawfully tying its core ERP product (the "tying product") to its downstream process mining product (the "tied product").

26.     As explained further in, *inter alia*, paragraphs 109–16, 124–26, 280–93 below, SAP

AMENDED COMPLAINT

1    has market power in the ERP market and a 65% share of the market for large-scale customers.[5] 98

2    of the 100 largest companies in the world are SAP customers; SAP's customers generate 84% of

3    total global commerce.

4         27.     For all of these customers, SAP uses its market power to enact a positive tie;

5    specifically, it coerces the purchase of Signavio—most directly, by including Signavio (whether or

6    not the customer wants it) as part of bundled SAP software sales, including migrations and upgrades

7    of its core ERP product. As explained further in, *inter alia*, paragraphs 146–53, migration to

8    S4/HANA is forced on customers by virtue of SAP pulling support and updates from its legacy

9    ECC product. Given that power over its locked-in customers, SAP is also able to enforce a negative

10   tie against Celonis by threatening the success and reliability of ERP application migration and

11   support for customers who continue to utilize the current Celonis extractor, thus eviscerating the

12   value of the tying product, if they purchase Celonis.

13        28.     SAP is using its market power over its ERP customers to coerce them into using

14   Signavio and not using Celonis. The result of SAP's tying conduct is that customers no longer get

15   to work with the process mining solution of their choice and are instead effectively required to

16   choose SAP's downstream product, Signavio. SAP effectuates its tie through a multi-layered

17   scheme that includes (a) restrictive licensing policies, (b) threats that Celonis customers will be cut

18   off from either data or ERP support in the future, (c) threats of a risk to successful S/4 cloud

19   migration, which could be catastrophic for customers' business operations and continuity; and

20   (d) bundling and pricing schemes that make choosing any option besides Signavio unworkable and

21   economically irrational.

22

23

24   [5] In the pending antitrust lawsuit brought by Teradata Corporation (Teradata) against SAP, Teradata's expert
     economist opined that SAP possesses market power in the antitrust product market for "core ERP products for large

25   enterprises," and a unanimous Ninth Circuit sent the case post-summary judgment to trial. *See Teradata Corp. v. SAP
     SE*, 124 F.4th 555, 566–68 (9th Cir. 2024). According to the court, "SAP's sizable market share, high profit margins,

26   and high barriers to entry and switching costs . . . combined with other evidence of coercion, provide [a] strong
     indication of market power." *Id.* at 573–74 (citation omitted). For this narrower market in particular, customers are

27   locked into their SAP ERP application due to enormously high switching costs, including the costs associated with
     migrating data to a different ERP application, deploying and testing the new application, training employees to use

28   the new ERP application, and troubleshooting problems that occur after a change.

1                          *Bundling and Predatory Pricing*

2          29.    SAP has engaged in unlawful bundling and predatory pricing to exclude Celonis

3   from competing in the process mining market. SAP has begun systematically offering its own

4   process mining product, Signavio, at zero cost when bundled with its ERP products or RISE (an

5   SAP program that bundles SAP-native business apps into one suite of offerings). This means that

6   SAP is pricing Signavio below its costs by any measure. Signavio's initial costs on a per-customer

7   basis are, upon information and belief, generally at a minimum in the tens of thousands of dollars

8   range per instance. By that metric, SAP is losing that amount of money on each and every software

9   sale, which is illegal under the antitrust laws. There is a dangerous probability that SAP will recoup

10  its losses for below-cost pricing by raising prices after it achieves monopoly power in the process-

11  mining market, given the barriers to entry and that SAP's customers are locked in.

12         30.    For example, earlier this year Celonis lost an expansion contract with ███

13  ████    for fiscal year 2026 to SAP because Signavio was offered for free. That was also the

14  reason given to Celonis for losses of renewal contracts with ██████████████████████,

15  and for losses of expansion contracts with ████████████████████████. This

16  new strategy is a deliberate effort by SAP, as reflected by its "Honeymoon is Over" campaign and

17  its internal directive to include Signavio in every software sale, to foreclose all other process mining

18  options by setting Signavio at a below-cost price. Offering Signavio below cost in this manner

19  distorts an otherwise healthy competitive market and violates the Sherman Act.

20                      *Monopolization & Attempted Monopolization*

21         31.    SAP's anticompetitive conduct includes, but also goes beyond, unlawful tying,

22  bundling, and predatory pricing. SAP also has engaged in a broader course of exclusionary tactics

23  that, taken together, constitute monopolization and attempted monopolization under Section 2 of

24  the Sherman Act. SAP has acted affirmatively to maintain its monopoly over the market for access

25  to customer ERP data—a market it created, in which customers buy licenses from SAP in order to

26  access their own data and work with the vendors of their choice. SAP alone controls the barriers to

27  entry by setting the legal and technical requirements for how customers can access their data, and

28

on what prices and terms they will pay for it. SAP has monopoly power over this relevant market as described further in, *inter alia*, paragraphs 294–306.

32.    SAP has willfully acquired and maintained monopoly power over the market for access to customer ERP data by means of predatory, exclusionary, and anticompetitive conduct that will result in the substantial foreclosure of competition. Specifically, in addition to the other conduct alleged herein, SAP's exclusionary course of conduct includes (1) promulgating changes to its policies that circumscribe customers' ability to access their own data and unreasonably reduce their choices for what they can do with that data; (2) a campaign of false and misleading statements about the consequences of data extraction and access, designed to cement SAP's control over this market; and (3) eliminating all commercially viable sources of data extraction in an effort to route customers to SAP's flywheel of products.

33.    SAP has attempted to acquire and maintain monopoly power in the market for process mining by means of predatory, exclusionary, and anticompetitive conduct. Specifically, in addition to the other conduct alleged herein such as anticompetitive bundling, SAP's exclusionary course of conduct includes (1) the "honeymoon is over" initiative specifically targeting Celonis through a campaign of false statements about Celonis' compliance with SAP policies, the risks associated with use of Celonis, and the relative equivalence of Signavio to Celonis; (2) using the migration SAP imposed on its ERP users to try to force adoption of Signavio by means of contract buyouts and forced inclusion of Signavio in software bundles; (3) controlling the barriers to entry for this market by imposing increasingly restrictive licensing requirements and data transfer charges on customers' use of competitors to Signavio; and (4) coercing customers via SAP's AI product strategy.

34.    Each of these acts furthers SAP's goal of depriving customers of any realistic choice but SAP's own downstream products and services. SAP has engaged in a pattern of affirmative conduct in an attempt to monopolize the downstream market for process mining, not justified by technical necessity and lacking any legitimate procompetitive rationale. It has done all of this in service of a clear agenda: as previewed above by SAPs' executives' statements about their vision

1  for SAP's control over enterprise data, SAP has an artificial intelligence ("AI") product strategy

2  that is built around SAP remaining in a "category of one" with respect to customers' enterprise

3  data.

4                                *California's Unfair Competition Law (UCL)*

5        35.    SAP's conduct was specifically directed at California residents and specifically

6  affected California customers. SAP conducts extensive marketing activities within California for

7  its Signavio process mining offering, including an April 2025 SAP Signavio Business Process

8  Exchange in Carlsbad, a July 2023 and July 2024 SAP Signavio Customer Dinner in San Diego, a

9  March 2025 SAP SuccessFactors Partner Summit in San Ramon, and a roadshow this year in Palo

10 Alto. SAP's conduct has affected specific California mutual customers of SAP and Celonis,

11 including ███████████████████████████████████████████████

12 ████████████████████████████████████. SAP has leveraged its dominant

13 position in ERP software and its tight integration with critical business systems to impair rivals'

14 ability to compete on the merits in the emerging process mining markets, which is of growing

15 significance to California-headquartered companies.

16       36.    SAP's common law torts, false advertising, promissory estoppel, and other claims

17 are both unlawful and unfair under the UCL. Furthermore, SAP's false and misleading

18 representations and blatant disregard for the assurances it previously offered to regulators and thus

19 the public constitute fraud under the UCL.

20       37.    SAP has violated the UCL because its conduct (1) threatens an incipient violation

21 of the antitrust laws; (2) violates the spirit of those laws; and (3) significantly threatens competition.

22 The Ninth Circuit's decision in *Epic Games v. Apple* confirms that California's Unfair Competition

23 Law captures an even broader ambit of liability for anticompetitive conduct than the Sherman

24 Act.  In *Epic*, the Ninth Circuit upheld the district court's finding that Apple's policy of not allowing

25 third parties to use links in its platform to direct customers to their own payment systems constituted

26 an "unfair" practice under the UCL. Here, similar to the conduct at issue in *Epic*, SAP has imposed

27 information costs on the users of its ERP systems by changing its policies on data extraction and

28

third party access, "prevent[ing] [customers] from making informed choices" when selecting ERP providers about whether they have the ability to control their data, extract their data, and work with the third party data vendors of their choice. *Epic Games, Inc. v. Apple Inc*., 559 F. Supp. 3d 898, 1055 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (Cal. 1999) ("When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.").

*Celonis is Not Seeking to Deal with SAP; Only Its Customers*

38.     Celonis is not seeking to deal with SAP. Rather, Celonis seeks to continue to serve its customers, which extract their own data from their own databases in their own closed customer environments—whether utilizing an SAP Enterprise Central Component ("ECC") (predominantly hosted on the customer's servers) or SAP S/4HANA Cloud Private Edition (predominantly hosted on third-party servers dedicated to the customer) in order to work with Celonis. While customers store their data using SAP software, it is the customers who extract that data and transmit it to Celonis. SAP is not involved in either the extraction or the transmission, and the process does not require Celonis' access to any of SAP's own databases. Customers only "use" SAP software in the same way that consumers who store their data in a Microsoft Excel spreadsheet "use" Excel when they export that data to some other application.

39.     Accordingly, Celonis is not seeking to "use [SAP]'s facilities or services" (Dkt. 56 at 3); Celonis is not asking SAP for "technical support" (*Id*. at 1); and Celonis is not "seeking access to . . . SAP's software." (Id. at 4.). Unlike cases where plaintiffs did attempt to plead refusal-to-deal claims, Celonis is not asking SAP to provide Celonis with any application programming interfaces (APIs) so Celonis can query any SAP network (*see Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 988 (N.D. Cal. 2020). Nor is Celonis asking SAP "to share

- 14 -

its intellectual property with rivals" or taking the position that SAP "had an affirmative duty to continue sharing its intellectual property." Likewise, Celonis is not seeking "advance access to information about how to invoke [SAP] APIs" (*Novell, Inc. v. Microsoft Corp.*, 731 F. 3d 1064, 1066, 1069, 1074 (10th Cir. 2013); and Celonis is not complaining about its "exclusion" from SAP's "website" or that SAP is "preventing [Celonis] from advertising its website free of charge on the [SAP] site" (*LiveUniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *5, 13 (C.D. Cal. June 4, 2007), *aff'd* 304 F. App'x 554 (9th Cir. 2008).

40.    Thus, the issue is not that SAP is declining to cooperate with rivals; rather, it is actively obstructing its customers' ability to work with competitors and restricting trade in an entire market. This is not a *Trinko*-style refusal to deal. *See Verizon Comm'cns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004). Instead, it is a deliberate campaign to drive a competitor out of business and to prevent customers from having control over their own data. As the court found in *United States v. Google LLC*, refusal-to-deal analysis does not apply to "anticompetitive restraints that a monopolist places on its customers, as opposed to its competitors;" nor does it apply to "a monopolist's more direct interference with rivals," such as where a company limits the ability of mutual customers to deal with rivals or where it requires the purchase of a bundle "rather than just the [product] they really want." *Google*, 2025 WL 1132012, at *43 (E.D. Va. Apr. 17, 2025) (citing *Novell*, 731 F.3d at 1072, 1076). That is precisely what is alleged herein.

*Harm*

41.    Despite Signavio's demonstrably inferior product offering, there is clear evidence that SAP's anticompetitive strategy is working. Celonis cannot compete for customers if customers cannot—or are led to believe they cannot—use their tools to extract their data from their own instances of SAP ERP systems for process mining. Celonis is not the only loser in this scenario. Customers lose choice and innovative solutions in process mining, and they are forced to adopt SAP's inferior offering at whatever price point SAP sets once all of its competition is gone.

42.    SAP's anticompetitive scheme has caused, and will cause, harm to Celonis in the form of lost customer relationships and opportunities, lost profits, lost investment, and continued

1  erosion of market share, including in California specifically. Indeed, it has already caused Celonis

2  to lose at least one contract with ███████████, a California corporation. If SAP is permitted

3  to continue its conduct unabated, then Celonis' business is at risk. SAP's customers, including at

4  least 13 mutual customers of SAP and Celonis, which are headquartered and/or incorporated in

5  California, will lose the benefit of competition with respect to their process mining options, and

6  other businesses that require access to customers' data also will be harmed.

7        43.    The harm from SAP's conduct is not limited to Celonis, or even SAP's customers.

8  All downstream companies that work with SAP ERP customers' data are affected by the conduct

9  alleged herein. As one example: Teradata, an Enterprise Data Warehousing company headquartered

10  in San Diego, has also sued SAP in this same District for, *inter alia*, antitrust violations arising out

11  of the SAP's tying practices and attempted monopolization. Those claims are now post-summary

12  judgment and scheduled for trial in April 2026.

13        44.    Celonis therefore seeks (i) an injunction prohibiting SAP's illegal conduct and

14  enforcing SAP's promises, (ii) monetary damages, and (iii) all other legal and equitable relief

15  available under law and which the Court may deem proper.

16                                        **Parties**

17        45.    Plaintiff Celonis SE is based in Germany with its principal place of business located

18  at Theresienstr. 6, Munich, Germany 80333.

19        46.    Plaintiff Celonis, Inc., a wholly-owned US entity of Celonis SE, is a Delaware

20  corporation, and maintains offices across the United States, including Northern California, with its

21  principal US office located at One World Trade Center, 70th Floor, New York, NY 10007.

22        47.    Celonis SE and Celonis, Inc. (collectively, "Celonis") are premier providers of

23  process mining software that extracts data from customer systems such as SAP's ERP applications,

24  integrates that data with other tools, and provides fact-based, real-time insights to allow businesses

25  to audit, analyze, and improve existing processes.

26        48.    Defendant SAP SE is a German company. Its principal place of business is located

27  at Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190.

28

49.     Defendant SAP America, Inc. ("SAP America"), a wholly-owned subsidiary of SAP SE, is a Delaware corporation. Its principal place of business is 3999 West Chester Pike, Newtown Square, PA 19073, and it also has a place of business located at 2700 Camino Ramon, Suite 400, San Ramon, CA 94583.

50.     SAP SE and SAP America (collectively, "SAP") are software companies that provide ERP applications and additional specialized solutions like process mining. SAP America is responsible for sales, marketing, distribution, technical support, and customer service related to SAP ERP applications occurring in the United States, including throughout this District. SAP SE and SAP America have repeatedly committed overt acts in furtherance of the torts of intentional interference with contractual relations and intentional interference with prospective economic relations; false advertising under the Lanham Act and Sections 17500 *et seq.* of the California Business and Professions Code; monopolization, attempted monopolization, unlawful tying arrangements, unlawful bundling, and predatory pricing under Sections 1 and 2 of the Sherman Act and Sections 16700 *et seq.* of the Cartwright Act; and unfair competition under Sections 17200 *et seq.* of the California Business and Professions Code. SAP SE and SAP America have used their market power over their ERP ecosystem to self-preference their Signavio process mining software, and to condition their customers' continued use of the S/4HANA ERP product to which they are locked in upon moving away from Celonis to Signavio.

**Jurisdiction and Venue**

51.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This court has jurisdiction over the federal law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

52.     This action arises, in part, under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 to 16770. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and California law.

53.     This action arises in part under the Lanham Act of 1946, as amended, 15 U.S.C §§ 1051 *et seq*. This Court has jurisdiction over Celonis' claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1131 and 1338(a).

54.     This action arises in part under the California False Advertising Law, Cal. Bus. and Prof. Code § 17500 *et seq*. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support false advertising claims under both federal and California law. This action arises, in part, under California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support unfair competition, false advertising, and antitrust claims under both federal and California law.

55.     This action arises, in part, under California common law. This Court has supplemental jurisdiction over Celonis' claims arising under these laws pursuant to 28 U.S.C. § 1367.

56.     This court has personal jurisdiction over SAP SE and SAP America because, on information and belief, among other acts, they: (1) purposefully have availed themselves of the rights and benefits of the laws of this State and Judicial District, (2) either directly or through intermediaries have conducted, transacted, or solicited business in the State of California and in this Judicial District, (3) maintain an office in the State of California and in this Judicial District such that they are continuously and systematically present in California, or (4) maintain registered agents for service of process in California.

57.     Venue is proper as to SAP SE in this Judicial District under 28 U.S.C. § 1391(c)(3) because SAP SE is not a resident of the United States and therefore may be sued in any judicial district.

58.     Venue is proper as to SAP America in this Judicial District under 28 U.S.C. § 1391 and 1400(b) based on information and belief that SAP America maintains at least one regular and

established place of business in the District, located at 2700 Camino Ramon, Suite 400, San Ramon, CA 94583.

## General Allegations

### a.  Celonis Pioneered Process Mining and is a World Leader in the Technology

#### i.  *Introduction to Process Mining*

59.    Celonis, the first commercial process mining company, was founded in 2011 pursuant to a Process Mining Manifesto published by members of the Institute of Electrical and Electronics Engineers earlier in 2011.

60.    Process mining started out as an academic theory, but today it is a well-established business technology, used by thousands of organizations around the world, with hundreds more starting every day.

61.    Established processes allow tasks to be completed efficiently and consistently. Every step of a business process leaves a digital footprint in that business's transactional systems in the form of event log data.

62.    Process mining software works by using this event log data to create a picture of the business's actual processes.

63.    Process mining software uses the event log data to create a replica, or "digital twin," of the business's processes, helping the business visualize every move the business makes in real time. The digital twin shows the business its processes as they really are, allowing the business to uncover opportunities for value, identify and fix inefficiencies, or respond in real-time to supply or inventory issues. Process mining software can apply to any process and be used for each system within the business.

64.    For example, process mining tools can streamline accounts payable operations and ensure that invoices are entered and paid only once, avoiding duplicate payments. These tools may also be used by accounts payable teams to more readily identify delinquent accounts, rank them by invoice value, and prioritize collections on accounts receivable. Similarly, process mining can

increase the transparency of supply chain processes, so that businesses can prioritize material replenishment based on impact.

*ii.   Importance of Process Mining*

65.    Process mining reveals to a company how its business processes actually run and can help businesses change those processes for the better. Making business processes run better has a proven positive impact on a business's performance. Celonis' process mining has enabled customers to realize over $8 billion in value.

66.    Many businesses do not realize their processes are variable or that the processes run less efficiently than envisioned. The impact that variability has on the business's functioning can be enormous. Moreover, many businesses do not have clarity into the processes running across programs, systems, and departments.

67.    As a result, businesses do not know how their processes flow in reality, as compared to how the processes were intended to flow. When processes do not flow as intended, the result can be tremendous lost value, material inefficiency, unmet customer needs, and greater environmental and resource burdens.

68.    Celonis' process mining technology solves this problem by acting as a connector among systems, programs, processes, and people, illuminating the inner workings of businesses so these elements can work together more effectively.

*iii.   Process Mining Functionality*

69.    Process mining works by extracting a customer's data from event logs readily available in today's information systems (including ERPs, Customer Relationship Management ("CRM") tools, databases, applications, etc.) to visualize and analyze business processes—and all of their variations—as they run.

70.    Process mining and ERP applications both serve the needs of large-scale, complex customers, but process mining depends on an underlying ERP system in order to operate. While ERP systems present customers with a unified view of their business activity, process mining shows customers how the processes within that activity actually run, providing them with real-time

- 20 -

insights for improving operational processes and orchestrating the daily business.

71.     ERP software is the "hub" or backbone on which many different mission critical day-to-day business processes are run, including HR, payroll, billing, accounting, etc. ERP is an essential software infrastructure on which many companies rely for the operation of their businesses.

72.     To perform process mining, businesses must extract their data to the process mining vendor. Convenient, direct, stable, and performant integration is essential to reap the benefits of process mining.

73.     ERP providers like SAP and Oracle, or CRM providers like Salesforce, historically allowed their customers to extract their own data to third-party vendor platforms like Celonis without any fees or with generous extraction limits before any fees would be incurred.

74.     Celonis builds specialized solutions that add functionality to SAP's ERP ecosystem. Approximately ■ of Celonis' business is connected to customers that have SAP ERP systems and reflects the fact that SAP is the leading provider of ERP applications that many companies, especially large-scale, complex companies, use in the running of their day-to-day business processes.

75.     Celonis' specialized solutions are specific to an ERP application—a configuration for one application cannot be redeployed to other ERP applications without reconfiguring or reengineering it at significant burden and cost. For example, Celonis invested heavily in creating an extractor that was compatible with SAP's ERP applications that customers can use to locate and extract their own data for use with Celonis' process mining software.

76.     Because process mining relies on a business's own data, in combination with other tools, the functionality of Celonis' software (and therefore the utility of that software to its SAP-based customers) is wholly dependent on access to customer data that sits within that customer's instance of an SAP ERP application.

77.     With that data, once extracted from storage in the ERP, the customer can use Celonis to analyze its business processes and drive improvements and innovation in all manner of its operations. Celonis does not operate "within" SAP's ERP or use SAP tools to conduct this analysis.

78.     SAP's conduct to restrict access to a customer's own SAP-based ERP instance will similarly affect every third-party company that relies upon access to customer data that is stored within the SAP ERP.

*iv.   Celonis' Process Mining Offerings*

79.     Celonis launched the first process mining tool, Celonis 3.0, in 2013, followed by Celonis 4.0 in 2016, before moving process mining from on-premise to the cloud in 2018.

80.     Celonis' first extractor—which remains its most robust extractor, still in use today— is an Advanced Business Application Programming ("ABAP") Remote Function Call ("RFC") extractor. The RFC ABAP extractor was custom-built to enable customers to extract their data directly from their individual instances of SAP systems.

81.     Celonis initially launched its product through a co-marketing effort with SAP. Beginning in July 2015, Celonis was included on SAP's master price list and sold to customers as "SAP Process Mining by Celonis." An early timeline of Celonis' performance with SAP is outlined in an SAP publication reproduced below in Figure 2:

1

2

3

4

5

6

7

8

9

10

11

12

**Fig. 2**



13    82.    In 2018, SAP recognized Celonis as SAP's top-growing solution extension partner.

14    83.    Also in 2018, Celonis' first cloud-based offering, "SAP Process Mining 1.1 by

15    Celonis, Cloud Edition" was reviewed by SAP and determined to meet SAP's Premium

16    Qualification for SAP Solution Extensions.

17    84.    Celonis now offers its process mining software through its Process Intelligence

18    Platform and remains the leading provider of that type of software. Celonis' software is a type of

19    middleware that acts as a bridge between the customer's data in existing systems and Celonis'

20    platform, helping those customers automate and orchestrate systems, people, and other resources

21    more effectively.

22    85.    Celonis' process mining technology offers objective, fact-based insights, derived

23    from actual data, to help businesses audit, analyze, and improve their existing processes.

24        *v.  Process Mining Interchangeability*

25    86.    Process mining is a specialized technology that analyzes event log data to identify

26    trends, patterns, and details of how a process unfolds.

27

28

- 23 -

87.    As a result, process mining software is not readily interchangeable with earlier solutions, such as process mapping, or with other services, such as data mining software and automation software.

88.    Process mining is faster, cheaper, and more accurate than earlier solutions, such as process mapping. In process mapping, a group of individuals gather to visually map out a specific business process, step-by-step, by identifying all the activities, decision points, and potential bottlenecks involved. The result typically is a detailed process map, often in the form of a flowchart. However, these efforts can be lengthy and often are subjective.

89.    Robotic process automation software ("RPA") sometimes is leveraged with process mining. RPA enables automation within applications and interfaces that businesses already use, such as copying items from one system to another or verifying information between two systems. RPA does not help a business understand its processes, though it can be used to improve a process identified via process mining.

90.    Process mining also is sometimes confused with data mining. Data mining software is broad in scope and analyzes large volumes of data to find patterns, discover trends, and gain insights for future use. While process mining also looks for patterns and trends, it serves a distinct purpose—it analyzes data to optimize business processes.

91.    Thus, both providers and consumers of process mining view the technology as not interchangeable with and as distinct from process mapping, RPA, or data mining.

92.    Celonis offers additional functionality through an offering it calls process intelligence. Process intelligence is a solution that allows businesses to see how their people, applications, and data interact. Process intelligence rapidly provides contextualized insights to the user, allowing them to adapt accordingly. For example, a process intelligence solution may allow a user to ask the system a question, and the system will test hypotheses and change data selection. With process intelligence, users can also automate responses to certain process dynamics, such as sending emails or starting processes in other systems.

**b. General Background on Enterprise Resource Planning**

*i. Introduction to ERP*

93.     Enterprise Resource Planning ("ERP") is a software application that helps organizations streamline their core business processes—including finance, HR, manufacturing, supply chain, sales, and procurement—with a unified view of business activity.

94.     ERP applications began in the early 1960s, when manufacturing companies adopted computerized business applications for production scheduling.

95.     By the 1990s, ERP had expanded to serve a broader range of business activities across multiple industries, such as HR, project accounting, and CRM needs across retailers, utilities, and service companies.

96.     Today's ERP applications increasingly use intelligent technologies, such as artificial intelligence ("AI"), machine learning ("ML"), natural language processing ("NLP"), and in-memory databases, helping businesses leverage insights from transactional and unstructured data.

*ii. Importance of ERP*

97.     Most or all of an organization's core business data typically resides in that organization's ERP application. For example:

a.   Finance utilizes ERP to close the books;

b.   Sales utilizes ERP to manage customer orders;

c.   Logistics utilizes ERP for organize deliveries;

d.   Procurement utilizes ERP to source goods and services and manage supplier relationships;

e.   Accounts payable utilizes ERP to pay suppliers;

f.   Management utilizes ERP for visibility into the company's performance; and

g.   Corporate governance utilizes ERP to provide banks and shareholders accurate financial records.

*iii.   ERP Functionality*

98.     An ERP application consists of integrated module solutions or business applications that share a common database, which connects them and lets them talk to each other. Each ERP module typically focuses on one business area, but they can work together using the same data to meet the company's needs.

99.     Companies pick and choose the module solutions they want—such as financing, logistics, procurement, and HR—and can add and scale as needed. ERP applications can also support industry-specific requirements, either as part of the application's core functionality or through application extensions that integrate with the suite of modules.

100.    While modern ERP applications provide an enormous range of business functionality, they must connect to and synchronize with other applications and data sources to be effective, including CRM and Human Capital Management ("HCM") software, e-commerce platforms, industry-specific solutions, and even other ERP applications.

101.    This integration gives companies a unified view of information from different systems, which improves customer experiences and facilitates collaboration across teams and business partners.

102.    The flexibility of an ERP application allows it to integrate with a wide range of software products using connectors or customized adaptors, such as APIs, a type of software interface that connects computers or computer programs and allows them to communicate.

103.    Indeed, on its own website, SAP identifies "integration" with other third-party software solutions and data sources as a "core feature" that all ERP applications should have.

*iv.   Lack of ERP Interchangeability*

104.    ERP software is essential for many mission critical day-to-day business processes and is essential infrastructure. As a result, ERP applications are not interchangeable with other tools that companies use to simplify and improve their business processes, such as customer relationship management ("CRM") applications.

105.    A CRM system supports and connects front-office business functions, such as

marketing sales, advertising, and customer service. ERP applications on the other hand, primarily support and connect back-office functions, such as finance, supply chain operations, and HR.

106.    Thus, both providers and consumers of ERP and CRM applications view each of the applications as serving their own distinct purpose.

### c.    SAP is the World's Largest Provider of ERP Applications

#### i.    SAP's ERP Offerings

107.    SAP ERP made its first appearance in 1972 with SAP R/2, an early mainframe-based ERP software system.

108.    In the 1990s, SAP introduced SAP R/3, which operates locally in an on-premise environment only.

109.    SAP ECC ("Enterprise Central Component") is SAP's legacy business suite and the final progeny of the R/1, R/2, and R/3 solutions, being offered in an on-premise environment only. SAP ECC instances are privately hosted on non-SAP servers. In 2014, SAP notified its customers that it was going to discontinue ECC, ceasing technical support by 2025. SAP subsequently extended its support of ECC until 2027, or 2030 for customers who agree to pay a premium fee.

110.    ECC customers thus will need to migrate to SAP's cloud-based S/4HANA, which it launched in 2015.

111.    Today, SAP offers two main editions of the S/4HANA ERP application: SAP S/4HANA Cloud Public Edition and SAP S/4HANA Cloud Private Edition, in which a customer's specific SAP S/4HANA instance is hosted on a private cloud infrastructure.

112.    Celonis' customers primarily utilize either SAP ECC or SAP S/4HANA Cloud Private Edition. In all instances, when Celonis customers extract their data, they do so only from their own instance of their individual ERP system; they do not access SAP systems or databases more broadly. Nor does their extraction of data from their SAP ERP system have any impact—or touchpoint whatsoever—on other companies' SAP ERP systems.

113.    SAP markets S/4HANA as a solution for large and upper mid-size customers that have more complex organizational structures and industry requirements. S/4HANA combines the

technologies and analytics best suited for large-scale, complex customers, which typically have high annual revenue, high data volume, and large staff (including many employees utilizing the ERP).

114.    For small and mid-size enterprises, SAP markets other ERP applications, such as SAP Business ByDesign, an "out-of-the-box" solution suited for less complex businesses.

115.    With respect to ERP applications sold to large-scale, complex customers, and on information and belief, SAP has held and continues to hold a market share of 65%.

116.    Oracle is the only other significant competitor for ERP applications sold to large-scale, complex customers, but industry research indicates that Oracle's share has historically been less than SAP's with respect to the number of installed ERP applications for that customer base.

117.    In addition to size, geography is another important factor in selecting an ERP application. While many ERP applications are accessible from any location with an internet connection, providers find that a strong, local footprint can assist in marketing and client retention. To that end, it is common for ERP providers to have a local presence in different sales regions.

*ii. SAP's ERP Data Access*

118.    Historically, ERP applications had been "agnostic" to the customer's database platform. However, that position has changed over time as providers have required that their ERP applications also run on their proprietary transactional databases.

119.    For example, in 2015 SAP changed its approach to require that S/4HANA run on a HANA database. SAP has admitted that HANA is the only existing database that supports the features of S/4HANA. Similarly, Oracle (SAP's main competitor for ERP applications) requires that Oracle ERP run on its transactional database.

120.    SAP's about-face and reversal of years of prior practice is notable even as compared to Oracle, because, upon information and belief, Oracle allows its ERP application customers to extract their data to non-Oracle analytical platforms with no performance degradation or other extraction limitations, whereas SAP has imposed such limitations.

121.    Specifically, SAP offers two types of licenses to its customers to access their data on SAP databases: "runtime" and "full use." A "runtime" license imposes restrictions on how data can be accessed from the HANA database. It prohibits customers from accessing their data directly from the HANA database and instead requires customers to access their data through an application layer. A "runtime" license also limits the ways in which a customer can combine SAP and non-SAP data. A "full use" license removes restrictions on how SAP and non-SAP data can be combined.

122.    Upon information and belief, "runtime" and "full use" licenses are priced differently.  Upon information and belief, a "runtime" license is generally priced as a percentage of the price of the SAP application(s) that the HANA database supports, while the "full use" license is priced based on the size of the customer's database.

123.    Upon information and belief, a "full use" HANA license cannot be priced lower than a HANA "runtime" license for any customer, and SAP's policy is not to discount a "full use" license. Upon information and belief, a "full use" license is prohibitively expensive for most customers.

    iii.    *SAP's Position in the ERP Applications Market and Conduct in California*

124.    Since SAP's creation over 50 years ago, it has become the world's largest ERP application provider.

125.    As of February 2025, SAP reported the following statistics for its ERP business:

a.   Nearly $36 billion in total revenue from cloud and software;

b.   SAP customers generate 84% of total global commerce;

c.   98 of the 100 largest companies in the world are SAP customers;

d.   85 of the 100 largest companies in the world are SAP S/4HANA customers; and

e.   Approximately 80% of SAP's customers are small or medium sized enterprises.

126.    Celonis' own experience reflects SAP's strong position in the ERP Applications Market, described further herein, *inter alia*, at paragraphs 278–93. Approximately ■■ of Celonis' business is connected to customers with SAP ERP systems. In addition, SAP's ability to force its customers—many of whom are large companies—to incur massive costs in connection with the

migration of their data to SAP's S4/HANA cloud-based ERP solution, as well as SAP's ability to force customers to incur exorbitant license fees to access their own data, constitute direct evidence of SAP's market power in the ERP Applications Market.

127.    Several of SAP's and Celonis' mutual customers are California residents or otherwise operate within the state. At least thirteen of those mutual customers are headquartered and/or incorporated in California, including household names such as ██████████████. Several more of those mutual customers have offices or locations in California, including ██████████████████████████████████.

128.    SAP's wrongful conduct affects all customers and third parties that require access to data stored on customers' own instances of SAP's ERP system and prevents third parties from advertising compatibility with SAP's ERP application, including SAP's customers and competitors in California.

129.    In one example, California company ████ contacted Celonis and expressed concern about Celonis connecting directly to ████ data stored in SAP through the Celonis ABAP RFC extractor. According to ████ SAP informed ████ that their connection to ████ ERP database for use with Celonis was prohibited. Upon information and belief, the relevant communications between SAP and ████ took place in March and April of 2024, and at least one recipient of SAP's communications was ██████████████████████████████.

130.    SAP's conduct not only impacts entities in California including California residents, but also it has taken place in and been directed at California, specifically. SAP conducts extensive marketing activities within California, including an April 2025 SAP Signavio Business Process Exchange in Carlsbad, a July 2023 and July 2024 SAP Signavio Customer Dinner in San Diego, a March 2025 SAP SuccessFactors Partner Summit in San Ramon, a roadshow it has planned to take place in Palo Alto three weeks after the present filing and which is slated to feature SAP's Application Lifestyle Management experts and product management team, and the naming rights

- 30 -

SAP has acquired both to the SAP Center at San Jose: an arena which hosts approximately 150 events every year, as well as to the SAP Training Center in Santa Clara: the official training center of the San Francisco 49ers.

131.    SAP has also leveraged its wrongful conduct to acquire California-resident customers, including at Celonis' expense. In one recent example, SAP and Celonis were competing for a fiscal year 2026 contract with ███████████, which SAP won after offering to bundle Signavio in with S4/HANA "for free." This singular loss cost Celonis ████████ in annual contract value.

132.    ███████████ is just one of many examples of contracts with companies organized or headquartered in California which Celonis has lost to SAP and a result of SAP's illegal bundling of Signavio.  Celonis has also lost potential new contracts with ███████████████ ███████████.

133.    Given SAP's position in the ERP Applications Market, if SAP is successful in locking out third parties that serve SAP ERP customers, that will have anticompetitive effects reaching far beyond the immediate harm to Celonis, and which will continue to impact customers and competitors in California and beyond.

        *iv.   SAP Customers are "Locked In" to SAP's ERP Ecosystem*

134.    SAP's strong position in the ERP Applications market is further entrenched by the fact that its customers are "locked in" and cannot switch ERP systems without incurring massive burden and expense. "Lock-in" refers to a situation where an organization becomes dependent on a software vendor for its software and related services. Even if an organization later decides to switch its software, there might be restrictions that prevent, prohibit, or otherwise make that switch more difficult.

135.    Organizations struggle with vendor lock-in because of factors like project duration, database complexity, proprietary knowledge, and cost. Indeed, ERP implementations are very complex and may cost hundreds of millions of dollars.

136.    As a result of these complexities and challenges, changing ERP applications is viewed within the industry as complex, costly, disruptive, and risky. Companies rarely if ever change their ERP systems, with some customers referring to it as an "interspecies organ transplant." A significant portion of SAP's installed customer base has used SAP's ERP application for over two decades or more.

137.    Customers who choose SAP's ERP application are subject to this lock-in effect. A business which has opted to use and has invested in the SAP ERP software cannot realistically move away from the SAP ecosystem. Switching to another platform is extremely costly, time consuming, and highly disruptive.

138.    An enterprise's ERP application can constitute billions of dollars in spend and require years of planning and implementation for large-scale, complex companies. This investment stands in contrast to the hundreds of thousands to several million dollars (at the high end) that an enterprise might also pay for an additional application or service, like process mining software.

139.    An enterprise also has a long and continuing investment in its ERP application in the form of training, system integrity, breadth of use, and enterprise-wide integration.

    a.  Businesses can spend days to weeks training their employees on ERP applications, and these trainings can reoccur at regular intervals to both introduce new skills and reinforce existing ones.

    b.  Businesses also put significant resources into effective data governance to ensure the datasets and reports the ERP application utilizes are reliable.

    c.  Businesses also use their ERP application across the breadth of their organizations, meaning the individual preferences of different departments must yield to the common needs of the overall entity.

    d.  Businesses also value reputation and longevity when it comes to ERP applications. Since the switching costs are particularly high for ERP systems, ensuring that a new deployment will service the needs of the customer well into the future remains a vital consideration.

e.   Finally, SAP offers incentives for its customers to upgrade, keeping them within the SAP ecosystem.

140.   These barriers make migration to other ERP providers virtually impossible and this lock-in therefore reinforces SAP's position in the market for ERP applications.

141.   In the rare instance when a company does use two or more ERP systems, on information and belief, it is typically because a company that uses SAP acquires another company or division that does not use SAP. In these merger and acquisition scenarios, the combined post-acquisition company will not transition the acquired assets to the same ERP due to transition burdens and costs. These instances further demonstrate the lock in created by the burden of switching ERP systems.

142.   For example, in 2012, Oracle found that having its customers switch from its ERP to SAP would be 30 times more expensive than simply upgrading. Indeed, Celonis is not aware of any major customer of SAP who has abandoned the SAP platform in order to switch to another platform.

143.   SAP itself recognizes its customers as an "established (locked in) installed base to sell new products and services to." The leverage that SAP enjoys as a result of this lock-in is further illustrated in the context of SAP ERP upgrades, which are expensive and complex, and threaten disruption.

144.   Customers also recognize the complexities of SAP and the lock-in effect inherent in the SAP business structure. Many customers have expressed frustration with SAP's expensive and inescapable structure once SAP is implemented at the organization.

145.   Thus most, if not all, customers ultimately have no other choice but to implement the upgrades—switching to another ERP application is simply not a realistic option. SAP has been able to pressure its customers by phasing out support for older versions of the SAP ERP, thereby increasing maintenance costs for customers unless they update.

*v.   SAP's Forced Migration Illustrates this Lock-In*

146.   SAP's position in the market for ERP applications, and the extent to which its users

are locked into its ecosystem, is illustrated by SAP's impending forced migration from ECC to S/4HANA.

147.    In light of the SAP S/4HANA offerings, SAP is sunsetting ECC. Customers can expect maintenance and occasional updates of core applications through 2027, by which time they will need to have migrated to SAP S/4HANA (or pay a premium fee to SAP for extended support through 2030). Because customers will require ongoing maintenance and support for business-critical SAP ERP applications, customers will effectively be required to transition to S/4HANA when SAP ends support for ECC. Migration support and continued technical support are a part of customers' use of SAP's core ERP product.

148.    But the majority of SAP customers, including those that use Celonis, still use ECC. In fact, only 30% or so of SAP's ERP customers are on S/4HANA, with the vast majority— approximately 70%—still on ECC. Similarly, almost █ of Celonis' customers using SAP ERP systems have yet to migrate.

149.    The migration process generally takes two years.

150.    The industry is concerned about this migration, as even moving simple technology—which an ERP application is not—from on-premise to cloud is complicated. Various industry sources are providing advice on the migration, highlighting customers' anxiety.

151.    In addition to the complexity, the migration also is expensive. Costs can range from $50 million or $100 million to up to $1 billion. SAP quoted an enterprise $100 million simply to migrate its data from ECC to S/4HANA, a task that represents only a portion of the overall project.

152.    When SAP customers migrate to S/4HANA they are also met by increased costs. Recently, as part of the SAP RISE program (which bundles numerous SAP products into one suite of offerings, marketed to support migration), SAP has moved features previously available at lower pricing tiers to higher pricing tiers. It is not merely that SAP imposes significant migration costs on customers. Once the customer migrates, SAP imposes heightened tiered pricing structures for RISE, which generally includes Signavio, on those customers.

153.    SAP's ECC to S/4HANA migration thus is causing its own customers to undertake

1    great risks to their businesses, and to pay hundreds of millions of dollars to SAP over the next

2    couple of years for the privilege. That SAP can force this on its customers without fear of losing

3    market share to its competitors illustrates its position in—and the lock-in effect of—the ERP

4    application market.

### d.    SAP's Process Mining Software Struggles Despite Self-Preferencing

6    154.    Following its founding, Celonis joined SAP's Startup Focus Program in 2012. The

7    Startup Focus Program was an accelerator for analytics startups building new applications on the

8    SAP HANA platform, which, at the time, was open to third-party applications.

9    155.    By 2016, Celonis was an SAP Solution Extension Partner in SAP's independent

10   software vendor ("ISV") program, and SAP resold Celonis on SAP contracts.

11   156.    SAP Solution Extensions are non-SAP solutions sponsored and supported by SAP.

12   "SAP supports these solutions as its own, guaranteeing the standards of quality and support SAP

13   clients expect" by requiring all partners to undergo a "rigorous" selection process. All SAP Solution

14   Extension partner solutions "are certified [by SAP] as premium quality."

15   157.    In fact, Celonis was a Level 1 preferred vendor and marketed as "SAP Process

16   Mining by Celonis."

17   158.    Celonis continued to develop its software system in direct collaboration with SAP,

18   which envisioned Celonis as providing a key customer offering.

19   159.    As previously noted, in 2018, Celonis' first cloud-based offering, "SAP Process

20   Mining 1.1 by Celonis, Cloud Edition" was reviewed by SAP and determined to meet SAP's

21   Premium Qualification for third-party SAP Solution Extensions.

22   160.    In the years that followed, and given SAP's stated intent to foster collaboration,

23   Celonis invested millions of dollars in SAP-related technology, including connectors, extractors,

24   business apps, and solutions.

25   161.    By 2020, Celonis updated its offering to include a new innovation called real time

26   extension. This functionality allowed companies to extract data from the SAP ERP to the Celonis

27   cloud program in real time to accelerate business improvement and efficiencies for Celonis clients.

28

162. SAP and Celonis jointly marketed the real time extension offering to customers during their partnership. Celonis uses these same real time extension capabilities launched in 2019 today.

163. After SAP purchased Signavio, a competitor of Celonis, in 2021, Celonis and SAP's contractual relationship and partnership ceased.

164. SAP's plan was that customers would select its own process mining solution, Signavio, instead of Celonis.

165. At the time of the acquisition, SAP assured regulators that it would not self-preference its own offerings, such as Signavio, and not charge fees for data access using third-party technology. Specifically, on information and belief, SAP represented that process management software accesses data in the ERP using only simple scanner access, which is an indirect use for which no fees are applicable.

166. But Signavio struggled to gain significant acceptance amongst users, particularly versus Celonis.

167. Celonis is a superior product to Signavio that is more frequently recommended by customers. Signavio has significant limitations versus Celonis, including stability, scalability, limited data models, limited real-time data extract-transform-load (ETL) capabilities, analysis errors, limited filtering/selection components, limited workflow/automation capabilities, and poor integration between the AI/ML capabilities and the process mining module.

168. For example, in a recent competition between Celonis and Signavio for a Celonis renewal contract with ████████, which ran from July 2024 – October 2024, Celonis received feedback from the customer that Celonis was quicker in setting up pipelines for data extraction and implementing tech architecture, had superior product functionality to address insights and value drivers, and had a more engaged, proactive, and responsive team.

169. Thus, SAP began to exploit its control over its installed base of customers, particularly on its cloud-based platform. SAP began to use this control to restrict access to its ERP application, particularly for highly innovative applications that enable SAP users to run business

processes outside the SAP platform—business processes for which SAP had its own competitive, internal, native solutions.

170.    Indeed, in September 2023, SAP employees associated with its Ariba procurement software told customer ███ that SAP has a product (Signavio) that competes with Celonis, such that it would be a conflict of interest for SAP Ariba's platform to be deployed or work in conjunction with Celonis. At least one recipient of those communications was ████████████ ██████████████. ████ has significant presence across California.

171.    Meanwhile, SAP linked Signavio directly with SAP's ERP system, giving Signavio an access advantage over alternative products from third-party providers.

172.    Finally, SAP has begun offering Signavio for free in its bundled offerings, highlighting SAP's willingness to exclude rival process mining solutions like Celonis even if it meant selling Signavio to customers at prices below the cost of providing the service.

173.    Customers have identified this extreme cost disparity and are moving to Signavio not because of Signavio's fair competition or provision of a better product, but because customers either have no ability to opt out or no incentive to refuse even a clearly inferior product when it is being offered for free. One such customer, ████ found it difficult to justify spending money on Celonis because, according to its ██████████████████████, with "Signavio, it's . . . for free."

174.    In addition, SAP has used bundling and pricing strategies (including discount thresholds) to induce adoption of Signavio at the expense of Celonis. For instance, in March 2024, customer ████████████████ did not renew its contract with Celonis because the company felt pressured to purchase Signavio in order to meet a certain discount threshold to decrease the costs of migrating to S/4HANA.

175.    And, in May 2025, potential customer ████ contacted Celonis and identified that although "Celonis has been considered a preferred provider," ████ had chosen to use Signavio. On information and belief, SAP offered ████ anticompetitive pricing for Signavio. ████ maintains an office in Corona, California.

176. SAP has publicly marketed Signavio for free, and in a 2024 LinkedIn advertisement, shown below in Figure 3, SAP promoted Signavio as "free of charge" for SAP maintenance customers.

**Fig. 3**



177. Customers have been directly marketed to with the same offer, and many have accepted. For example, ▮▮▮▮ moved the majority of its business to Signavio after a competition between Celonis (the incumbent) and Signavio. On information and belief, SAP offered Signavio for free as part of ▮▮▮▮ SAP contract and migration support.

178. Similarly, on information and belief, ▮▮▮▮ selected Signavio rather than Celonis due to Signavio's free bundling with SAP and the push from SAP to use Signavio to protect the S/4HANA migration.

179. Moreover, SAP bundles Signavio with other specialized solutions as part of its RISE offering. Signavio is an "entitlement" within the bundle, rather than an "add-on," meaning customers who select RISE automatically gain access to Signavio. And customers selecting the

RISE bundle for the first time are, on information and belief, onboarded into the RISE bundle at no additional cost. This means that additional onboarding support, such as quality checks, guided enablement, and other technical support is available for free, which usually comes at an additional charge.

180.    Customers have informed Celonis that SAP calls this discounted pricing "digital licensing." These customers report that as long as the customer only uses SAP products, the customer will receive a discount on SAP products.

181.    Customers have expressed concern about SAP's bundling tactics. Customers have stated that SAP, through RISE and other tactics discussed below, ensnares customers into using their products. For example, customers have told Celonis that the more products they select to bundle within their SAP RISE product, the steeper their discount, incentivizing customers to purchase products they do not need or want, and then locking them into those products. ███████ ████████ has stated that "the more of the products you list on the BOM, the bill of materials in a RISE contract, the deeper the discounts you get on your RISE contract."

182.    On information and belief, when Celonis engaged ███████████ for an expansion opportunity, Signavio offered to bundle Signavio for free with ██████████ purchase of their S/4 instances. Celonis lost this expansion opportunity as a result.

183.    Other customers whose contracts were up for expansion with Celonis have similarly ended up with Signavio instead due to its zero cost when bundled with SAP's software package. These customers include, upon information and belief, expansion customers ██████████ ██████████████████████████.

184.    As an ████████ employee, ██████████, reported in January 2025, "SAP can be very flexible on pricing related to Signavio if this is part of a larger deal related to a renewed S/4HANA license, for example. It can be very insignificant, the cost of Signavio, compared to the license that they're selling as a full SAP bundle. I'm sure you're familiar that Signavio is owned by SAP. The cost of that software can be pretty much for free."

185.    SAP's below-cost pricing was further exacerbated by SAP's self-preferencing and discriminatory licensing requirements, which, as described above, dictate how customers can access their data from the HANA database. While SAP was offering Signavio below cost, its licensing requirements significantly *raised* the cost of using a third-party option like Celonis, particularly where SAP insisted that the third-party option necessitated a "full use" license as opposed to simply a "runtime" license. Critically, SAP does not impose any additional license fees for Signavio to access SAP customer data.

e.    **SAP Had a Longstanding Open Access Policy for Customers to Extract Their Own Data**

186.    SAP had long operated on an open access policy to permit the development of third-party specialized solutions for its ERP applications, which have enriched and added functionalities to customers' SAP ecosystems.

187.    Indeed, SAP tested and qualified Celonis' integration, finding it met all of SAP's quality standards. Celonis on multiple occasions won the SAP HANA Innovation Award, which honors HANA-based solutions that make a decisive contribution to business value.

188.    In more recent times, however, innovative applications also have been developed that allow SAP users to perform certain functions for using their own data better and more efficiently outside the SAP ecosystem, including process mining and other business process management functions.

189.    As a result, SAP views some providers, particularly those that provide applications or services that compete with SAP's native offerings, as hindering SAP's profitability because the third-party products and applications increase the choices available to SAP users.

190.    This increased choice, while possibly diminishing the ancillary revenue of the SAP ecosystem, does not undermine it. Rather, the increased competition for additional services like process mining helps ensure the ecosystem will continue to remain a desirable software infrastructure for many businesses in the foreseeable future.

191.    But SAP's own internal documents show that it is not content with its sales of its core ERP product and allowing its customers to decide which additional offerings are best situated for their purposes. In its internal documents, SAP has characterized business process intelligence as a "must win" and has expressed real concern at becoming trapped in what it has described as a "transactional only" space.

192.    SAP could have reacted to such competitive pressure by innovating and improving its own products. Instead, to protect itself from the threat of competition, SAP has embarked upon an aggressive campaign to preclude its customers from working with third-party application and technology providers through new charges and fees, arbitrary technical limitations, restrictive policy updates, false and misleading communications, and self-preferencing of its own solutions at the expense of rivals.

      **f.    SAP Begins to Falsely Claim that Celonis' Technology is Non-Compliant with SAP Users' Licenses**

193.    Since 2021, Celonis' customers have relied on what is known as the "indirect static read" exception in SAP's ERP Software Usage Rights to utilize their own data for Celonis' process mining software.

194.    In particular, the exception allows customers to utilize their own data and extract it to third-party non-SAP systems without a license, as long as all of the criteria listed below are met.

a.    The data was created by an individual licensed to use the SAP ERP system from which the information is being extracted;

b.    The action runs automatically on a scheduled basis; and

c.    The use of such extracted information by the non-SAP systems and/or their users does not result in any updates to and/or trigger any processing capabilities of the SAP ERP system.

195.    Specifically, Celonis customers have used Celonis' RFC ABAP extractor to extract their data from their ERP implementations, a process which meets the indirect static read exception requirements. The RFC ABAP extractor does not communicate directly with the database layer.

Instead, when customers deploy the RFC ABAP extractor, it communicates with the application layer in the customer's SAP instance, pulls only the most recent data, and runs its process mining analytics over this newly extracted data. The ABAP extractor extracts data reliably not only from customers' SAP ECC implementations, but also from customers' SAP S/4HANA implementation.

196.    Celonis has been using the RFC ABAP extractor for years, including for any sales through its former partnership with SAP, without any issues. In fact, before SAP acquired Signavio, Celonis was marketed as SAP's favored process mining solution, with SAP deeming Celonis a "Level 1 Gold Integrator." As SAP's preferred process mining solution, Celonis served clients using SAP's ECC platforms and S/4HANA platforms without issue. But with the end of Celonis' contractual relationship with SAP, this preferred vendor status was revoked as well.

197.    Despite this history, SAP personnel have questioned, and are misinforming, SAP's own customers about the compliance of Celonis' ABAP extractor, particularly its compliance with S/4HANA and migration to S/4HANA's cloud systems. Specifically, SAP personnel have falsely accused its customers and Celonis of using extractors based on "disallowed technology" or technology that purportedly now requires customers to pay for a "full use" license and thus would necessitate customers to pay a prohibitive amount of money to access their own data.

198.    For example, on or around November 8, 2024, SAP employee ███████ ███████ communicated to Celonis client ███████, that in order to continue using Celonis once on S/4HANA, ██████ would have to purchase an additional, and expensive, "SAP OpenHub for S/4HANA" license.

199.    Additionally, on numerous occasions from 2021 to the present, SAP has contacted its customers that are using Celonis and has accused those customers of violating the indirect static read exception, without any basis, before pressuring them to upgrade their "runtime" license to "full use," thus incurring substantial additional costs.

200.    These communications have been part of an organized campaign by SAP designed to penetrate and convert Celonis' customers, without public exposure.

201.    Upon information and belief, in May 2023, SAP released a presentation to its salesforce aimed at propagating the false narrative that the "Celonis ABAP extractor is ***not***** compliant with runtime databases." (emphasis in original). That same presentation also trained SAP's salesforce to propagate the falsity that "if the customer wants to use Celonis, the customer must either buy HANA [full use], or redo all the extractions using SAP D[ata] I[ntelligence] Cloud, or stop applying Celonis to SAP data." (On information and belief, SAP Data Intelligence Cloud is a data management solution that supports the SAP technology platform.) In other words, SAP was directing its salesforce to tell Celonis customers that they either had to stop extracting data to use with Celonis or pay exorbitant (non-viable) fees to be able to do so. This presentation was labeled "INTERNAL – SAP and Partners Only."

**Fig. 4**



202.    Another internal SAP slide containing these same statements made clear that while there should be "no general compliance campaign, no public comm[unication]s," account teams should still evaluate whether to make these false claims about Celonis' compliance behind closed doors with customers, on "a case-by-case basis." On information and belief, this calculated

1   controlled exposure was in recognition of the falsity and wrongfulness of SAP's anti-Celonis

2   campaign.

3                          **Fig. 5**

**Compliance** – Process mining on data coming from on-prem SAP systems
Celonis ABAP extractor is *not* compliant with runtime databases

- **Compliance applies to customer, not Celonis itself** – if the customer wants to use Celonis, the customer must either buy HANA FU, or redo all the extractions using SAP DI Cloud, or stop applying Celonis to SAP data

- **No general compliance campaign, no public comms** – whether or not to communicate this to customers, and how to do it, must be evaluated by account team on a case-by-case basis

- **Only for Celonis direct contracts** – so far, we have allowed SolEx customers to apply the Celonis ABAP extractor. If they migrate to Celonis paper, though, we will not grant exceptions anymore

203.    SAP did ultimately communicate these false statements to customers, executing on its campaign directed to customers with Celonis contracts, and resulting in the loss of both existing and prospective business by Celonis. Exemplary instances of such communications include the following:

    a.   On August 28, 2023, ▮▮▮▮▮, a ▮▮▮▮▮▮▮▮▮▮▮ at SAP, informed ▮▮▮▮▮ that "Celonis cannot just extract data (either via app or DB) without having valid licenses for each of the integration mechanisms. . . . From an SAP perspective this means either introducing SAP Data Intelligence as layer between SAP and Celonis or the usage of HANA full use." In other words, SAP stated that ▮▮▮▮▮ would need to pay for SAP Data Intelligence (a data integration tool) or upgrade to an expensive full use license to continue using Celonis. This communication was sent by email to ▮▮▮▮▮ ▮▮▮▮▮. ▮▮▮▮▮ has several locations throughout California which operate across its divisions, including in Emeryville, San Diego, and Sacramento.

    b.   In April 2024, SAP contacted ▮▮▮▮▮ concerning noncompliance with data extraction. At least one recipient of that information was ▮▮▮▮▮▮▮▮▮

1    ███████████████████████████ ██████████ has eight locations in California,

2    including offices and an Innovation Hub.

3    c.    In August 2024, SAP contacted ██████████ concerning noncompliance with the

4    indirect static read exception. At least one recipient of that information was ███

5    ███████████████████████████████████████.

6    d.    On September 16, 2024, ██████████████████████████████████████████████

7    at SAP, emailed ████████████████████████ regarding the latter's interest

8    in building a data connection between Celonis and ███████ S/4HANA ERP

9    application. ████████t informed ██████ that its existing license was not sufficient,

10    and that ██████ would need to purchase an additional license, stating specifically that

11    "a DB license is required to build the connection Celonis->S/4, it's not included in the

12    licensing agreement." ██████████████, who works in the ████████████████

13    ████████████████████████ at SAP, confirmed that point in a September 16, 2024

14    email to ██████████████████, stating that an "ETL, DB trigger-based

15    replication…requires a DB license….The application license (named user or digital

16    access) has to do with indirect access, which is a totally independent topic, and less

17    relevant for Celonis." DB license means "database license" and refers to a "full use

18    license." ████████████ job responsibilities include "collaborating with customers on

19    how to use the SAP Business Process Transformation portfolio to prepare for S/4HANA

20    transformation, during the project, and for continuous process improvement afterward."

21    e.    Again in September 2024, SAP told ██████████████ that allowing Celonis access to

22    ██████████ SAP ERP system would lead to additional costs.

23    f.    In March 2025, █████ contacted Celonis regarding a recent conversation with SAP's

24    HANA team, where ██████ was informed that its current extraction processes with

25    Celonis were no longer permitted by SAP, including under SAP Note 3255746. Upon

26    information and belief, the recipients of this communication at ██████ included ███████

27    ████████████████████. As a result of this misinformation, █████ ultimately reduced

28

AMENDED COMPLAINT

1    its contract with Celonis, explaining that because of its understanding that Celonis'

2    "approach is not allowed," one of the options pitched by Celonis "will not be a valid

3    one." ████ has numerous franchise locations across the state of California, and also

4    maintains a ████████████████████████ site and a ████████████████

5    ████████████████, both in Carson, California.

6    g.  And recently, ████████████, former ████████████████████████████

7        ████████████████████, told a Celonis representative that "SAP threatened to

8        shut down the interface and/or require additional licenses" if ████████ continued to

9        use third party providers, like Celonis. The same customer emphasized that the issue

10       "was about data transfer" and referenced SAP's claims that Celonis was "not compliant"

11       with the standard interface.

12   204.    SAP's communications campaign and the impact it has had is also visible through

13   numerous inquiries Celonis has itself received from concerned customers.

14   a.  On January 22, 2025, ████ employee ████████ contacted Celonis noting that "the

15       latest SAP publications" communicate that "RFC data replication services are NOT

16       permitted by SAP" and asked for a meeting with Celonis to "understand how the data-

17       extraction works today and how it will continue to work in the future with ever-changing

18       SAP terms."

19   b.  Also in January 2025, ████ employee ████████████ contacted Celonis seeking

20       clarity on whether it could extract data from its SAP ERP for use with Celonis "without

21       any limitations or risk that SAP will want to charge us for such a connection."

22   c.  On February 28, 2025, ████ employee ████████ contacted Celonis regarding SAP's

23       newly imposed requirements. ████ went so far as to state that due to SAP's policies,

24       ████ may be "unable to implement Celonis on our S4 instance."

25   d.  On March 10, 2025, ████████ employee ████████████ contacted Celonis sharing

26       SAP Note 3255746 and requesting documentation that Celonis is "in compliance with

27       SAP requirements."

28

e. On March 12, 2025, ████████ employee ████████ contacted Celonis about direct connection between Celonis and SAP and asked if Celonis had "been certified by SAP for RISE yet?"

f. On March 17, 2025, ████ employee ████████ contacted Celonis regarding SAP S/4HANA stating that they had been "warned" that they "could have problems with Celonis in the future installing add-ons such as the Celonis RFC module" after migrating to S/4HANA.

g. On April 30, 2025, ████████ employee ████████ contacted Celonis regarding compliance of Celonis' extractor with SAP.

h. On May 19, 2025 customer ████████ employee ████████ contacted Celonis regarding material published by SAP regarding third-party connection to data stored within the SAP ERP and asked whether there would be future issues with data connection to the SAP ERP.

205. SAP's claims and accusations of non-compliance are false, and SAP knew or should have known its statements to customers were false, including at the time it made them. On information and belief, SAP's recognition of the wrongful nature of its false communications campaign is what led SAP to dictate there be "no public comms" on this issue, and to institute a process for strategically communicating these false messages to customers. Indeed, SAP conceded in a letter dated February 5, 2024 that it "does not have clear visibility" into Celonis' compliance with SAP policies, and represented that it would cease making such statements to customers. Despite these representations, SAP continued to make false and misleading statements regarding Celonis' compatibility with SAP, including statements to Celonis customers concerning Celonis' alleged use of ODP and associated issues of compliance with SAP Note 3255746.

206. SAP is also now falsely claiming that use of Celonis will interfere with customers' migration to S/4HANA and that customers will be required to pay prohibitively high fees if they seek to continue to use Celonis' products.

207. For example, in or around February 2025, SAP ████████ contacted ██

███████████ and told ██████, on information and belief, that Celonis not only was a risk to its system's stability (without any factual basis whatsoever), but also that there would be increased costs for extracting data to Celonis in the future. SAP therefore suggested that ████████ switch to Signavio, which it offered to bundle into ████████ package. ███ ████ ultimately elected not to renew its contract with Celonis, instead switching to Signavio. This lost contract cost Celonis ████████ in annual contract value. ████████ has multiple locations in California, including in Stockton and Escalon.

208.    These false claims are in stark contrast to SAP's promotion of Celonis as a means of assisting migration only a few years prior, as shown in Figure 6, from in or around April 2018.

**Fig. 6**





209.    In addition to its organized campaign of false statements made directly to customers, SAP has also engaged in public-facing false advertising.

210.    On the public-facing learning section of its website accessible as of the date of filing of this Amended Complaint, SAP advertises the following comparison between Signavio and competitive offerings on a page titled "Differentiating SAP Signavio + SAP LeanIX Solutions in the Market."

**Fig. 7**[6]



When we come to 2024, market consolidation is finalizing the consolidation.
Companies can enter the market with acquisition and partnership quickly, e.g. MSFT & ServiceNow

| | SAP | UiPath | Celonis | Software AG | Microsoft | IBM | iGrafx | ServiceNow | BOC Group | MEGA | Ardoq | Orbus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Process modeling | ✓ | | ✓ 🛒 | ✓ | ◑ | ✓ | ✓ | ◑ | ✓ | ✓ | ✓ | ✓ |
| Process governance | ✓ | | ✓ 🛒 | ✓ | ◑ | ◑ | ✓ | ◑ | ✓ | ✓ | ◑ | ◑ |
| Journey modeling | ✓ | | ✓ 🛒 | ✓ | ◑ | ◑ | ◑ | | ✓ | ◑ | | ◑ |
| Process mining | ✓ | ✓ 🛒 | ✓ | ✓ | ✓ 🛒 | ✓ 🛒 | ✓ 🛒 | ✓ | | | | |
| Task mining | ✓ 🐾 | ✓ 🛒 | ✓ | ✓ 🐾 | ✓ 🐾 | ✓ | | ✓ 🛒 | | | | |
| RPA | ✓ | ✓ | ✓ 🐾 | ✓ 🐾 | ✓ 🐾 | ✓ | ◑ | | ✓ 🛒 | | | |
| Workflow Autom. | ✓ | ◑ | ✓ 🛒 | ✓ | ✓ | ✓ | | ✓ ◑ | ✓ 🐾 | | | |
| Enterprise Archit. | ✓ | | | ✓ | ◑ | ◑ | | ◑ | ✓ | ✓ | | ✓ |
| AI | ◑ | ◑ | ◑ | ◑ | ✓ | ✓ | ◑ | ◑ | ◑ | ◑ | ◑ | ◑ |

✓ Offers    ◑ Some Capabilities    🛒 Buy    🐾 Partner

211.  This comparative advertising contains factually false statements regarding Celonis' offerings and capabilities.

212.  First, this advertisement suggests that Celonis customers must pay an additional fee for workflow automation services. This is false. Workflow automation is included in the base package of Celonis' offerings.

213.  Second, this advertisement suggests that Celonis does not offer enterprise architecture services. This is also false. Celonis does offer enterprise architecture services, including as an add-on feature in coordination with its partner Ardoq.

214.  Additionally, SAP continues to advertise its platform as an "open ecosystem," notwithstanding its policies and practices to the contrary. For example, as of the date of this filing, SAP's public-facing Data and Analytics page encourages customers to "[m]aximize the value of all your data with SAP Business Data Cloud, SAP HANA Cloud, and our open data ecosystem."[7] This same page advertises that customers can "[i]nteroperate with leading data and AI vendors with

---

[6] https://learning.sap.com/courses/discovering-sap-business-transformation-management-solutions/differentiating-sap-signavio-sap-leanix-solutions-in-the-market
[7] https://www.sap.com/hk/products/data-cloud/analytics.html

AMENDED COMPLAINT

the SAP open data ecosystem." SAP knows these statements are false, including by virtue of the contradictory representations it is making regarding customers' ability to use Celonis.

215.    Instead of seeking to improve its offerings through innovation, SAP has thus responded to the competition from third-party providers by aggressively leveraging its market power. Specifically, SAP is using scare tactics and threatening customers with additional fees to access the customers' own data within their specific SAP environment, falsely continuing to advertise itself as an "open ecosystem" notwithstanding these practices, falsely alleging that the migration of their ERP system from on-premises to cloud will be imperiled by allowing access to Celonis and other third-party software tools, and making false comparative statements about Celonis' offerings. SAP is engaging in this conduct in an effort to build a defensive wall that will insulate its native, ancillary offerings from competition, and ultimately increase its revenue.

### g. SAP Has Taken Steps to Exclude Third-Party Providers Like Celonis for Anticompetitive Reasons

#### i. SAP Notes Make Third-Party Data Extraction Unviable

216.    In addition to threatening customers to acquire or upgrade unnecessary licenses at the cost of tens or even hundreds of thousands of dollars and otherwise impeding the ability of customers to access their own data, SAP has signaled that it plans to preclude the ability of customers to extract their own data using third-party software providers like Celonis completely.

217.    SAP has imposed increasingly restrictive policies that have, step by step, left customers without *any* technically or economically viable options if they want to extract their data to use Celonis for process mining. Figure 1, *see* ¶ 20, summarizes these restrictions, which the following paragraphs describe in more detail. Customers who ignore the notes and SAP policies are told they do so at their own risk.

218.    On February 2, 2024, SAP updated SAP Note 3255746, which had previously stated that SAP does not *support* the use of ODP for third-party applications, to state it does not *permit* the use of ODP for third-party applications. The revised Note further states that, "Any and all problems experienced or caused by customer or third-party applications using RFC modules of the

1  Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and SAP

2  is not responsible for resolving such problems."

3      219.    The February 2024 Note is reproduced at Figure 8 below. The green highlights

4  indicate the updated language. The red highlights indicate the prior language, which had been

5  operative since 2022.

6                                      **Fig. 8**



7  3255746 - ~~Supported~~ Unpermitted usage of ODP Data Replication APIs

8  Version          14
   Language         English                                        Type            SAP Note
9  Component        BC-BW-ODP (Operational Data Provisioning (ODP) and Delta Queue (ODQ))   Master Language  English
                                                                    Released On     ~~1702.1002.~~2022~~2024~~

10  **Symptom**

11  The usage of RFC modules of the Operational Data Provisioning (ODP) Data Replication API by customer~~-~~, or third-party applications ~~applications~~ to access
    SAP ABAP sources (On-Premise or Cloud Private Edition) is NOT supported ~~permitted~~ by SAP. These functional Such modules are only intended for SAP-
    internal applications . Since they are un-released and un-documented they can be changed by SAP and may be modified at any time by SAP without further
12  notice. Customer or partner applications using these functional modules do not follow SAPs recommendation for a sustainable and enterprise-critical
    architecture. Any notice.

    SAP reserves the right to implement technical measures to restrict and audit the unpermitted use of RFC modules of the Operational Data Provisioning
13  (ODP) Data Replication API .

    Any and all problems experienced or caused by such applications customer or third-party applications using RFC modules of the Operational Data
14  Provisioning (ODP) Data Replication API are at the risk of the customer and resolutions are not supported by SAPSAP is not responsible for resolving such
    problems.

15  **Other Terms**

16  ODQ, ABAP CDS, @Analytics.dataExtraction.enabled, extractor, DataSource, S-API

17  **Solution**

    The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API. All
    customer and partner third-party applications should be build built using this API since it provides a stable interface (link to to documentation).
18  More information on Operational Data Provisioning (ODP) is available in the FAQ.

19

20      220.    While the Note suggests that customers should use an OData API, the suggestion is

21  not a viable alternative for data access because neither the performance nor the reliability of this

22  alternative is satisfactory. This alternative is particularly ill-suited for high-volume data transfers

23  such as required by process mining software like Celonis.

24      221.    For example, an OData setup will take on average five times the amount of time as

25  an RFC level integration for a typical use case, such as to extract data from SAP S/4HANA private

26  cloud for an Accounts Payable process. In practice that means that, where 100 tables would need

27

28

1    to be extracted, the RFC-based setup would take 0.5 days as compared to the OData setup taking

2    at least three days.

3        222.    Performance also is not comparable. For operational use cases where Celonis needs

4    real-time data (e.g., time-sensitive matters such as logistics, supply chains, airport baggage

5    handling), Celonis could not use OData because transferring significant amounts of live data is not

6    reliable with OData and would make operational use cases (e.g., real-time data refresh and high

7    amounts of data for use cases in ground operations for airlines or transportation/logistics)

8    practically impossible. SAP itself recognized this limitation in a later update to the Note discussed

9    below, cautioning: "When using the OData interface, which is based on OData version V2, you

10   may need to check the performance impact of your data replication process in case you replicate

11   large volumes of data."

12       223.    SAP's customers and the industry generally recognize these limitations, and, as a

13   result, none of Celonis' customers use OData-based extractors. They are not viewed as a viable

14   option.

15       224.    After inducing uncertainty in its customer base by restricting ODP-based extractors

16   that use the RFC module like Celonis, SAP then updated the Note again—to self-preference its

17   own solution.

18       225.    On July 11, 2024, SAP revised the Note to recommend that customers "use SAP

19   Datasphere for realizing data replication scenarios to move data from various SAP sources (such

20   as SAP S/4HANA, SAP BW, SAP ECC sources etc.) into third-party applications & tools."

21   Datasphere is an integrated SAP solution that serves as a data warehouse solution for data analysis.

22   Datasphere permits SAP users to move data between SAP systems, but it is prohibitively

23   expensive—more than the cost of using Celonis itself—if a customer were to try to use Datasphere

24   to extract data for use with Celonis. A comparison of this Note to its February predecessor, as well

25   as a clean version, are available at Figures 9 and 10, respectively.

26

27

28

**Fig. 9**

| Version | 45 | | Type | SAP Note |
|---|---|---|---|---|
| Language | English | | Master Language | English |
| Component | BC-BW-ODP (Operational Data Provisioning (ODP) and Delta Queue (ODQ)) | | Released On | 02.11.12.07.2024 |

**Symptom**

The usage of RFC modules of the Operational Data Provisioning (ODP) Data Replication API by customer, or third-party applications to access SAP ABAP sources (On-Premise or Cloud Private Edition) is NOT permitted by SAP. Such modules are only intended for SAP-internal applications and may be modified at any time by SAP without notice.

SAP reserves the right to implement technical measures to restrict and audit the unpermitted use of RFC modules of the Operational Data Provisioning (ODP) Data Replication API .

Any and all problems experienced or caused by customer or third-party applications using RFC modules of the Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and SAP is not responsible for resolving such problems.

**Other Terms**

ODQ, ABAP CDS, @Analytics.dataExtraction.enabled, extractor, DataSource, S-API

**Solution**

We clearly advice you to use SAP Datasphere for realizing data replication scenarios to move data from various SAP sources (such as SAP S/4HANA, SAP BW, SAP ECC sources etc.) into third-party applications & tools. SAP Datasphere offers different services for these scenarios such as the replication flow as integrated data replication tool within SAP Datasphere for various data replication scenarios as well as the access using the OpenSQL interface.

Replication Flows are the recommended and strategic replication tool for realizing data replication scenarios for replicating SAP-data to SAP as well as third party applications & tools. Please use the following link to find more information about replication flows (documentation), where you can find more information about the current supported connections. In future, additional connectivity will be added step by step to replication flows and added to our documentation once it is available as public feature. Furthermore, you can check our SAP Datasphere Road Map Explorer for additional planned innovations in this area.

The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API

. All customer and third-party applications should be built using this API since it provides a stable interface (link to documentation)

and can still be used (link to documentation) but there are no plans to enhance this interface based on the strategic direction towards using replication flows in SAP Datasphere. When using the OData interface, which is based on OData version V2, you may need to check the performance impact of your data replication process in case you replicate large volumes of data.

More information on Operational Data Provisioning (ODP) is available in the FAQ.

**Fig. 10**

SAP Note

### 3255746 - Unpermitted usage of ODP Data Replication APIs

Component: BC-BW-ODP (Basis Components > BW Service API > Operational Data Provisioning (ODP) and Delta Queue (ODQ)), Version: 5, Released On: 11.07.2024

**Symptom**

The usage of RFC modules of the Operational Data Provisioning (ODP) Data Replication API by customer, or third-party applications to access SAP ABAP sources (On-Premise or Cloud Private Edition) is NOT permitted by SAP. Such modules are only intended for SAP-internal applications and may be modified at any time by SAP without notice.

SAP reserves the right to implement technical measures to restrict and audit the unpermitted use of RFC modules of the Operational Data Provisioning (ODP) Data Replication API .

Any and all problems experienced or caused by customer or third-party applications using RFC modules of the Operational Data Provisioning (ODP) Data Replication API are at the risk of the customer and SAP is not responsible for resolving such problems.

**Other Terms**

ODQ, ABAP CDS, @Analytics.dataExtraction.enabled, extractor, DataSource, S-API

**Solution**

We clearly advice you to use SAP Datasphere for realizing data replication scenarios to move data from various SAP sources (such as SAP S/4HANA, SAP BW, SAP ECC sources etc.) into third-party applications & tools. SAP Datasphere offers different services for these scenarios such as the replication flow as integrated data replication tool within SAP Datasphere for various data replication scenarios as well as the access using the OpenSQL interface.

Replication Flows are the recommended and strategic replication tool for realizing data replication scenarios for replicating SAP-data to SAP as well as third party applications & tools. Please use the following link to find more information about replication flows (documentation), where you can find more information about the current supported connections. In future, additional connectivity will be added step by step to replication flows and added to our documentation once it is available as public feature. Furthermore, you can check our SAP Datasphere Road Map Explorer for additional planned innovations in this area.

The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API and can still be used (link to documentation) but there are no plans to enhance this interface based on the strategic direction towards using replication flows in SAP Datasphere. When using the OData interface, which is based on OData version V2, you may need to check the performance impact of your data replication process in case you replicate large volumes of data.

More information on Operational Data Provisioning (ODP) is available in the FAQ.

AMENDED COMPLAINT

226.    On its Technology Blog, SAP further states, "*For generic data access from SAP applications, we recommend leveraging SAP Datasphere. SAP Datasphere is the new semantic layer, which enables a business data fabric architecture that uniquely harmonizes mission-critical data across the organization from various SAP and non-SAP sources*."

227.    But SAP Datasphere requires customers to pay an exorbitantly expensive fee if they want to use a third-party vendor for extracting their own data from Datasphere, particularly for a use like process mining, rendering the use of any options besides SAP's Signavio economically unviable.

228.    The July 2024 update further stated that SAP will no longer invest in OData-based extractors (the solution recommended in the February 2024 update), rendering that already infeasible option unreliable as well. The Note stated specifically: "The Operational Data Provisioning (ODP) framework for data extraction and replication is exposed by an official and externally-available OData API and can still be used [...] but *there are no plans to enhance this interface based on the strategic direction towards using replication flows in SAP Datasphere*." (Emphasis added).

229.    In other words, SAP offers as the only non-SAP technical option an unreliable and unsupported alternative, ensuring that customers—regardless of preference—must use SAP's Datasphere and other SAP native solutions.

230.    Note 3255746 seemingly allows for additional extraction options outside of SAP's recommendations, so long as those options are not ODP-based.

231.    And, because Celonis' primary extractor is the RFC-based ABAP extractor, and not ODP based, the Note appears to permit Celonis' extractor. Despite this appearance, however, SAP has another policy—its "Clean Core Policy"—that effectively prohibits using any data extraction method outside of SAP's options.

*ii.    SAP's Clean Core Policy Enforces SAP's Data Extraction Prohibition*

232.    In 2023, SAP introduced the "Clean Core Policy" as part of its migration of all legacy accounts to S/4HANA. SAP claims the policy is intended to address new challenges posed

by the cloud. SAP claims that, as a result of the migration, each individual customer cannot implement enhancements in the same way that it could in earlier on-premise environments.

233.    Clean Core promotes internal SAP end-to-end solution implementation and pushes use of "SAP reference solution architecture to leverage SAP solutions." SAP extols "avoid[ing] extensions when possible" under Clean Core to "leverage the full capabilities of extensibility on the stack". In promoting Clean Core, SAP positions Signavio as a means to properly implement that initiative.

234.    Under the Clean Core policy, customers wanting to use Celonis are limited to data extraction utilizing the insufficient OData or SAP's native options, like Datasphere, discussed previously. Despite the unique considerations that various customers' environments pose, SAP is explicitly telling all customers that they need to follow the Clean Core policy and that SAP will enforce the Clean Core policy even if a different data extraction method is technically possible within that environment.

235.    If the customer is using another data extraction method and a problem arises, SAP will attribute the problem to non-compliance with the Clean Core policy, which will be the fault of the customer.

236.    To ensure compliance with customers still using on-premises ERP editions, an SAP migration architect or architecture review board is involved in most migrations, enforcing SAP recommendations and marking any use of a third-party vendor that involves data extraction as a "high risk" for failure.

237.    SAP is then telling customers this "high risk" designation indicates they are likely to run into reliability problems that will harm the migration. If these problems occur, SAP will not provide support on tickets or other issues (even though customers are paying for such support as part of their ERP license).

238.    This change presents a real risk to customers, as the likelihood of a migration failure is high given the complexity of the effort involved. In fact, industry sources estimate that as many as 75% to 80% of projects like these have failures. Customers are naturally nervous to continue

1    migration deemed to have a "high risk" for failure.

2        239.    SAP's representations regarding the justification for the Clean Core Policy in this

3    instance are incorrect, and the Clean Core policy is instead being used merely as a pretextual scare

4    tactic to prevent customers from using competing solutions like those offered by Celonis. As noted

5    earlier, approximately ▊ of Celonis' SAP ERP customers already have migrated to S/4HANA

6    and continue to use Celonis' RFC-based ABAP extractor without issue.

7        240.    In fact, system migration is a core use case that Celonis supports and has supported

8    since its time as an SAP partner, helping customers in the pre-migration phase understand what are

9    the most important process deviations they have that could impact their migration. Celonis has

10   supported over ▊ of its customers through migration. And, while SAP and Celonis were still

11   partners, Celonis was positioned as a means of reducing the risks associated with S/4HANA

12   migration.

13                    *iii.   SAP Datasphere Beta Program Self-Preferences Signavio*

14       241.    As noted above, SAP customers who migrate to S/4HANA are expected per Note

15   3255746 to use SAP Datasphere, a data management tool that is supposed to help businesses

16   integrate, catalog, and store data, whether from SAP applications or third-party tools.

17       242.    But SAP Datasphere instead effectively prohibits third-party solutions like Celonis

18   because of the high cost of granting third-party access.

19       243.    SAP is launching a program to integrate Signavio, its process mining software, into

20   Datasphere, thus positioning it as the default tool for customers using S/4HANA.

21       244.    This positioning will allow customers to extract data to Signavio via Datasphere at

22   no extra cost, in stark contrast to the high cost of extraction to third-party solutions like Celonis,

23   priced by gigabytes of uncompressed data transferred.

24       245.    As ▊▊▊▊ employee ▊▊▊▊ explained it on March 18, 2025 in

25   conversation with Celonis regarding SAP Note 3255746: "SAP is currently trying to make access

26   to the data more difficult or to be paid additionally, e.g. via SAP Datasphere." ▊▊▊▊

27

28

AMENDED COMPLAINT

has a large presence in California, including a regional corporate headquarters in Costa Mesa and a North American research and development headquarters in Long Beach.

246.    As recently as last week, on July 14, 2025, ███████████ contacted Celonis stating that they had heard rumors that extracting data from an SAP ERP to a third-party product like Celonis would be expensive in the future and may not be possible.

247.    Given the volumes of data that customers want process mining software to analyze, the costs to customers of using Datasphere to extract data for a third-party provider like Celonis will be prohibitively expensive. On information and belief, Celonis estimates that transfer costs likely will be up to ten times the price customers pay to use Celonis in the first place. For example, extracting a single table of approximately 100GB—an insubstantial amount of data in this context—could cost a customer $30,000 at the prices Celonis understands SAP Datasphere is charging. This amount does not include additional extractions of the same table as the data it contains changes in real time. Ultimately, the charges could total millions of dollars in just a few years, or potentially even in just a few months.

248.    When customers have questioned their options for process mining software in light of these new charges, arbitrary technical limitations, and restrictive policy updates, SAP has informed them that they should use Signavio instead, at no or low cost and without any extraction fees given its integration into Datasphere. This recommendation comes despite demonstrable evidence that Signavio is an inferior product. For example, ███████████, an employee at customer ███████████ remarked in December 2024, "not all the features that Celonis has are supported by Signavio." And even SAP has acknowledged Celonis' superiority with respect to functionality, having to promise that Signavio will catch up in functionality in the years to come.

249.    When customers have expressed concern with Signavio's inferiority, SAP has responded, without factual support, that Signavio will have all the features and functionality of Celonis by 2027 (not coincidentally, the deadline for migration to S/4HANA). For example, SAP, through ███████████, promised ███████ that, if it did not renew its contract with Celonis and instead opted for Signavio, that Signavio would have Celonis' capabilities by 2027.

**h.  To Enrich Itself, SAP is Forcing Customers to Choose Now Between Higher Prices and Lower Quality for Process Mining Software**

250.    The unfair competition from SAP's actions, false statements, and policy changes cannot be overstated. SAP is unilaterally deciding to sunset a legacy ERP application that a majority of its customers utilize. These customers are locked into the SAP ERP ecosystem, spending millions for the platform, and are unable to migrate it to a competing provider.

251.    SAP is using this leverage to force these customers to migrate to SAP's cloud-based ERP application on SAP's timetable.

252.    The migration process is complex, potentially taking up to two years, and mission critical, given the importance of ERP to a business's functioning.

253.    SAP is pressuring customers to start the migration process now to avoid the possibility of missing the future cutoff date in 2027.

254.    This migration coincides with several other SAP policies that effectively disallow any viable data extraction from its cloud-based ERP application, imposing both arbitrary technical limitations and exorbitant, unwarranted costs on many third-party providers such as Celonis.

255.    And if customers attempt to use an unpermitted method to get their data to their preferred vendors, any issues that they encounter in their ERP application—including issues with their complex and mission critical migration—will be at their own risk, and SAP will disclaim any responsibility for resolving such issues, regardless of the customer's agreement with SAP.

256.    Meanwhile, SAP is offering its own process mining solution, Signavio, as a native integration in the cloud-based ERP application, with no charge for data transfers, and at low cost or even for free as part of a bundle.

257.    For example, on information and belief, Celonis was engaged in a proof-of-value demonstration for ███████ and had a very promising business case. However, ███████ ultimately signed a multi-million dollar contract with SAP instead. ███████ received Signavio for free as part of the package.

258.    In contrast, another potential customer, ███ was not even offered the option to opt out of Signavio's services. Recently, SAP offered Signavio to ███ for free as part of the SAP RISE package to support ███ migration to S/4HANA. However, ███ informed Celonis that Signavio was included in the RISE package whether ███ wanted the software or not, giving ███ no option to opt-out of acquiring the Signavio product.

259.    More recently, in June 2025, a Global Systems Integrator (GSI) partner told a Celonis representative that Signavio was offered to ███ for free within SAP's RISE bundle, but they otherwise would be charged for Signavio if they did not participate in RISE. As the GSI partner noted "the pricing presented by Signavio on ███ will only apply if ███ doesn't sign Rise, otherwise it's still free."

260.    SAP is even using the embedded nature of Signavio within the SAP ERP to convince customers to move away from Celonis and purportedly "de-risk" their migration. Signavio CEO Gero Decker has described how Signavio became "indispensable"—in his words—because competitors "couldn't replicate" Signavio given the "needed access to data" from customers that only SAP, and by extension Signavio, has.

261.    SAP has undertaken all of these actions and changes in contravention of its "open ecosystem" promises and its assurances offered in 2021 to regulators when it initially acquired Signavio—that process management software, accessing data in the ERP application via simple scanner access, was an indirect use that would not incur fees.

262.    As a result of SAP's conduct, customers are starting 2025 faced with unfair and detrimental choices for their businesses. Unable to switch from the SAP ERP application given its lock-in, and with millions of dollars in migration costs hanging over their heads (especially if migration were to fail), the customers are asked to choose between using their preferred vendors— such as Celonis for process mining—or capitulating to SAP in the false hope it will help improve their chances for a successful migration.

263.    This is a Hobson's choice. If an SAP customer retains their preferred non-SAP vendor, it will mean submitting to impossible technical restrictions, uneconomic data transfer

charges, or unjustifiable risks to their migrations. On the other hand, if an SAP customer submits to the migration that SAP is attempting to impose, then it will mean leaving behind more innovative products for inferior native SAP offerings.

264.    Celonis already has been approached by various customers who are uncertain of what to do and are eager to avoid this predicament. With the migration deadline fast approaching, customers are very concerned about defying SAP's requirements and risking costly mistakes in their migration programs. The risks of such migration mistakes are so substantial that it creates a situation in which customers feel obligated to forego Celonis and to take Signavio in order to safeguard the investment they have already made and must continue to make in their locked-in SAP ERP application.

265.    Indeed, in a recent meeting with ▅▅▅ SAP advertised the launch of its SAP Datasphere Beta Program, positioning Datasphere as the primary solution for customers who want to use data from S/4HANA. The slide deck indicates customers will not incur a premium outbound fee for using Signavio but will incur such a fee for using third-party vendors, such as Celonis. As discussed, the outbound fee can be substantial, sometimes even exceeding the cost of the third-party vendor, and in any case rendering the use of the third-party vendor economically unviable.

266.    ▅▅▅▅ a customer of both SAP and Celonis, communicated through its representative ▅▅▅▅▅ its confusion internally regarding the relationship between its two providers, stating "SAP claims that Celonis doesn't have or is not covered by 'SAP runtime license' to extract data from SAP ECC systems through the integration pattern which was defined at the beginning of the project. SAP is saying that, according to the SUR (Software Usage Rights), Celonis cannot just extract data (either via app or DB) without having valid licenses for each of the integration mechanisms."

267.    Similarly, in May 2025, ▅▅▅▅▅ employee ▅▅▅▅ told a Celonis representative that SAP, as part of their S/4HANA migration, will "prohibit the use of the Celonis adapter and will refuse support if an error in the system points towards Celonis." Based on this information, ▅▅▅▅ said "as things currently stand, we cannot use the connector."

268.    Other customers, including ███████████████████████ ████████████████, have contacted Celonis for clarity on SAP's position and asking questions regarding the implications of SAP's transition to S/4HANA. Although there are no architectural and licensing implications for extracting data from S/4HANA using Celonis' extractor, SAP is telling customers otherwise and harming both the customers' and Celonis' business as a result.

269.    For instance, ████ employee ████████ contacted Celonis and expressed confusion about SAP's S/4HANA migration requirements and identified the precise predicament Celonis faces, stating that "As more SAP customers migrate to S4, I am confident that a significant percentage will deploy on Rise." ████████ expressed concern about what this development would mean for Celonis' future relationship with its SAP ERP customers, and that SAP's policies would "prevent your add-on from being enabled on any customer's instance using Rise, thereby impacting your ability to continue business with those customers."

270.    Similarly, ████████ elected to leave Celonis for Signavio when its contract with Celonis came up for impending renewal, despite having expressed a preference for Celonis. SAP's anticompetitive conduct (such as its claims that Celonis risked system stability, its threat of future price increases for the use of Celonis, and its inclusion of Signavio in a bundle for free or effectively free) left the business little choice, even though it has experienced a $70M value realization based on its investment with Celonis.

271.    In another example, and after initially selecting Celonis over SAP through its RFP process, company ████ elected to award its contract to SAP, after SAP responded to its RFP loss by offering Signavio for free.

272.    Celonis generally enters into ████ year contracts with renewal options, and Celonis expects this story to play out repeatedly over the coming months, as many additional contracts go up for renewal between the date of this filing and the time SAP transitions to S/4HANA at the end of 2027.

273.    Celonis' pipeline of potential new customers are also being coerced by SAP's conduct. For example, potential customer ███ employee ███████ asked Celonis, "[w]hether you can guarantee to us that the platform can be connected directly to SAP (under the RISE cloud model)…to map processes, without any limitations or risk that SAP will want to charge us for such a connection."

274.    Beyond risk of additional financial charges, SAP is coercing Celonis' customers away from Celonis by offering buy-outs of contracts—a practice whereby Signavio is not merely free, but SAP is in fact ***paying customers to use Signavio***. In March 2025, for example, SAP contacted ███████ and offered to buy out their contract with Celonis, which currently runs through 2027, if ████ would switch from Celonis to Signavio. Such a buyout would lead not only to immediate revenue loss, but also to loss of future revenue streams for Celonis that—given SAP's lock-in of customers—are exceedingly difficult to re-obtain.

275.    SAP is engaging in this conduct now, despite the fact that there is no technical problem with Celonis' extractor, because SAP wants not only to sell the license for its ERP application but also to eliminate competition for additional services like Signavio's process mining.

276.    SAP has no procompetitive justifications for its conduct. Any alleged concerns about migration success or other technical issues are pretextual, given the evidence of successful migrations amongst Celonis customers and the long history of successful data extraction using the tools SAP is now effectively prohibiting.

277.    If SAP succeeds in driving out external competition for SAP's own internal solutions, and given the lock-in that customers face with SAP's ERP applications, SAP will have the ability to raise the price of its additional services like process mining without restraint.

**i.    SAP Dominates the SAP ERP Data Access Aftermarket and is Attempting to Dominate the SAP Process Mining Aftermarket**

*i.    Relevant Product Markets*

278.    There are at least three relevant antitrust product markets applicable to this dispute: (1) ERP Applications, (2) ERP Data Access, and (3) SAP Process Mining.

279.    Antitrust law and economics each recognize the concepts of "foremarkets" and "aftermarkets." The foremarket consists of the relevant market for a given primary good or service, of which there may be multiple brands. For example, there may be a relevant market for photocopier machines, which would be the foremarket. By contrast, an aftermarket is a derivative relevant market that may be limited to products or services related to a single brand of the primary product or service sold in the foremarket. For example, while the photocopier foremarket may have multiple brands, there may be a derivative relevant market for the servicing of only Kodak-brand photocopiers—this is known as an aftermarket. In this context, ERP Applications is a foremarket: it is comprised of ERP applications that customers utilize. The SAP ERP Data Access Market and SAP Process Mining Market are separate aftermarkets, comprised of data access to the SAP ERP application and process mining software compatible with the SAP ERP application.

### 1. ERP Applications Market

280.    As described above, an ERP application is the "hub" or backbone on which many different mission critical day-to-day business processes are run, including HR, payroll, billing, accounting, etc. It is an essential software infrastructure on which many companies rely for the operation of their business.

281.    ERP applications are a distinct type of business software. While ERP applications may share some functionality with other tools that companies use to simplify and improve their business processes, like CRM systems, providers and consumers of ERP applications recognize them as separate products serving distinct purposes.

282.    As noted, ERP applications handle back-office functions, such as finance, supply chain operations, and HR. This focus stands in contrast with, e.g., CRM systems that handle front-office business functions, such as marketing sales, advertising, and customer service.

283.    There are no reasonable substitutes for ERP applications. Though businesses may use services like QuickBooks or Excel at the beginning of their existence, these tools do not present reasonable alternatives because they prove inefficient and unsustainable as the business matures and expands.

284.    Customers are locked into their SAP ERP application as a result of the information disparity at the time of purchase and the enormously high costs of switching.

285.    These customers also are unable to perform detailed cost analyses for the lifecycle of their ERP applications at time of purchase. It is difficult for customers to obtain the necessary information among competing ERP applications with respect to maintenance costs, upgrade timelines (or the costs of such upgrades), as well as any disruption in service that may occur over the life of the product. Such pre-purchase analyses also cannot account for any post-sale changes in policy or practice such as SAP's changes discussed above. There thus exists an information disparity between ERP application customers and providers.

286.    Severe switching costs associated with changing a customers' ERP application provider effectively preclude the vast majority of customers from changing their ERP applications. These switching costs include both direct financial costs and indirect costs at every stage of the switching process. Initially, ERP application customers devote substantial resources to evaluating ERP applications. For large customers, this process can take several years to complete, given the need to thoroughly examine the functionality of ERP applications and measure that functionality against the unique needs of a particular customer.

287.    After the evaluation process, customers spend significant sums on the actual licensing, development, and implementation of ERP applications within their specific business environments. A large customer may spend tens of millions of dollars on its ERP applications in a given year, depending upon the complexity and customization of its ERP applications, the number of users, and other factors.

288.    Implementing ERP applications involves extensive costs and substantial devotion of resources, including but not limited to training employees on how to properly use those ERP applications, troubleshooting problems, and realigning business practices with the selected provider. In addition to employee-focused change management, implementation involves major costs associated with migrating data, testing and deployment of specific software developed for each customer, and technical implementation that occurs during this time period.

289. Accordingly, changing ERP application providers is not a task completed in days or weeks but over a period of months or years, from the date a license agreement is signed, through development, testing, and training, to the actual deployment.

290. These switching costs, coupled with the information disparity between provider and customer as to future changes in policy or practice, mean that ERP application customers are "locked-in" to their current providers and thus may be exploited by a change in policy or practice from their provider that was not known at the time customers made their initial choice of ERP application provider. Indeed, as discussed above, SAP has twice updated Note 3255746 in the past year.

291. These switching costs also explain how SAP is able to require customers to migrate to the cloud, which is a lengthy and time-consuming process. To migrate data to the SAP S/4HANA private Cloud, on information and belief, a customer must undergo a complex multi-step process to identify and group its data and confirm accurate staging before that data can be migrated. This process must be completed over a lengthy period because large data customers are significantly limited in the amount of data they can migrate to the cloud each day.

292. It also is possible to identify a narrower market for ERP applications sold to large companies. As explained above, SAP markets its S/4HANA ERP application as a solution for large and upper-midsize customers that have more complex organizational structures and industry requirements. These customers are unique in their ERP application needs because of their high annual revenue, high data volume, and large staff, including many employees utilizing the ERP application.

293. This narrower market would have the same characteristics as the ERP Applications Market, although SAP's share of the market would range from 60% to 90% depending on the industry in which the customer operates.

2. SAP ERP Data Access Market

294. Customers access their data stored in their SAP ERP applications for a range of purposes, such as HR, payroll, billing, and accounting. The SAP ERP Data Access Market is the

product market for accessing customers' own data that is stored in the SAP ERP application. While the SAP ERP Data Access Market is derivative of the ERP Applications Market, it constitutes its own distinct aftermarket that is properly limited to the SAP ERP applications that customers utilize.

295.    The SAP ERP Data Access Market is limited to SAP itself. As the owner of the ERP application, SAP is the gatekeeper that controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed.

296.    SAP offers ERP data access via multiple products that represent reasonable substitutes in the eyes of its ERP customers. Firstly, and as recounted above, SAP offers customers various licensing options, with the licenses controlling how data can be accessed from the HANA database. Secondly, and again as recounted above, SAP offers customers various technical solutions, with those technical solutions representing the only data extraction "compliant" with announced SAP policy.

297.    Also, as recounted above, these licensing options and technical solutions are not necessarily considered by the ERP customers at the time they purchase their ERP application. Rather, an ERP customer may not engage with SAP concerning data access until well after the original ERP purchase and at the point when the customer is considering functionality from third parties that would add to its experience with the SAP ERP ecosystem.

298.    SAP markets and sells these products to its ERP customers. The price of the licenses depends upon the access requirements of the customer (although as noted SAP has attempted to "oversell" its customers on their licensing needs). The price of the technical solutions can be monetary or nonmonetary. SAP Datasphere charges customers a premium outbound cost, while OData, although not charging a fee, taxes its customers in the form of substandard performance.

299.    Data access to other company systems (or even the company's raw data) is not a reasonable substitute for ERP data access when the customer uses an ERP system. As explained above, an ERP system becomes the central repository for most or all of a company's data, providing it in a uniform fashion. While companies previously could choose the database underlying their ERP applications, including databases that would allow extracts to third-party providers, SAP

changed that practice when it introduced S/4HANA in 2015 and required all S/4HANA users to also utilize the HANA database.

300.    As a result, if an SAP ERP customer wants to access its own data in the ERP application, that customer must utilize a data access option that SAP allows.

301.    This requirement means that a customer's initial selection of an ERP application effectively determines the universe of data access alternatives available to it throughout the life of the ERP application.

302.    As discussed above, this restriction on the customer's aftermarket options is difficult for a customer to comprehend a priori. A customer would need to overcome several complexities and challenges—such as ensuring stakeholder engagement in the ERP selection process; creating portable applications that can be deployed on a variety of ERP applications; understanding project commonalities across technology, technical requirements, and vendors; developing a future exit strategy; and analyzing current alternatives like upgrades—when considering the future limitations its ERP selection will impose.

303.    In addition, customers are at an information disadvantage and unable to accurately price the life-cycle of their ERP application usage as explained above.

304.    Customers cannot avoid this uncertainty because of the significant switching costs and lock-in discussed. Changing ERPs is viewed within the industry as complex, costly, disruptive, and risky. And the same barriers to entry that protect SAP's position with its customers in ERP Applications Market also protect SAP's position in the SAP ERP Data Access Market.

305.    In the SAP ERP Data Access Market, SAP itself controls the barriers to entry by setting the legal and technical requirements on how customers or their contracted third-party vendors can access customers' data in the ERP application.

306.    There is substantial evidence that SAP monopolizes the SAP ERP Data Access Market. As the gatekeeper for its own ERP application, SAP solely controls both the technical and legal conditions on which customers' data stored in the ERP application can be accessed.

1

### 3. SAP Process Mining Market

2      307.    The SAP Process Mining Market is the product market for process mining software

3  compatible with SAP ERP applications. While the SAP Process Mining Market is derivative of the

4  ERP Applications Market, it constitutes its own distinct aftermarket that is properly limited to the

5  SAP ERP applications that customers utilize. The SAP Process Mining Market is comprised

6  primarily of Celonis, Signavio, Software AG, and UiPath.

7      308.    Process mining software needs to be compatible with SAP ERP applications. Absent

8  this compatibility, the process mining software is unusable to the customer because the customer's

9  data on which the software relies is contained within the customer's SAP ERP application. As noted

10  above, process mining acts as a bridge between the customer's data in an existing system and

11  Celonis' platform. Specifically, the software uses event log data to create a digital twin of the

12  business's processes, helping the business visualize every move the business makes in real time.

13  Thus, any option that does not achieve this real time access to allow dynamic analysis—as a result

14  of technical incompatibility as opposed to arbitrary administrative exclusion—is not

15  interchangeable.

16      309.    This compatibility requirement means that a customer's initial selection of an ERP

17  application effectively determines the universe of alternatives available to it with respect to

18  aftermarket services like process mining. Once a customer has selected the SAP ERP application,

19  it must select a process mining software compatible with that platform.

20      310.    As discussed above, this restriction on the customer's aftermarket options is difficult

21  for a customer to comprehend at the time it is selecting an ERP application. A customer would need

22  to overcome several complexities and challenges—such as ensuring stakeholder engagement in the

23  ERP selection process; creating portable applications that can be deployed on a variety of ERP

24  applications; understanding project commonalities across technology, technical requirements, and

25  vendors; developing a future exit strategy; and analyzing current alternatives like upgrades—when

26  considering the future limitations its ERP selection will impose.

27

28

311.   In addition, customers are at an information disadvantage and unable to accurately price the life-cycle of their ERP application usage as explained above.

312.   Customers cannot migrate away from this uncertainty either because of the significant switching costs and lock-in discussed. Changing ERPs is viewed within the industry as complex, costly, disruptive, and risky.

313.   Just as SAP's position in the ERP Applications Market, and dominance in the SAP ERP Data Access Market, is protected by high barriers to entry, so is SAP erecting high barriers to entry around the SAP Process Mining Market as well given its complete control over the ecosystem.

314.   In the SAP Process Mining Market, SAP itself controls the barriers to entry by setting administrative and technical requirements on the market participants that are allowed to integrate with its ERP application. This case is not one of a true technical problem or actual incompatibility that prevents a third party from offering a viable alternative product. Nor is it a case of a smaller company upset that a bigger competitor has a better product in the eyes of customers. In this instance, customers already were using the smaller company's viable alternative product despite the existing barriers—compliance with licensing requirements. SAP is now setting those barriers even higher, to the point where it is aiming for all options but SAP's own Signavio offering to be excluded.

315.   There is substantial evidence that SAP seeks to monopolize the SAP Process Mining Market. Having purchased Signavio in 2021, it already has a competing product in the market that it self-preferences against third-party options like Celonis via promotions, offerings, and technical advantages. Nonetheless, for the time being, some customers still have chosen to use Celonis, even when SAP has bundled Signavio into its offerings for free, indicating Celonis' superior quality.

316.   Now SAP seeks to self-preference its Signavio offering further, and to disadvantage and harm Celonis further, by prohibiting customers from using any other option using its unwarranted policy changes, arbitrary technical limitations, and unilateral imposition of data transfer charges.

*ii.  Relevant Geographic Market*

317.    The geographic scope of the ERP Applications Market, the SAP ERP Data Access Market, and the SAP Process Mining Market is global. The availability of ERP applications, of data access, and of process mining software is not materially limited by geography.

318.    It may be possible to identify a narrower market for ERP applications based on country or region, however. While geography does not impact availability, as explained above there are national and regional preferences from a customer's perspective for ERP providers with a strong, local footprint, which could create geographical barriers.

**j.  SAP's Anticompetitive Conduct Has Harmed Competition and Caused Celonis to Suffer Antitrust Injury**

319.    SAP's anticompetitive conduct has harmed competition. SAP's anticompetitive conduct has also inflicted antitrust injury upon Celonis.

320.    As recounted above, SAP is using its market power in the ERP Applications and SAP ERP Data Access markets to subject customers to increasingly stringent restrictions on data extraction of those customers' own data from SAP ERP applications. The purpose of these restrictions is to force customers who desire to continue using third-party options like Celonis' process mining software either (i) to pay additional fees to SAP in the form of licenses and transfer costs or (ii) to cease using those third-party options in favor of SAP's own, lesser quality offerings, such as Signavio.

321.    Moreover, SAP is using its market power in the ERP Applications and SAP ERP Data Access markets to achieve what it could not through competition on the merits—adoption of its Signavio offering. Although SAP already is self-preferencing its Signavio offering, it has faced challenges with consumer acceptance of its offering. Rather than improving the product, SAP is moving to restrict its own customers from using any other competing product, including Celonis' process mining software. These restrictions thus ensure that customers will have to utilize the lower quality Signavio for their process mining needs.

322.    SAP also is using its market power in the ERP Applications and SAP ERP Data Access markets to prohibit customers from using Celonis' process mining software if those customers want to receive the value of their SAP ERP application. SAP's restrictions on data extraction and prohibitively expensive fees on data transfers, coupled with the threat that migrating customers use unpermitted processes at their own risk, have forced customers to choose between undertaking SAP's obligatory and impending ERP application migration and Celonis' process mining software. Given SAP's market power in the SAP ERP Data Access Market, and the lock-in that customers face in the ERP Applications Market, it is hardly a choice at all.

323.    In addition, SAP is providing its Signavio process mining software below cost. Although SAP entices customers in the present by bundling Signavio with other specialized solutions and presenting them as a free "entitlement" with a customer's ERP application, SAP's below-cost pricing aims to drive third-party alternatives from the SAP Process Mining Market. Once those third-party alternatives, which constrain SAP competitively, are excluded, SAP will be able to raise the price of its Signavio offering without restraint given the lock-in effects of the ERP Applications Market.

324.    Finally, SAP's conduct directly contradicts assurances SAP offered, just over three years ago, to regulators and to the public about the type of access it would allow to its ERP application. SAP's about-face on such a fundamental issue has pulled the rug out from under customers and third-party providers alike, allowing SAP to enrich itself unjustly while simultaneously destroying the value created by the beneficial relationships between SAP's customers and third-party providers in the SAP ERP ecosystem.

325.    In these ways, SAP's anticompetitive conduct has allowed it to reduce choice, stifle innovation, raise prices and costs, reduce quality, and prevent the free flow of competition on the merits. All of these constitute antitrust injury.

1
2

### k. Monopolization and Attempted Monopolization: SAP's Separate Course of Anticompetitive Conduct

3

*i. Introduction to Monopolization and Attempted Monopolization*

4      326.    SAP's bundling, tying, and predatory pricing practices are individual examples of

5    its unlawful actions, each of which establishes an independent claim for relief. But in addition, SAP

6    is engaging in a broader course of anticompetitive conduct that separately constitutes

7    monopolization and attempted monopolization in violation of Section 2 of the Sherman Act.[8]

8      327.    The main thrust of SAP's anticompetitive scheme is to deprive its customers of the

9    meaningful option to choose third-party products and services that operate on those customers' own

10   data. These third-party products and services are not horizontal competitors to SAP's ERP

11   application offering; they seek to use customer data to provide a service that complements the use

12   of ERP systems. SAP has embarked on its strategy to reduce competition by self-preferencing its

13   own offerings, including Signavio for process mining.

14     328.    SAP could have lawfully competed on the merits in product and service areas that

15   operate on its customers' data, such as data extraction and process mining. But instead, SAP chose

16   to diminish competition by taking advantage of the practical and economic power it has over its

17   ERP customers. This course of conduct, detailed below, unreasonably harms competition in the

18   SAP Process Mining Market (among others) and thereby injures Celonis.

19     329.    SAP has previously contended that Celonis' theory of anticompetitive harm is its

20   inability to access SAP databases in a preferred manner.[9] But SAP's contention is wrong on both

21   the technical facts and the economic reality of the instant case.

22

23

---

24   [8] For avoidance of doubt, SAP's bundling, tying, and predatory pricing practices can be considered part of the
     broader anticompetitive scheme asserted in this section. However, the course of conduct alleged herein presents an
25   independent basis (combined, or individually in its constituent parts) for the monopolization and attempted
     monopolization claims even absent SAP's bundling, tying, and predatory pricing conduct.

26   [9] *See* SAP's Motion to Dismiss Initial Complaint, ECF No. 46, p. 6 ("Monopolization and attempted monopolization
     claims require, among other things, that the defendant engaged in 'anticompetitive conduct.' . . . Celonis tries to
27   satisfy this element by alleging that SAP is no longer permitting Celonis to use SAP software to extract data in the
     ways Celonis prefers.").

28

330.    The issue is not that Celonis needs access to SAP databases. Rather, it is **SAP's customers** who must access their data stored in their instance of the SAP ERP—using either SAP-provided or third-party extraction tools—in order to work with **their own data** using products and services such as Celonis' process mining offering.[10] As noted above, SAP's customers own the enterprise data that resides in their instances of SAP systems. SAP's General Terms and Conditions for Cloud Services explicitly recognize this, providing that "Customer owns all right and interest in and to Customer Data," defined to include "any content, materials, data and information that Authorized Users enter into the production system of a Cloud Service or that Customer derives from its use of and stores in the Cloud Service."

331.    Furthermore, the harm to competition extends beyond Celonis. SAP's coercive tactics—particularly its efforts to restrict what customers can do with their own data—are exclusionary and lack procompetitive justification. These practices harm not just competitors like Celonis, but also SAP's own customers, who are deprived of the innovation, choice, and ultimate cost savings that come from competitive markets.[11] And as described below, that competitive injury includes diminished customer access to AI innovations as a result of SAP's exclusionary practices.

*ii.   SAP's Monopolistic Scheme*

332.    SAP's customers purchase its ERP product to store and process vast amounts of company data, connecting disparate data sources together into an integrated system. As detailed above, this involves an expensive and complex integration, the result of which leaves customers effectively unable to switch ERP providers in response to unfavorable SAP changes to pricing, product functionality, or business practices.

---

[10] SAP's counsel conceded as much at the initial motion to dismiss hearing, where he admitted that SAP charges its **customers** different license rates for different types of database access. *See* Mot. Hr'g Tr. 21:12-23:5 (June 23, 2025).

[11] SAP's actions are entirely distinct from the facts in *LiveUniverse Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556–57 (9th Cir. 2008). There, the alleged anticompetitive restriction at issue was Myspace's decision to not allow users to post links to a competing social media service. *Id.* at 557. However—critically—the Court reasoned that there was no antitrust injury alleged because "there [wa]s no allegation that My[s]pace has prevented consumers from accessing [the competitor]" and that "[c]onsumers remain free to choose which online social networks to join, and on which websites they upload text, graphics, and other content." *Id.* That is **not** comparable to the facts here, for SAP customers who would like to work with Celonis. SAP is not merely restricting something akin to Celonis content in its systems. Instead, SAP is coercing its customers away from using Celonis in an exclusionary attempt to restrict competition in the process mining market. In this way, SAP is distorting competition in that market to privilege Signavio, to the exclusion of Celonis.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

333.    This lock-in effect affords SAP unusual practical and economic power over its customers. SAP has taken advantage of this position in an unlawful effort to exclude competition in economic markets outside of the ERP product itself. As particularly relevant to Celonis, that includes the SAP Process Mining Market.

334.    With respect to Celonis' claims, SAP's anticompetitive scheme consists of at least four features: (1) the "Clean Core"/"RISE" and "Honeymoon is Over" initiatives; (2) promulgation of technical policies designed to unreasonably reduce Celonis' ability to compete; (3) a campaign of false and misleading statements about Celonis; and (4) customer coercion via SAP's AI product strategy.

1.    The "Clean Core"/RISE and "Honeymoon is Over" Initiatives

335.    Soon after its acquisition of Signavio, SAP launched two initiatives that have unreasonably impaired competition in the SAP Process Mining Market.

336.    SAP's first such initiative, the "Clean Core" policy, was adopted in 2023. Clean Core, which SAP describes as being "embedded into RISE", coerces SAP customers into using SAP-provided products and services such as Signavio instead of third-party products like Celonis. It does so by restricting feasible data extraction methods and pressuring customers to limit third-party interaction with their data.

337.    As described in, *inter alia*, paragraphs 232–40, SAP's Clean Core policy effectively limited its customers' data extraction options to two choices that are insufficient for use with Celonis: OData or SAP Datasphere (ODP is banned). For many customers, using either such option to extract data to Celonis would involve unreasonably low extraction speeds or reliability or come with unreasonably high fees—just as SAP intended in order to coerce adoption of Signavio.

338.    This tactic involves an ongoing SAP pressure campaign against its customers, threatening substantial risks that purportedly would arise from those customers' use of "noncompliant" extraction methods to access their own data.

339.    For example, SAP announced that if a customer experienced an issue while using a disfavored extractor, then SAP would withhold technical support (despite the customer having

already contracted for that support under its ERP license), regardless of whether the issue was caused by such extractor.

340.    Relatedly, SAP falsely asserted to a significant number of customers that their use of "noncompliant" extractors would present a substantial risk of failure in the SAP-mandated customer migration from on-premises to cloud-based ERP. Such a migration failure would involve substantial disruption and expense to the customer, making this an effective—albeit pretextual—threat.

341.    As noted in, *inter alia*, paragraphs 239–40, SAP's purported justifications for the Clean Core initiative are inaccurate and represent merely a scare tactic designed to prevent customers from working with third parties such as Celonis. Indeed, system migration is a core use case that Celonis has long supported since its time as an SAP partner.

342.    Additionally, in accordance with the Clean Core/RISE initiative, SAP pressures customers to adopt the "integrated toolchain," referring to a collection of native products and services built into the SAP ERP environment.

343.    As this SAP-published graphic shows, Signavio is a prominent part of that integrated toolchain.

**Fig. 11**



344.    SAP's second initiative—aimed specifically at Celonis—is expressly referred to as "The Honeymoon is Over." SAP's name for this initiative is particularly notable in light of the mutually beneficial relationship it had shared with Celonis prior to SAP's acquisition of Signavio.

345.    Pursuant to this initiative, SAP sought to deter Celonis' customers from renewing their contracts via a campaign that targeted those customers and misleadingly informed them that Celonis' extraction method is not compliant with SAP's technical requirements.

346.    Upon information and belief, the "The Honeymoon is Over" initiative also encompasses the other anticompetitive actions that SAP has taken against Celonis, which are detailed throughout this Complaint.

        2.    <u>Promulgation of Technical Policies Designed to Unreasonably Reduce Celonis' Ability to Compete</u>

347.    As previously identified in, *inter alia*, paragraphs 216–31 of this complaint, SAP has taken additional steps to exclude third-party providers like Celonis by releasing successive technical notes that increasingly limit extraction methods for customers wanting to use Celonis.

348.    Figure 1 shows these changes (including, for clarity, the Clean Core initiative) and their increasingly draconian limitations that SAP has imposed on its customers:

**Fig. 1 – SAP's Increasingly Exclusionary Extraction Policies**

| Policy | Date | SAP Restriction of Customer Extraction | Post-Implementation Options for Extraction to Third Parties |
|---|---|---|---|
| N/A | Before SAP's Initiation of Anticompetitive Scheme | No restriction. | <ul><li>ABAP</li><li>OData</li><li>ODP</li></ul> |
| Note 3255746 v.1 | 10/17/2022 | SAP continues to allow but withdraws support from third-party ODP extraction. | <ul><li>ABAP</li><li>OData</li><li>ODP (unsupported for third-party services)</li></ul> |
| Clean Core Initiative | 2023 | SAP launches a campaign against customer use of any non-SAP extensions, purportedly to support S/4HANA migration. It formally advises against ABAP extraction and then informs customers that ABAP extraction is prohibited. | <ul><li>OData</li><li>ODP (unsupported for third-party services)</li></ul> |
| Note 3255746 v.4 | 2/2/2024 | SAP prohibits third-party ODP extraction. SAP promotes Datasphere, an SAP product with commercially infeasible fees for data access. | <ul><li>OData</li><li>Datasphere (prohibitively expensive fees when used with outside vendors like Celonis for data extraction)</li></ul> |
| Note 3255746 v.5 | 7/11/2024 | SAP withdraws support from OData extraction and asserts that there are no plans to enhance this interface in the future. | <ul><li>OData (unsupported)</li><li>Datasphere (prohibitively expensive fees when used with outside vendors like Celonis for data extraction)</li></ul> |
| **RESULT**: **No commercially viable extraction methods** to third-party products. | | | |

349.    As a result of these shifting extraction policies and the coordinated push toward use of Datasphere, SAP currently permits its customers to use only two options for extracting their own data to third-party services: (1) OData (for which SAP has withdrawn technical support) and (2) Datasphere (that is prohibitively expensive for extraction to non-SAP process mining and other

services).[12] SAP ODP, per SAP policy, is reserved for extraction to SAP-native services. And for reasons described above at, *inter alia*, paragraphs 216–23 and 227, neither OData nor Datasphere is practically viable for Celonis' customers.

350.    SAP's campaign is therefore not about blocking Celonis from using a "preferred" extraction method—it is instead about preventing customers from using any viable extraction method at all, including for pretextual reasons and in service of privileging SAP's inferior Signavio offering.

351.    SAP's limitation of the available extraction options to these impractical choices is exclusionary and part of its coercive scheme to force customer adoption of Signavio over Celonis.

352.    As a consequence of this tactic, SAP can exclude third parties outright or employ its economic leverage to present them with a competition-reducing choice: partner with SAP or be excluded from access to enterprise data and the ability to serve customers with AI (and other) innovations.

353.    This partner-or-perish tactic enhances SAP's ability to lock in customers and reduce third-party competition.

### 3.    A Campaign of False and Misleading Statements about Celonis

354.    As described in, *inter alia*, paragraphs 197–215 of this complaint, SAP also engaged in a campaign of false and misleading statements about Celonis as part of its monopolistic scheme.

355.    This campaign generally involved several elements, telling customers that using Celonis was not compliant with SAP policies, would require prohibitively expensive ERP licenses, posed a risk to their system stability, or would jeopardize their migration to S4/HANA; and also making false statements comparing SAP and Celonis, including with respect to Celonis' capabilities. SAP relatedly lures customers to its own solution under false pretenses, including through continued promises of an "open ecosystem," notwithstanding its practices, policies and threats to the contrary.

---

[12] By operation of the parties' joint stipulation, Celonis' RFC-ABAP extractor is permitted during the pendency of this litigation. *See* ECF Nos. 83, 86. However, SAP's policies otherwise restrict customers' ability to use that Celonis extractor, and the temporary stipulated permission should have no bearing on these claims.

356.    These SAP assertions are materially false and misleading (and were so at the time they were made), and together they serve as a potent coercive mechanism to insulate Signavio from competition.

4.    Customer Coercion via SAP's AI Product Strategy

357.    The central role that artificial intelligence plays in SAP's business strategy contextualizes its exclusionary practices and anticompetitive intent—in the relevant markets and throughout the entire enterprise tech stack.

358.    As one commentator has put it, SAP has come to consider AI not "as a mere feature" but instead "as the strategic core of enterprise software."

359.    SAP's AI product strategy, described below, underlies its coercive attempts to force customer adoption of SAP-native products like Signavio and reinforces the other elements of its anticompetitive scheme.

360.    At its May 2025 SAPPHIRE conference, SAP announced a vision of its value proposition involving an AI-powered "flywheel effect." SAP posits that this term refers to how AI and data-driven tools can empower its customers with "extremely powerful Business AI."

361.    But aside from these purported customer benefits, SAP also conceptualizes its AI strategy as a means to grow its own business at the expense of third-party competition.

362.    As to Celonis' process mining offering, the exclusionary mechanism lies primarily in SAP's direct linkage of the "AI flywheel" concept and the Clean Core/RISE initiative. SAP board member Muhammad Alam stated at the 2025 SAPPHIRE conference, "In the age of AI, true differentiation will lie in how you create value from this end-to-end context for your organization. ***This can only happen when you simplify and innovate your core***, and not add another layer of complexity to your landscape." (emphasis added)

363.    As one commentator put it, "[t]he message from Sapphire is clear:  modernizing to S/4HANA Cloud with a 'clean core' is increasingly positioned as essential to fully leverage SAP's innovation roadmap."

364.    And SAP has made this clear elsewhere. Its website refers to "AI innovations" in describing the "set of guiding principles" that constitute the Clean Core initiative. And even more

explicitly, it lists "Unlocking new innovations"—specifically "continuous improvement through capabilities such as business AI"—under the header, "Explore the value of a clean core strategy."

365.    The message is clear: customers are locked out of SAP's critical AI innovation pipeline absent adoption of the Clean Core/RISE initiative and acquiescence to SAP's broader exclusionary campaign against third-party competition.

366.    This exclusionary approach to the AI product strategy is injurious to competitors (like Celonis) and customers alike. As to Celonis, the approach is exclusionary because it (1) coerces customers not to use its process mining offering due to SAP's Clean Core restrictions on data extraction; and (2) positions Signavio as the self-preferenced alternative via RISE.

367.    Other third parties are in the exact same position, facing anticompetitive restrictions on data extraction and related SAP self-preferencing that inhibit their ability to serve customers AI (and other) innovations.

368.    Through these exclusionary machinations, SAP's AI product strategy has an even broader anticompetitive effect: chilling AI innovation across the entire enterprise tech stack. By leveraging the Clean Core/RISE initiative to preclude sufficient third-party access to customer data, SAP has substantially limited those third parties' ability to deliver competing business AI products to customers. That is because when those third-party AI offerings are denied sufficient access to customers' enterprise data, such offerings are devalued and further innovation is disincentivized.

369.    As one commentator recently noted, the AI economy has encouraged "new battle lines [to be] drawn around the control of customer data" and "[t]o some, charging for or outright blocking access to that information is starting to seem like a handy defensive strategy."

370.    In this way—having bet the farm on AI at SAPPHIRE 2025—SAP has built a competitive moat out of its unparalleled data access. This moat is a barrier to entry and adoption that reinforces its customer lock-in (in the ERP Applications, Process Mining, and other economic markets) at the expense of fair competition and the market benefits that flow therefrom.

1

5.   Impact on Relevant Markets

2

371.    SAP's anticompetitive course of conduct has unreasonably restrained competition

3

and caused injury to Celonis in the SAP ERP Data Access Market and the SAP Process Mining

4

Market.

5

*SAP ERP Data Access Market Impact*

6

372.    SAP's course of conduct has served to maintain its monopoly position in the SAP

7

ERP Data Access Market via coercive and exclusionary practices, as opposed to competition on

8

the merits.

9

373.    Celonis has suffered economic injury (in the form of lost customers, lost profits, lost

10

business opportunities, increased costs to acquire and maintain customers, and other similar harm)

11

as a result of SAP's conduct in this market, and such injury will continue to accumulate as that

12

conduct endures.

13

*SAP Process Mining Market Impact*

14

374.    SAP's course of conduct constitutes attempted monopolization of the SAP Process

15

Mining Market, comprising tactics that are not competition on the merits, but rather an attempt to

16

exclude Celonis and other third-party competition.

17

375.    SAP has unlawfully limited Celonis' ability to compete in this market, thereby

18

depriving customers of choice and of the economic benefits of competition on price, quality,

19

functionality, and output.

20

376.    SAP has undertaken its anticompetitive course of conduct with the specific intent to

21

monopolize the SAP Process Mining Market, as evidenced by (1) its Clean Core and "The

22

Honeymoon is Over" initiatives that target Celonis and other third party competition; (2) its

23

changes to technical policies following the Signavio acquisition; (3) its attempts to coerce Celonis

24

customers to adopt Signavio; (4) its false statements regarding Celonis; (5) its exclusionary

25

approach to the AI product strategy; and (6) the absence of procompetitive justification for this

26

course of conduct.[13]

27

28

---

[13] SAP's similar anticompetitive conduct in other markets also reflect its specific intent to monopolize the SAP

377. Through this conduct, SAP has attained a dangerous probability of achieving monopoly power. This dangerous probability is reflected in barriers to entry that flow from the lock-in effect of SAP's ERP offering and its control over enterprise data in the ERP Data Access market, in which it is the gatekeeper of its customers' data. As courts have recognized, a "direct sign of monopoly power is . . . [use of] . . . market power in adjacent segments . . . to make it more difficult for customers . . . to switch to rival [offerings]." *Google LLC*, 2025 WL 1132012, at *33.

378. Celonis has suffered economic injury (in the form of lost customers, lost profits, lost investment, lost business opportunities, increased costs to acquire and maintain customers, and other similar harm) as a result of SAP's conduct in this market, and such injury will continue to accumulate as that conduct endures.

6. Impact on Additional Unnamed Markets

379. The relevant antitrust markets for Celonis' claims are the ERP Applications Market, the SAP ERP Data Access Market and SAP Process Mining markets. But SAP's unlawful course of conduct causes similar harm to competition across a variety of other markets that—although not a direct aspect of Celonis' injury—reflect SAP's anticompetitive goals. Moreover, SAP's misconduct in these other markets, which is driven by the same goals and grounded in similar coercive tactics, further demonstrates its specific intent to monopolize the SAP Process Mining Market.

380. And just as Celonis has been injured by SAP's unlawful conduct, so too have other third-party providers of products and services that rely on access to customer enterprise data stored in SAP's ERP.

381. The impact in AI-related markets is reflected in SAP's anticompetitive practices described above.

382. Another apt example is found in Teradata, a leading provider of Enterprise Data Warehousing ("EDW") products that has been similarly injured by SAP's anticompetitive

---

Process Mining Market. *See* ¶¶ 379–91.

strategies. EDW products enable centralized storage and integration of vast amounts of data collected from numerous sources across an entire business.

383. In 2008, SAP—which at the time did not offer an EDW product comparable to Teradata—entered into a joint venture with Teradata to develop a commercially viable technology that would enable certain SAP applications to utilize Teradata Database for analytical storage and retrieval of data. Prior to this collaboration, SAP had little presence in the EDW market.

384. Teradata and SAP jointly launched Teradata Foundation, a product geared towards SAP's top-tier customers. Teradata Foundation would allow these SAP customers to use Teradata as their underlying data-analytics engine. However, following the release, SAP launched its own competing EDW product, HANA. SAP's development of HANA during the joint venture was unknown to Teradata.

385. Upon information and belief, SAP improperly used Teradata's proprietary information to develop its HANA offering.

386. SAP's HANA struggled to gain traction in the EDW market, forcing SAP to resort to anticompetitive measures to coerce adoption.

387. Before this point, SAP had repeatedly acknowledged customers' freedom to choose products and services to use with their enterprise data. But in light of HANA's poor performance, SAP chose to leverage its dominance in the ERP Applications Market to require customers to license HANA when buying the S/4HANA ERP. As a consequence of this unlawful tying, SAP forced customers to switch their longstanding databases (such as Teradata's EDW) to HANA.

388. SAP also introduced restrictive clauses in its licensing agreements, significantly limiting customers' ability to export enterprise data to external EDW databases and limiting their ability to extract ERP-generated data stored within HANA. These exclusionary clauses reinforced the unlawful tie and allowed SAP to cut off Teradata from access to substantial amounts of critical customer enterprise data.

389. Furthermore, SAP designed and sold S/4HANA in a manner that made it incompatible with any transactional database other than HANA, inextricably linking the two, even

though they are separate and distinct technologies. Consequently, SAP enhanced its customer lock-in at multiple layers of the tech stack, all to the exclusion of Teradata and other third parties.

390.    Because of this anticompetitive behavior, Teradata suffered substantial economic harm and lost business opportunities. Furthermore, EDW customers were deprived of choice and of the benefits of competition on price, quality, innovation, and output.

391.    SAP's anticompetitive strategies have had this same impact across the entire enterprise tech stack, causing harm to competition and consumers throughout.

**Interstate Trade and Commerce**

392.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

393.    SAP's anticompetitive conduct has taken place in—and negatively affected the continuous flow of interstate trade and commerce in—the United States in that, among other things:

a.  SAP has provided its SAP ERP applications and process mining software throughout the United States;

b.  The anticompetitive scheme alleged herein has affected billions of dollars of commerce. SAP has inflicted antitrust injury by artificially excluding Celonis, raising the costs of Celonis and other competitors, increasing prices, reducing quality, stifling choice and competition, and causing other antitrust injuries described herein.

394.    SAP's actions must be stopped, and the harm to Celonis must be remedied.

**Claims for Relief**

**FIRST CLAIM FOR RELIEF**

**(Intentional Interference with Contractual Relations – Against All Defendants)**

395.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

396.    As herein alleged, SAP has intentionally interfered with the contracts between Celonis and its customers for the provision of process mining software.[14]

---

[14] Plaintiffs reference specific paragraph numbers to direct the reader to helpful allegations related to each claim, for purposes of convenience. These references are not intended to be exhaustive of the relevant factual allegations for any given claim or issue, and Plaintiffs expressly rely on all factual allegations herein.

1    397.    SAP has known of these contracts.

2    398.    SAP's conduct has prevented and will prevent performance, has made and will make

3    performance more expensive or difficult, and has caused customers to terminate their contracts.

4    399.    SAP has intended to disrupt the performance of those contracts or knew that

5    disruption of performance was certain or substantially certain to occur.

6    400.    Celonis has been and will be harmed.

7    401.    SAP's conduct has been and will be a substantial factor in causing Celonis' harm.

8    **SECOND CLAIM FOR RELIEF**

9    **(Intentional Interference with Prospective Economic Relations – Against All Defendants)**

10    402.    Celonis repeats and realleges each and every allegation of this Complaint as if fully

11    set forth herein.

12    403.    As herein alleged, SAP has intentionally interfered with prospective and existing

13    economic relationships between Celonis and its past and current process mining customers, as well

14    as future customers. Celonis has received outreach and feedback from customers tying decisions to

15    leave, not renew, not expand, or not engage with Celonis to the problems created by the unlawful

16    acts described herein, including SAP's unfair and anticompetitive practices, as well as its false and

17    misleading statements. This independently wrongful conduct is detailed in Counts III-XII below,

18    with examples of specific customers and instances of interferences described and identified in, *inter*

19    *alia*, paragraphs 18, 23, 30, 35, 42, 131–32, 168, 173–75, 177–78, 182–83, 203(f), 207, 257, 267,

20    and 270–71.

21    404.    Celonis and the customers referenced in the previous paragraph have had and would

22    have had economic relationships that probably would have resulted in an economic benefit to

23    Celonis.

24    405.    Under those relationships, Celonis would have earned revenue for providing its

25    products and services to each potential client.

26    406.    SAP has known of these relationships and prospective relationships.

27    407.    SAP has engaged in wrongful conduct, including, but not limited to, its violations

28    of Sections 17200 and 17500 of the California Business and Professions code, 15 U.S.C.

§ 1125(a)(1)(B), Sections 1 and 2 of the Sherman Act, and the California Cartwright Act.

408.    SAP has intended to disrupt those relationships and prospective relationships or knew that the disruption of those relationships was certain or substantially certain to occur.

409.    SAP's independently wrongful conduct as described herein has disrupted and will disrupt those relationships.

410.    Celonis has been and will be harmed.

411.    SAP's wrongful conduct has been and will be a substantial factor in causing Celonis' harm.

### THIRD CLAIM FOR RELIEF

### (Federal False Advertising, 15 USC § 1125(a)(1)(B) – Against All Defendants)

412.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

413.    SAP has, on or in connection with its goods and/or services, used in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of SAP and/or Celonis' goods, services and/or commercial activities, in violation of the Lanham Act, 15 USC § 1125(a)(1)(B). The details of these false and misleading representations of fact, including the contents of those representations, the actual recipients thereof, and the titles and/or job responsibilities of the individuals who made the representations, are identified in, *inter alia*, paragraphs 198, 203(a)-(g), 207, 210-214.

414.    SAP's false or misleading descriptions of fact and/or false or misleading representations of fact have deceived, and are likely to continue to deceive, a substantial portion of SAP's audience, which includes Celonis' customers, including as to the compliance of Celonis' offerings with SAP policies, the need for additional licenses, the risks associated with use of Celonis' offerings, the relative equivalence of SAP's competing Signavio product, and continued characterizations of SAP as an "open ecosystem."

415.    SAP's false or misleading descriptions of fact and/or false or misleading representations of fact are by their nature and in light of their significant financial implications

material, and have and will continue to influence consumer purchasing decisions, including to dissuade consumers from purchasing or renewing Celonis' offerings.

416.    Celonis has been, and will continue to be, damaged by SAP's acts of false advertising in an amount to be determined at trial.

417.    Upon information and belief, SAP's conduct is willful, deliberate, intentional and in bad faith. At least certain of these false and misleading statements are the subject of an organized campaign by SAP designed to penetrate and convert Celonis' customers without public exposure, which campaign is detailed in, *inter alia*, paragraphs 199–205.  Others of these statements have been made to the market broadly in public-facing communications, including on SAP's Data and Analytics website as well as its online Learning platform.  These public-facing false and misleading statements are detailed in, *inter alia*, paragraphs 209–14.

418.    As a result of SAP's acts, SAP has caused, and will continue to cause, irreparable harm to Celonis and to the goodwill associated with the Celonis products, services, and trademarks, for which Celonis has no adequate remedy at law. Thus, Celonis is entitled to injunctive and other relief.

### FOURTH CLAIM FOR RELIEF

### (California False Advertising Law, Cal. Bus. and Prof. Code § 17500 *et seq*. – Against All Defendants)

419.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

420.    SAP has, on or in connection with its goods and/or services, used in commerce false or misleading descriptions of fact and/or false or misleading representations of fact, which, in commercial advertising or promotion, misrepresent the nature, characteristics or qualities of SAP and/or Celonis' goods, services, and/or commercial activities, in violation of the Cal. Bus. and Prof. Code § 17500 *et seq*. This conduct is further described and identified in the paragraphs referenced in Count III, above.

421.    Members of the public, including actual and prospective customers of Celonis, and including in California, have been, are likely to and will continue to be deceived by SAP's false

and misleading statements. Specific examples of California customers who received and were the subject of these communications, as well as SAP's California-based marketing activities, are detailed in at least paragraphs 35, 129-130, and 203(a), (b) and (f).

422.    Because of SAP's false and misleading statements of fact, members of the public, including Celonis' customers, have expressed concern regarding the continued use of Celonis' services, resulting in the actual and likely further loss of customers and market share by Celonis, including in California.

423.    Celonis has been, and will continue to be, damaged by SAP's acts of false advertising in an amount to be determined at trial.

424.    Upon information and belief, SAP's conduct is willful, deliberate, intentional, and in bad faith.

425.    As a result of SAP's acts, SAP has caused, and will continue to cause, irreparable harm to Celonis, for which Celonis has no adequate remedy at law.  Thus, Celonis is entitled to injunctive and other relief.

## FIFTH CLAIM FOR RELIEF

### (Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2 – Against All Defendants)

426.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

427.    SAP possesses monopoly power in the SAP ERP Data Access Market. SAP has the power to control prices and/or exclude competition in this relevant market and has done so with respect to its own customers through unilateral changes to its licensing regime (amounting to a unilateral price increase), constituting direct evidence of SAP's monopoly power. SAP's data licensing scheme requires customers to pay SAP for a license to access their own data, saved in the customer's implementation of SAP's software.

428.    SAP's position in the market confirms its monopoly power, serving as the gatekeeper that solely controls the legal and technical conditions upon which customers and their contracted third-party vendors can access customers' own data. SAP's dominance is protected by

high entry barriers and high switching costs that make it unlikely, at any time in the foreseeable future, for a competitor to enter and take away substantial market share from SAP. All of this indirect evidence further confirms SAP's monopoly power.

429.    SAP has willfully acquired and maintained monopoly power in the SAP ERP Data Access Market by means of predatory, exclusionary, and anticompetitive conduct. Such conduct includes, but is not limited to:

a.    changing existing policies to exclude all viable methods of data extraction, including by arbitrarily changing existing policies to exclude previously utilized data extraction methods;

b.    introducing new policies to constructively prohibit customers from using third-party providers like Celonis or prohibitively raise the price of such services;

c.    misinforming customers about Celonis' compliance with SAP's policies and the risks of using Celonis;

d.    conditioning the mandated migration and necessary support for customers' ERP applications on customers not using Celonis' process mining software, or, alternatively, on customers using Signavio's process mining software;

e.    offering Signavio at a price below the cost of providing that software to its customers;

f.    coercing customers to abandon Celonis in favor of Signavio to avoid data extraction issues;

g.    threatening the success and reliability of ERP application migration and support for customers who continue to utilize the current Celonis extractor contrary to the Clean Core Policy; and

h.    embarking on an anticompetitive AI product strategy that reinforces the anticompetitive scheme.

This conduct is further described and identified in, *inter alia*, paragraphs 1–34, 305–06, 319–73.

430.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or

market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

431.    SAP's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

432.    SAP's conduct has had a substantial effect on interstate commerce.

433.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct. For example, SAP's change in policy and false and misleading statements stand to impact approximately ▮▮▮ of Celonis' current and future business given SAP's instruction that customers start their migrations as soon as possible.

434.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

435.    Because of SAP's monopolization in violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's monopolization has caused.

## SIXTH CLAIM FOR RELIEF

### (Attempted Monopolization Under Section 2 of the Sherman Act, 15 U.S.C. § 2 – Against All Defendants)

436.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

437.    SAP has attempted to willfully acquire and maintain monopoly power in the SAP Process Mining Market by means of predatory, exclusionary, and anticompetitive conduct. As discussed above, such conduct includes, but is not limited to:

a.    changing existing policies to exclude all viable methods of data extraction, including by arbitrarily changing existing policies to exclude previously utilized data extraction

1    methods;

2    b.  introducing new policies to constructively prohibit customers from using third-party

3        providers like Celonis;

4    c.  misinforming customers about Celonis' compliance with SAP's policies and the risks

5        of using Celonis;

6    d.  conditioning migration and support of customers' ERP applications business on

7        customers not using Celonis' process mining software, or, alternatively, on customers

8        using Signavio's process mining software;

9    e.  offering Signavio at a price below the cost of providing that software to its customers;

10   f.  coercing customers to abandon Celonis in favor of Signavio to avoid data extraction

11       issues;

12   g.  threatening ERP application migration and support for customers who continue to

13       utilize the current Celonis extractor contrary to the Clean Core Policy; and

14   h.  embarking on an anticompetitive AI product strategy that reinforces the anticompetitive

15       scheme.

16       438.    SAP has engaged in this conduct with a dangerous probability of monopolizing the

17   SAP Process Mining Market. SAP already has the power to control prices and/or exclude

18   competition in this market and have done so with respect to Celonis, constituting direct evidence

19   of SAP's dangerous probability of obtaining monopoly power. Indeed, SAP has unilaterally set a

20   price increase for process mining—demanding more money from its customers for less service.

21   SAP also has excluded Celonis by (1) prohibiting all viable methods of data extraction, (2)

22   misinforming customers about costs associated with using Celonis, (3) creating policies to prevent

23   customers from using viable methods of data extraction, (4) coercing customers into a false choice

24   between using Celonis and the SAP ERP application; and (5) embarking on an exclusionary AI

25   product strategy that reinforces the anticompetitive scheme. SAP's market position confirms SAP's

26   dangerous probability of obtaining monopoly power. SAP's market position is protected by high

27   entry barriers given that SAP dictates the terms and conditions on which a third party can access

28   its ecosystem. This reality makes it unlikely, at any time in the foreseeable future, for a competitor

to enter or take away substantial market share from SAP. All of this indirect evidence further confirms SAP's dangerous probability of obtaining monopoly power. This conduct is further described and identified in, *inter alia*, paragraphs 1–34, 315-16, 319–71, 374–79.

439.    SAP has engaged in the anticompetitive conduct described herein with the specific intent of monopolizing the SAP Process Mining Market. Specific intent to monopolize means a desire to dominate a market by improper means. There is clear evidence of SAP's specific intent to obtain power through unfair and anticompetitive means, including (1) its Clean Core and "The Honeymoon is Over" initiatives that target Celonis and other third-party competition; (2) its changes to technical policies following the Signavio acquisition; (3) its attempts to coerce Celonis customers to adopt Signavio; (4) its false statements regarding Celonis; (5) its exclusionary approach to the AI product strategy; and (6) the absence of procompetitive justification for this course of conduct.

440.    There are no legitimate pro-competitive or business justifications for SAP's conduct and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

441.    SAP's acts and practices have continued to be anticompetitive in nature and tendency and constitute an unfair method of competition in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

442.    SAP's conduct has had a substantial effect on interstate commerce.

443.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct. For example, SAP's change in policy and false and misleading statements stand to impact approximately █████ of Celonis' current and future business given SAP's instruction that customers start their migrations as soon as possible.

444.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

445.    Because of SAP's attempted monopolization in violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's attempted monopolization has caused.

**SEVENTH CLAIM FOR RELIEF**

**(Illegal Tying Under Section 1 of the Sherman Act, 15 U.S.C. § 1 – Against All Defendants)**

446.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

447.    SAP's ERP Applications – including its ECC legacy and its flagship S/4HANA products—constitute the "tying product" in a distinct and well-defined product market, separate from the market for process mining software. As alleged above, SAP has market power in the ERP Applications market, and customers are locked in to the SAP ecosystem post-sale due to incredibly high switching costs, long implementation cycles, and deep operational entrenchment.

448.    SAP has unlawfully used its power in the ERP Applications market to coerce its ERP customers into adopting SAP's own process mining software, Signavio—a separate and distinct product in a separate market—as the "tied" product. SAP's coercion deprives customers of the ability to freely choose alternatives, including Celonis, even if such alternatives may be superior for those customers. In tying these products together through this coercive conduct, SAP restrains trade in the SAP Process Mining Market.

449.    SAP's tying arrangement operates through multiple coercive mechanisms: (1) it threatens its SAP ERP Applications customers regarding risk to the success and reliability of ERP application migration and availability of support for customers who continue to utilize the current Celonis extractor (*see, e.g.*, ¶¶216–17, 235–40); (2) it enforces technical and policy restrictions that render third-party data extraction either non-viable or too risky to use, despite years of prior use (*see, e.g.*, ¶¶ 347–53); (3) it ties Signavio to every software sale, offering it for free, or not offering customers an opportunity to decline it as an add-on to their package (*see, e.g.*, ¶¶ 25–28, 131–32,

152, 172–85, 259–76, 323); (4) it raises rivals' costs by imposing new punitive data transfer fees on any customers seeking to use third-party solutions like Celonis, while also threatening customers with the uncertainty of needing an exorbitantly expensive license to continue using a third-party process mining vendor going forward (*see, e.g.*, ¶¶ 185, 193–205); and (5) it conditions migration support and ongoing functionality for the ERP system on customer's abandonment of Celonis (*see, e.g.*, ¶¶206–08, 215, 232–40, 255, 339). This conduct is further described and identified in, *inter alia*, paragraphs 25–28.

450.    Even customers who would otherwise choose Celonis are coerced into not using it solely to preserve access to their ERP system and ensure successful migration—core investments that are integral to companies' operation. SAP's conduct constitutes a classic post-sale tying arrangement under *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), with real-world economic coercion and no practical ability to opt out.

451.    In the alternative, this same conduct constitutes unlawful tying of the SAP ERP Data Access (the "tying" product), where SAP acts as the gatekeeper to its ERP customers' own data, to process mining. Data access and process mining are separate products, and SAP has coercively tied access to the customer's data—through technical restrictions, license manipulation, mandatory migration, and fee schedules (*see* ¶ 449)—to use of SAP's own process mining product.

452.    In either market formulation, SAP's conduct has the effect of foreclosing competition in the SAP Process Mining Market by rendering third-party options economically or technically unviable.

453.    SAP possesses substantial economic power in the SAP ERP Data Access Market, i.e., the "tying" product market. That economic power has allowed SAP to likewise restrain competition and coerce others in the SAP Process Mining Market, i.e., the "tied" product market. That some of Celonis' customers and prospective customers already have sacrificed their relationship or potential future business with Celonis to abide by SAP's data extraction policies and secure migration and support of their ERP application as a result of SAP's conduct confirms SAP's coercive power.

454.    SAP's anticompetitive coercion has had anticompetitive effects.

455.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

456.    SAP's conduct has had a substantial effect on interstate commerce, including in the tied product market.

457.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

458.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

459.    Because of SAP's violation of Section 1 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's illegal tying has caused.

## EIGHTH CLAIM FOR RELIEF

### (Illegal Tying Under The California Cartwright Act,

### Cal. Bus. & Prof. Code § 16700 *et seq*. – Against All Defendants)

460.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

461.    SAP has engaged in unlawful tying in violation of the Cartwright Act by leveraging its dominance in the market for SAP ERP Applications to condition or coerce the use of its own process mining software, Signavio, by ERP Applications customers located in California or served by SAP through its California offices and salesforce.

462.    The relevant tying product is SAP's ERP Applications product, and the tied product

is SAP's process mining product Signavio. These are separate products with distinct technical functions and consumer demand, as described herein.

463.    SAP has substantial market power in the ERP Applications market. Most SAP ERP customers—particularly large enterprises—are effectively locked into SAP's ERP platform post-sale due to high switching costs, multi-year implementation timelines, and mission-critical dependencies.

464.    In California, SAP has used its market power to force ERP customers into using Signavio through coercive means, including but not limited to: (1) the imposition of outbound data extraction fees on California customers who opt to use an alternative, like Celonis (*see* ¶ 245); (2) the bundling of Signavio with ERP services provided to California customers, (*see* ¶ 175) while (3) raising the cost of using Celonis through licensing threats (*see* ¶ 203). This conduct is further described and identified in, *inter alia*, paragraphs 25–28 and 449.

465.    In the alternative, this same conduct constitutes unlawful tying of the SAP ERP Data Access (the "tying" product), where SAP acts as the gatekeeper to its ERP customers' own data, to process mining. Data access and process mining are separate products, and SAP has coercively tied access to the customer's data—through technical restrictions, license manipulation, mandatory migration, and fee schedules—to use of SAP's own process mining product. This conduct is further described and identified in, *inter alia*, paragraphs 25–28 and 449.

466.    In either market formulation, SAP's conduct has the effect of foreclosing competition in the SAP Process Mining Market by rendering third-party options economically or technically unviable.

467.    SAP possesses substantial economic power in the SAP ERP Data Access Market, i.e., the "tying" product market. That economic power has allowed SAP to likewise restrain competition and coerce others in the SAP Process Mining Market, i.e., the "tied" product market. That some of Celonis' customers and prospective customers already have sacrificed their relationship or potential future business with Celonis to abide by SAP's data extraction policies and secure migration and support of their ERP application as a result of SAP's conduct confirms SAP's coercive power.

468.    These acts have caused harm to competition in California by suppressing customer choice and foreclosing Celonis—a more innovative, higher-performing solution—from access to California-based ERP users who otherwise would have continued to use or selected Celonis for their process mining needs. Celonis has sustained injury in California as a result of SAP's conduct. Celonis maintains a substantial commercial presence in the state, and has suffered lost revenues, diverted customers, and reputational harm as California customers facing coercive tying conditions have canceled, declined to renew, or refused to engage Celonis in favor of Signavio's tied offering.

469.    SAP's anticompetitive coercion has had anticompetitive effects.

470.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

471.    SAP's conduct has had a substantial effect on interstate commerce, including in the tied product market.

472.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

473.    It is appropriate to bring this action under the Cartwright Act because many affected individuals and entities reside in California, SAP America maintains an office in California, and overt acts in furtherance of SAP's anticompetitive scheme occurred in California. SAP's tying conduct has been aimed at California customers and has taken place in California, including sales presentations, contract negotiations, licensing threats, and technical discussions about ERP migration.

474.    Because of SAP's violation of the Cartwright Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's illegal tying has caused.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CLAIM FOR RELIEF**

**(Illegal Bundling Under Section 2 of the Sherman Act, 15 U.S.C. § 2 – Against All Defendants)**

475.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

476.    ERP applications, data access, and process mining are separate products with distinct purposes as explained in this complaint.

477.    SAP possesses substantial economic power in the SAP ERP Data Access Market. SAP is attempting to restrain competition and coerce others in the SAP Process Mining Market.

478.    As part of that effort, SAP has bundled together its ERP application, data access products, and its SAP process mining software to offer to customers. This conduct is further described and identified in, *inter alia*, paragraphs 29–30, 131–32, 152, 172–85, 259, 270, 323.

479.    Within this bundle, SAP offers its Signavio process mining software for free. The price at which is offering the SAP process mining software—$0—is below the costs of providing that software to the customer. Signavio's initial costs on a per-customer basis are, upon information and belief, generally at a minimum in the tens of thousands of dollars range per instance. Thus, SAP is offering Signavio at a price below its costs.

480.    On information and belief, the total discount SAP offers across the bundle including the SAP process mining software exceeds the cost of providing that software to the customer, resulting in SAP selling process mining services at a price below the cost of providing those services.

481.    SAP's anticompetitive coercion has had anticompetitive effects.

482.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

483.    SAP's conduct has had a substantial effect on interstate commerce, including in the bundled product markets.

484.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

485.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

486.    Because of SAP's violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's illegal bundling has caused.

**TENTH CLAIM FOR RELIEF**

**(Predatory Pricing Under Section 2 of the Sherman Act, 15 U.S.C. § 2 – Against All Defendants)**

487.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

488.    ERP applications, data access, and process mining are separate products with distinct purposes as explained in this complaint.

489.    SAP possesses substantial economic power in the SAP ERP Data Access Market. SAP is attempting to restrain competition and coerce others in the SAP Process Mining Market.

490.    As part of that effort, SAP sells SAP process mining software to customers for free. This conduct is further described and identified in, *inter alia*, paragraphs 29–30, 181–85 and includes offerings to ███ and other customers as part of the RISE bundle.

491.    The price at which is offering the SAP process mining software—$0—is below the costs of providing that software to the customer. Signavio's initial costs on a per-customer basis are, upon information and belief, generally at a minimum in the tens of thousands of dollars range per instance. Thus, SAP is offering Signavio at a price below its costs.

492.    SAP's anticompetitive coercion has had anticompetitive effects.

493.    There are no legitimate pro-competitive or business justifications for SAP's conduct (including because such conduct is not intended to and does not enhance overall efficiency or market efficiency), and even if there were such justifications, the anticompetitive effects of that conduct would far outweigh any possible pro-competitive effects.

494.    There is a dangerous probability that SAP will recoup its losses for below-cost pricing by raising prices after it achieves monopoly power in the process-mining market, given the barriers to entry and that SAP's customers are locked in.

495.    SAP's conduct has had a substantial effect on interstate commerce, including in the SAP process mining product market.

496.    Celonis has been, and will continue to be, injured in its property as a result of SAP's conduct.

497.    Celonis has suffered, and will continue to suffer, injury of the type that the antitrust laws were intended to prevent, including but not limited to: reduced choice, stifled innovation, increased prices and costs, reduced quality, and inhibition of the free flow of competition on the merits.

498.    Because of SAP's violation of Section 2 of the Sherman Act, Celonis seeks an award of treble damages or, in the alternative, disgorgement of SAP's ill-gotten gains. Celonis also seeks appropriate equitable relief to enjoin SAP from continuing to engage in anticompetitive behavior and to remedy the harms that SAP's predatory pricing has caused.

**ELEVENTH CLAIM FOR RELIEF**

**(Promissory Estoppel – Against All Defendants)**

499.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

500.    For more than a decade, SAP has made clear and unambiguous promises to the market as well as members of SAP's Startup Focus Program, including Celonis, that SAP was "all about access," including to "big data," and that SAP's "open ecosystem" was "a "fundamental pillar of [SAP's] success and growth strategy." These promises have included at

least those detailed in, *inter alia*, paragraphs 11–12 above.

501.    In reliance on these clear and unambiguous promises, Celonis has invested in and built a substantial business over the past 14 years, including investing in developing technology and substantial customer relationships, premised on the understanding that the SAP ecosystem was and would always remain open and accessible to customer use of third-party extraction technology. Celonis has invested millions of dollars developing SAP-specific extraction technologies to this end, building a business approximately ███ of which relies upon its ability to service customers with SAP ERP systems.

502.    This reliance was not only reasonable and foreseeable; it was the intent of SAP's promises and "open ecosystem strategy" to induce third parties to build on SAP's ERP platform, including "to help accelerate adoption of SAP HANA."

503.    Celonis has been and continues to be injured by virtue of its reliance on the promises made by SAP and SAP's failure to abide by them, which failure threatens Celonis' business model which was constructed around those promises.  In addition to Celonis' investment in reliance on those promises and its having built its business and established customer relationships around them, these injuries include, without limitation, lost customer relationships and opportunities, lost profits, continued erosion of market share and injury to Celonis' goodwill and reputation with its customers, who Celonis has committed to servicing.

504.    Enforcement of SAP's promises is the only way to avoid injustice.  If SAP is permitted to break its promises, including by restricting customer use of third-party extraction technology and attempting to impose prohibitive fees for such use, all businesses who rely on SAP customers' ability to access their data using third party extractors, including Celonis, will be under threat.

### TWELFTH CLAIM FOR RELIEF

**(Unfair Competition, Cal. Bus. & Prof. Code § 17200 *et seq*. – Against All Defendants)**

505.    Celonis repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

506.    California's Unfair Competition Law ("UCL") prohibits any business act or practice

that is "unlawful," or "unfair," or "fraudulent," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

507. Celonis has standing under the UCL as it has been deprived of money and/or property sufficient to qualify as injury in fact, such economic injury being the direct result of SAP's fraudulent and unfair business practices described herein.

508. UCL § 17203 provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."

509. Celonis seeks injunctive relief under § 17203 enjoining SAP from ongoing anticompetitive and otherwise unlawful, unfair, and fraudulent business practices, including false advertising. Such conduct is an actual and imminent threat to Celonis, including, but not limited to, lost business, lost goodwill, and reputational harm. Unless SAP is restrained by a permanent injunction, Celonis will suffer severe, irreparable harm in that it will be forced either to cease providing services to its customers or to jeopardize its customers' relationship with SAP, particularly for ERP application migration and support. Celonis is informed and believes, and on that basis alleges, that unless the Court grants injunctive relief, SAP will continue to restrict customers' ability to extract their own data from the SAP ERP application for use with Celonis' process mining software.

510. SAP's common law torts, false advertising, promissory estoppel, monopolization, attempted monopolization, tying, bundling, and predatory pricing are blatantly illegal and/or anticompetitive, violating the Sherman Act, the Cartwright Act, federal law and California common law, rendering them both unlawful and unfair under the UCL. Furthermore, SAP's false and misleading representations and blatant disregard for the assurances it previously offered to regulators and thus the public constitute fraud under the UCL. Celonis has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of its business relationships, client goodwill, and ability to continue operating.

511. SAP's unlawful and unfair, and fraudulent business practices not only harm Celonis but also threaten its customers as well. SAP's wrongful conduct has had effects on numerous

California residents, including those detailed in at least paragraphs 23, 30, 35, 42, 127-132, and 182. Celonis thus brings this claim to remedy an important right affecting the public interest and seeks to confer on the public a significant benefit. Pursuant to Code of Civil Procedure Section 1021.5, Celonis seeks and should be awarded, in addition to all other remedies, prevailing party attorneys' fees.

### **Prayer for Relief**

Wherefore, Celonis prays for judgment as follows:

1.      A permanent injunction enforcing SAP's promises and prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued violations of the antitrust laws, Lanham Act or false advertising laws;

2.      A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them from limiting, impeding, restricting, prohibiting or denying the ability of SAP customers to utilize Celonis to extract their data from any SAP systems, including effectively, and including through the imposition of fees or license requirements for such access, or the establishment of policies, practices or procedures that work to effect such limitations, restrictions, impediments or prohibitions;

3.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C. § 1 via its unlawful tying.

4.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C. § 2 via its monopolization of the ERP Data Access Market.

5.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C. § 2 via its attempted monopolization of the SAP Process Mining Market.

6.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C. § 2 via its unlawful bundling.

7.      A judgment in favor of Celonis that SAP has violated the Sherman Act 15 U.S.C. § 2

via its unlawful predatory pricing.

8.      A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code § 16700, *et seq.*

9.      A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code § 17200, *et seq.*

10.     A judgment in favor of Celonis that SAP has violated Cal. Bus. Prof. Code § 17500, *et seq.*

11.     A judgment in favor of Celonis that SAP has violated 15 USC § 1125(a)(1)(B);

12.     A judgment in favor of Celonis that SAP has tortiously interfered with contractual relations under California law;

13.     A judgment in favor of Celonis that SAP has tortiously interfered with prospective economic relations under California law;

14.     A judgment in favor of Celonis that SAP is estopped from breaking its promises, including its promise of an open ecosystem under the doctrine of promissory estoppel;

15.     An order awarding all monetary gains, profits and advantages derived by SAP for the acts complained of herein;

16.     An order awarding the cost of corrective advertising, to be determined by the Court after a full hearing on the merits;

17.     An order awarding all actual damages suffered by Celonis resulting from the acts complained of herein;

18.     An order awarding treble damages, along with reasonable attorney's fees, pre-judgment interest, and post-judgment interest, for SAP's violation of the antitrust laws, Lanham Act and false advertising laws;

19.     An order awarding Celonis its costs and attorney's fees; and

20.     Any and all other legal and equitable relief as may be available under law and which the court may deem proper.

1

**<u>Jury Demand</u>**

2           Celonis hereby demands a jury trial on all claims and issues presented in this Complaint

3    so triable.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: July 21, 2025

By: */s/ Michael M. Maddigan*
Michael M. Maddigan (Bar No. 163450)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
michael.maddigan@hoganlovells.com

Jennifer Fleury (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
Anna Kurian Shaw (*pro hac vice*)
Lauren B. Cury (*pro hac vice*)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jennifer.fleury@hoganlovells.com
justin.bernick@hoganlovells.com
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com

Christopher C. Wheeler (Bar No. 224872)
Alexis J. Loeb (Bar No. 269895)
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
cwheeler@fbm.com
aloeb@fbm.com

*Attorneys for Plaintiffs Celonis SE and Celonis, Inc.*

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

106

AMENDED COMPLAINT